**No. 17-17168**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

STATE OF HAWAII; ISMAIL ELSHIKH, JOHN DOES 1 & 2, and MUSLIM ASSOCIATION OF HAWAII, INC.,

*Plaintiffs – Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,

*Defendants – Appellants*.

---

On Appeal from the United States District Court
for the District of Hawaii
(1:17-cv-00050-DKW-KSC)

---

**BRIEF FOR APPELLANTS**

---


NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Acting Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

## TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

STATEMENT OF JURISDICTION ........................................................................ 3

STATEMENT OF THE ISSUE ............................................................................ 3

STATEMENT OF THE CASE ............................................................................. 4

A. Statutory Background ....................................................................... 4

B. Executive Order No. 13,780 ................................................................ 6

C. Proclamation No. 9645 ...................................................................... 7

D. District Court Injunction ................................................................... 12

SUMMARY OF ARGUMENT ............................................................................. 15

STANDARD OF REVIEW ................................................................................. 17

ARGUMENT ................................................................................................ 17

I. Plaintiffs' INA Claims Are Not Justiciable ............................................... 19

II. Plaintiffs' INA Claims Are Not Likely To Succeed On The Merits ........................................................................................ 27

A. The Proclamation Falls Squarely Within The President's Broad Authority Under Sections 1182(f) and 1185(a) ........................ 27

1. The President Has Extremely Broad Discretion To Suspend Entry Of Aliens Abroad ....................................... 28

2. The Proclamation Is Justified By The President's National-Security And Foreign-Affairs Judgments .................. 32

3. The District Court Applied Improperly Heightened Scrutiny And Disregarded The President's Findings And Determinations ....... 35

B. The Proclamation Does Not Violate 8 U.S.C. § 1152(a)(1)(A) ....... 39

1. Section 1152(a)(1)(A) And Sections 1182(f) And 1185(a) Do Not Conflict And Operate In Different Spheres ....... 42

2. In The Event Of A Conflict, Sections 1182(f) And 1185(a)(1) Prevail Over Section 1152(a)(1)(A) ....... 48

III. The Balance Of Equities Weighs Strongly Against An Injunction ....... 50

A. The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public ....... 53

B. Plaintiffs Suffer No Irreparable Harm ....... 51

IV. The Global Injunction Is Improper ....... 52

CONCLUSION ....... 54

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

STATEMENT OF RELATED CASES

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**


*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987) ........ 23, 28

*Allende v. Shultz*,
845 F.2d 1111 (1st Cir. 1988) ........ 28, 29

*Block v. Community Nutrition Inst.*,
467 U.S. 340 (1984) ........ 25

*Camreta v. Greene*,
563 U.S. 692 (2011) ........ 7

*Dalton v. Specter*,
511 U.S. 462 (1994) ........ 30

*Department of Navy v. Egan*,
484 U.S. 518 (1988) ........ 33, 50

*Fiallo v. Bell*,
430 U.S. 787 (1977) ........ 18

*Franklin v. Massachusetts*,
505 U.S. 788 (1992) ........ 23

*Haig v. Agee*,
453 U.S. 280 (1981) ........ 29, 50

*Haitian Refugee Ctr., Inc. v. Baker*,
953 F.2d 1498 (11th Cir. 1992) ........ 28

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952) ........ 21

*Hawaii v. Trump*,
245 F. Supp. 3d 1227 (D. Haw. 2017) ........ 6
859 F.3d 741 (9th Cir) ........ *passim*

*Holder v. Humanitarian Law Project*,
561 U.S. 1 (2010) .......................................................................... 40, 50

*INS v. Chadha*,
462 U.S. 919 (1983) ..........................................................................22

*IRAP v. Trump*,
241 F. Supp. 3d 539 (D. Md. 2017) ..........................................................6
2017 WL 4674314 (D. Md. Oct. 17, 2017)..................................................34
857 F.3d 554 (4th Cir. 2017)..........................................................................7

*Kerry v. Din*,
135 S. Ct. 2128 (2015) ..........................................................................21

*Kleindienst v. Mandel*,
408 U.S. 753 (1972) ..........................................................................21

*Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469 (D.C. Cir. 1995),
*vacated on other grounds*, 519 U.S. 1 (1996) ..............................................26

*Lewis v. Casey*,
518 U.S. 343 (1996) ..........................................................................52

*Lujan v. National Wildlife Fed'n*,
497 U.S. 871 (1990) ..........................................................................26

*Madsen v. Women's Health Ctr., Inc.*,
512 U.S. 753 (1994) ..........................................................................52

*Malek-Marzban v. INS*,
653 F.2d 113 (4th Cir. 1981)..........................................................................31

*Maryland v. King*,
567 U.S. 1301 (2012) ..........................................................................51

*Mow Sun Wong v. Campbell*,
626 F.2d 739 (9th Cir. 1980)..........................................................................28

*Nademi v. INS*,
679 F.2d 811 (10th Cir. 1982)..........................................................................31

*National Ass'n of Home Builders v. Defenders of Wildlife*,
551 U.S. 644 (2007) ....................................................................................49

*Nixon v. Fitzgerald*,
457 U.S. 731 (1982) ....................................................................................51

*NLRB v. SW General, Inc.*,
137 S. Ct. 929 (2017) ..................................................................................49

*O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*,
314 F.3d 463 (10th Cir. 2002).....................................................................51

*Radzanower v. Touche Ross & Co.*,
426 U.S. 148 (1976) ....................................................................................43

*Regan v. Wald*,
468 U.S. 222 (1984) ....................................................................................34

*Reno v. American-Arab Anti-Discrimination Comm.*,
525 U.S. 471 (1999) ....................................................................................30

*Saavedra Bruno v. Albright*,
197 F.3d 1153 (D.C. Cir. 1999) ..................................................... 19, 20, 23, 26

*Sale v. Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993) ............................................................ 22, 28, 31, 49, 50

*Shell Offshore, Inc. v. Greenpeace, Inc.*,
709 F.3d 1281 (9th Cir. 2013).....................................................................17

*Steel Co. v. Citizens for a Better Env't*,
523 U.S. 823 (1998) ....................................................................................22

*Stormans, Inc. v. Selecky*,
586 F.3d 1109 (9th Cir. 2009)............................................................... 17, 52

*Texas v. United States*,
523 U.S. 296 (1998) ....................................................................................24

*Town of Chester v. Laroe Estates, Inc.*,
137 S. Ct. 1645 (2017) ................................................................................52

*Trump v. Hawaii*,
No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017) .......................................7

*Trump v. IRAP*,
137 S. Ct. 2080 (2017) .......................................................................... 7, 53
No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017) .......................................7

*United States ex rel. Knauff v. Shaughnessy*,
338 U.S. 537 (1950) ............................................................... 5, 19, 27, 50

*Washington v. Trump*,
847 F.3d 1151 (9th 2017) ...................................................................... 20, 21

*Webster v. Doe*,
486 U.S. 592 (1988) ............................................................................ 21, 30

*Yassini v. Crosland*,
618 F.2d 1356 (9th Cir. 1980) ....................................................................31

*Zivotofsky ex rel. Zivotofsky v. Clinton*,
566 U.S. 189 (2012) ....................................................................................22

*Zivotofsky ex rel. Zivotofsky v. Kerry*,
135 S. Ct. 2076 (2015) ................................................................................51

**Statutes:**

Administrative Procedure Act:
5 U.S.C. § 701(a)(1) ....................................................................................19
5 U.S.C. § 701(a)(2) ....................................................................................26
5 U.S.C. § 702(1) .........................................................................................19
5 U.S.C. § 704 ..............................................................................................23

Foreign Relations Authorization Act, Fiscal Year 1979,
Pub. L. No. 95-426, 92 Stat. 963 (1978) ......................................................49

Immigration and Nationality Act:
8 U.S.C. § 1101 *et seq.* ...................................................................................4
8 U.S.C. § 1152(a)(1) ............................................................................. 14, 16

8 U.S.C. § 1152(a)(1)(A) ........ 1, 18, 25, 42, 45
8 U.S.C. § 1181 ........ 4
8 U.S.C. § 1182(a)(7)(A)(i) ........ 4
8 U.S.C. § 1182(a)(7)(B)(iv) ........ 4
8 U.S.C. § 1182(a)(7)(B)(i)(II) ........ 4
8 U.S.C. § 1182(f) ........ *passim*
8 U.S.C. § 1185(a) ........ 14, 29, 35
8 U.S.C. § 1185(a)(1) ........ 1, 5, 10, 16, 18, 25, 27
8 U.S.C. § 1187 ........ 4
8 U.S.C. § 1187(a)(12)(A)(i)-(ii) ........ 4
8 U.S.C. § 1187(a)(12)(D)(i)-(ii) ........ 5
8 U.S.C. § 1201(a)(1) ........ 4
8 U.S.C. § 1201(g) ........ 44
8 U.S.C. § 1201(h) ........ 4, 45
8 U.S.C. § 1201(i) ........ 19
8 U.S.C. § 1202(h) ........ 4
8 U.S.C. § 1203 ........ 4
8 U.S.C. § 1204 ........ 4
8 U.S.C. § 1225(a) ........ 4

Pub. L No. 65-154, 40 Stat. 559 (1918) ........ 29

6 U.S.C. § 236(f) ........ 19

28 U.S.C. § 1292(a)(1) ........ 3

28 U.S.C. § 1331 ........ 3

**Regulation:**

22 C.F.R. § 42.62 ........ 4

**Legislative Materials:**

H. Rep. No. 89-745 (1965) ........ 45

S. Rep. No. 89-748 (1965) ........ 45

**Other Authorities:**


Jimmy Carter, *Sanctions Against Iran: Remarks Announcing U.S. Actions* (Apr. 7, 1980), http://www.presidency.ucsb.edu/ws/?pid=33233 ....46

Exec. Order No. 12,172, 44 Fed. Reg. 67,947 (1979) ....31

Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) .... 30, 31

Exec. Order No. 13,780, 82 Fed. Reg. 13,209 (2017) ....6, 8

1 Charles Gordon et al., *Immigration Law and Procedure* (2016)....44

Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986)....31, 32, 46, 47-48

Proclamation No. 5829, 53 Fed. Reg. 22,289 (1988) .... 31

Proclamation No. 5887, 53 Fed. Reg. 43,185 (1988) .... 30

Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) .... 30

Proclamation No. 8342, 74 Fed. Reg. 4093 (2009) .... 30

Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011) .... 30

Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017) .... *passim*

U.S. Dep't of Homeland Sec., *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program ....5

U.S. Dep't of State:

*Country Reports on Terrorism 2015* (June 2016), https://www.state.gov/documents/organization/258249.pdf....5

9 *Foreign Affairs Manual* (2016)....44

## INTRODUCTION

The district court enjoined worldwide a Proclamation issued by the President of the United States pursuant to his broad constitutional and statutory authority to suspend or restrict the entry of aliens abroad when he deems it in the Nation's interest. The Proclamation—"Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," 82 Fed. Reg. 45,161 (2017)—was issued after a global review by the Department of Homeland Security, in consultation with the Department of State, of foreign governments' information-sharing practices and risk factors, culminating in a recommendation by the Acting Secretary of Homeland Security that the President restrict entry of certain nationals of eight countries that have inadequate practices or otherwise present heightened risks. The Proclamation imposes country-specific restrictions that, in the President's judgment, will most effectively "encourage cooperation" in information sharing and "protect the United States until such time as improvements occur." *Id.* at 45,164.

The district court nevertheless ruled that, despite the comprehensive review process and resulting detailed findings that were not present in the temporary entry suspension that preceded this one, the Proclamation exceeds the President's authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1), and constitutes impermissible nationality-based discrimination in the issuance of immigrant visas under 8 U.S.C.

§ 1152(a)(1)(A). Those erroneous rulings threaten the ability of this and future Presidents to address national-security threats and advance foreign policy interests. The Immigration and Nationality Act (INA) does not require the President to make reticulated findings of current harm to the United States before suspending entry of aliens from a country whose practices pose risks to our Nation, and in any event the Proclamation contains extensive findings and explanations that readily satisfy any applicable requirement of findings that would apply under the standard this Court applied in its now-vacated decision in *Hawaii v. Trump*, 859 F.3d 741 (2017). Nor does the INA prohibit the President from imposing nationality-specific restrictions on entry to the United States, as past Presidents have also done.

All that said, this Court should not even reach the merits, because plaintiffs' claims are not justiciable in the first place. As a general matter, courts cannot review a challenge to the political branches' exclusion of aliens abroad absent express statutory authorization. Congress has not provided such authorization, and thus plaintiffs' statutory claims are barred.

The district court also erred in its evaluation of the remaining factors governing preliminary injunctive relief. The interests of the public and the government are significantly impaired by barring effectuation of a judgment of the President that restricting entry for certain nationals of eight countries is warranted to protect the Nation's safety. By contrast, plaintiffs have not identified any cognizable

and irreparable injury that they personally would incur if the restrictions on entry take effect while the case is being adjudicated, and any impact from the Proclamation on their relatives' or other identified individuals' receipt of a visa is speculative. The preliminary injunction should be vacated for this reason as well.

At a minimum, the global injunctive relief was vastly overbroad. Under both Article III and equitable principles, any injunction cannot properly go further than necessary to redress plaintiffs' own injuries—*i.e.*, to identified aliens whose exclusion would impose cognizable, irreparable injury on plaintiffs themselves. The district court improperly extended the injunction to reach any alien worldwide, relief that is far beyond the proper scope of any remedy.

## STATEMENT OF JURISDICTION

The district court's jurisdiction was invoked under 28 U.S.C. § 1331. ER 70. This Court has jurisdiction under 28 U.S.C. § 1292(a)(1). The district court entered a temporary restraining order on October 17, 2017, ER 44-45, which it converted to a preliminary injunction on October 20, 2017, ER 1. Defendants filed a timely notice of appeal on October 24, 2017. ER 47.

## STATEMENT OF THE ISSUE

Whether the district court abused its discretion in entering a worldwide preliminary injunction barring enforcement of Section 2 of the Proclamation.

## STATEMENT OF THE CASE

### A. Statutory Background

The Immigration and Nationality Act (INA), 8 U.S.C. § 1101 *et seq.*, governs admission of aliens into the United States. Admission normally requires a valid immigrant or nonimmigrant visa. *Id.* §§ 1181, 1182(a)(7)(A)(i), (B)(i)(II), 1203. The visa-application process generally includes an in-person interview and results in a decision by a State Department consular officer. *Id.* §§ 1201(a)(1), 1202(h), 1204; 22 C.F.R. § 42.62. Although a visa is typically necessary for admission, it does not guarantee admission; the alien still must be admissible upon arriving at a port of entry. 8 U.S.C. §§ 1201(h), 1225(a).

Congress has created a Visa Waiver Program enabling nationals of approved countries to seek temporary admission for tourism or certain business purposes without a visa. 8 U.S.C. §§ 1182(a)(7)(B)(iv), 1187. In 2015, Congress excluded from travel under that Program aliens who are dual nationals of or recent visitors to Iraq or Syria (where "[t]he Islamic State of Iraq and the Levant (ISIL) * * * maintain[s] a formidable force"), as well as countries designated by the Secretary of State as state sponsors of terrorism (currently Iran, Sudan, and Syria).[1] *Id.* § 1187(a)(12)(A)(i)-(ii). Congress authorized the Department of Homeland Security

---

[1] U.S. Dep't of State, *Country Reports on Terrorism 2015*, at 6, 299-302 (June 2016), https://www.state.gov/documents/organization/258249.pdf.

(DHS) to designate additional countries of concern, considering whether a country is a "safe haven for terrorists," "whether a foreign terrorist organization has a significant presence" in the country, and "whether the presence of an alien in the country * * * increases the likelihood that the alien is a credible threat to" U.S. national security. *Id.* § 1187(a)(12)(D)(i)-(ii). Applying those criteria, in February 2016, DHS excluded recent visitors to Libya, Somalia, and Yemen from travel under the Program.[2]

In addition, building upon the President's inherent authority to exclude aliens, *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 542 (1950), Congress has accorded the President broad discretion to suspend or restrict entry of aliens. 8 U.S.C. § 1182(f) provides:

> Whenever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate.

8 U.S.C. § 1185(a)(1) grants the President broad general authority to adopt "reasonable rules, regulations, and orders" governing entry of aliens, "subject to

---

[2] U.S. Dep't of Homeland Security *DHS Announces Further Travel Restrictions for the Visa Waiver Program* (Feb. 18, 2016), https://www.dhs.gov/news/2016/02/18/dhs-announces-further-travel-restrictions-visa-waiver-program.

such limitations and exceptions as [he] may prescribe." Pursuant to these authorities, President Reagan suspended entry of all Cuban nationals in 1986, and President Carter authorized the denial and revocation of visas for Iranian nationals in 1979. *See* pp. 31-32, 46-47, *infra*.

### B. Executive Order No. 13,780

On March 6, 2017, the President issued Executive Order No. 13,780, 82 Fed. Reg. 13,209 (2017) (EO-2). Among other things, EO-2 directed the Secretary of Homeland Security to conduct a global review of whether foreign governments provide adequate information about their nationals seeking U.S. visas, and to report findings to the President. *See* EO-2 § 2(a), (b). The Secretary of State would then encourage countries identified as inadequate to alter their practices; following that diplomatic-engagement process, the Secretary of Homeland Security would recommend whether and, if so, what entry restrictions to impose on nations that continued to have inadequate practices or to pose other risks. *See id*. § 2(d)-(f).

During that review, EO-2 temporarily suspended the entry of foreign nationals from six countries that had been identified by Congress or the Executive Branch in connection with the Visa Waiver Program as presenting heightened terrorism-related concerns. *See* EO-2 § 2(c). The district court below, and another district court, preliminarily enjoined that entry suspension, *Hawaii v. Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017); *IRAP v. Trump*, 241 F. Supp. 3d 539 (D. Md. 2017), and were

affirmed in relevant part, *Hawaii v. Trump*, 859 F.3d 741 (9th Cir. 2017) (per curiam); *IRAP v. Trump*, 857 F.3d 554 (4th Cir. 2017) (en banc).

The Supreme Court granted certiorari, and partially stayed the injunctions pending review. *Trump v. IRAP*, 137 S. Ct. 2080 (2017) (per curiam). After EO-2's temporary entry suspension and certain other provisions expired, the Supreme Court vacated both injunctions as moot. *See Trump v. IRAP*, No. 16-1436, 2017 WL 4518553 (U.S. Oct. 10, 2017); *Trump v. Hawaii*, No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017); *see also Camreta v. Greene*, 563 U.S. 692, 713 (2011) (point of vacatur upon mootness is "to prevent an unreviewable decision from spawning any legal consequences" and to "clear[] the path for future relitigation").

### C. Proclamation No. 9645

On September 24, 2017, the President signed Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017). The Proclamation is the product of the comprehensive review of vetting and screening procedures conducted pursuant to Section 2 of EO-2, and reflects the recommendation of the Acting Secretary of Homeland Security, and consultations with the Secretaries of State and Defense as well as the Attorney General.

**1.** DHS, in consultation with the Department of State and the Office of the Director of National Intelligence, conducted "a worldwide review to identify whether, and if so what, additional information will be needed from each foreign

country to adjudicate an application by a national of that country for a visa, admission, or other benefit under the INA * * * in order to determine that the individual is not a security or public-safety threat." EO-2 § 2(a). In a report submitted to the President on July 9, 2017, the Acting Secretary of Homeland developed a "baseline" for the kinds of information required, which includes three components:

> (1) identity-management information, *i.e.*, "information needed to determine whether individuals seeking benefits under the immigration laws are who they claim to be," which turns on criteria such as "whether the country issues electronic passports embedded with data to enable confirmation of identity, reports lost and stolen passports to appropriate entities, and makes available upon request identity-related information not included in its passports";
>
> (2) national-security and public-safety information about whether a person seeking entry poses a risk, which turns on criteria such as "whether the country makes available * * * known or suspected terrorist and criminal-history information upon request," "whether the country impedes the United States Government's receipt of information about passengers and crew traveling to the United States," and "whether the country provides passport and national-identity document exemplars"; and
>
> (3) a national-security and public-safety risk assessment of the country, which turns on criteria such as "whether the country is a known or potential terrorist safe haven, whether it is a participant in the Visa Waiver Program * * * that meets all of [the program's] requirements, and whether it regularly fails to receive its nationals subject to final orders of removal from the United States."

Procl. § 1(c).

DHS, in coordination with the Department of State, collected data on, and evaluated, nearly 200 countries, and identified each country's information-sharing practices and risk factors. *Id.* § 1(d). The Acting Secretary of Homeland Security

identified 16 countries as having "inadequate" information-sharing practices and risk factors, and another 31 countries as "at risk" of becoming "inadequate." *Id.* § 1(e).

These preliminary results were submitted to the President on July 9, 2017. *Id.* § 1(c). The Department of State then conducted a 50-day engagement period with foreign governments to encourage them to improve their performance, which yielded significant gains. *Id.* § 1(f).

**2.** On September 15, 2017, the Acting Secretary of Homeland Security recommended that the President impose entry restrictions on certain nationals from seven countries that were determined to continue to be inadequate in their information-sharing practices or to present other risk factors: Chad, Iran, Libya, North Korea, Syria, Venezuela, and Yemen. *Id.* § 1(h). The Acting Secretary also recommended entry restrictions for nationals of Somalia, which, although it was determined to satisfy baseline requirements for information-sharing, has significant identity-management deficiencies and is unable to effectively control all of its territory. *Id.* § 1(i).

**3.** The President evaluated the Acting Secretary's recommendation in consultation with multiple Cabinet members and other high-level government officials. *Id.* § 1(h)(i), (ii). The President considered a number of factors, including each country's "capacity, ability, and willingness to cooperate with our identity-

management and information-sharing policies and each country's risk factors," as well as "foreign policy, national security, and counterterrorism goals." *Id.* § 1(h)(i).

Acting in accordance with the Acting Secretary's recommendation, the President exercised his constitutional authority and his statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1) to impose tailored entry restrictions on certain nationals from eight countries. The restrictions were intended "to encourage cooperation given each country's distinct circumstances, and * * * , at the same time, protect the United States until such time as improvements occur." Procl. § 1(h)(i). The President determined that these entry restrictions are "necessary to prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States," and "to elicit improved identity-management and information-sharing protocols and practices from foreign governments." *Ibid.*

For countries that refuse to cooperate regularly with the United States (Iran, North Korea, and Syria), the Proclamation suspends entry of all nationals, except for Iranian nationals seeking nonimmigrant student (F and M) and exchange-visitor (J) visas. Procl. § 2(b)(ii), (d)(ii), (e)(ii). For countries that are valuable counter-terrorism partners but have information-sharing deficiencies (Chad, Libya, and Yemen), the Proclamation suspends entry only of nationals seeking immigrant visas and nonimmigrant business, tourist, and business/tourist (B-1, B-2, B-1/B-2) visas.

*Id.* § 2(a)(ii), (c)(ii), (g)(ii). For Somalia, which has significant identity-management deficiencies and is unable to effectively control all of its territory, the Proclamation suspends entry of nationals seeking immigrant visas and requires additional scrutiny of nationals seeking nonimmigrant visas. *Id.* § 2(h)(ii). And for Venezuela, which refuses to cooperate in information-sharing but for which alternative means of obtaining identity information are available, the Proclamation suspends entry of government officials "involved in screening and vetting procedures" and "their immediate family members" on nonimmigrant business or tourist visas. *Id.* § 2(f)(ii).

The Proclamation provides for case-by-case waivers where a foreign national demonstrates that denying entry would cause undue hardship, entry would not pose a threat to the national security or public safety, and entry would be in the national interest. *Id.* § 3(c)(i)(A)-(C). The Proclamation requires an ongoing review of the Proclamation's restrictions, taking into account whether countries have improved their identity-management and information-sharing protocols, and periodic reporting to the President about whether entry restrictions should be continued, modified, terminated, or supplemented. *Id.* § 4.

The Proclamation took effect immediately for all foreign nationals who were subject to entry restrictions under Section 2(a) of EO-2 pursuant to the Supreme Court's partial stay of the injunctions barring enforcement of that provision, and was

to take effect on October 18, 2017, for all other persons subject to the Proclamation. *Id.* § 7.

### D. District Court Injunction

**1.** Plaintiffs in this action challenge the Proclamation under the INA, various other statutes, and the Establishment Clause and the Equal Protection Clause. The three individual plaintiffs are U.S. citizens or lawful permanent residents (LPRs) who have relatives from Syria, Yemen, and Iran seeking immigrant or nonimmigrant visas. ER 74-75. The Muslim Association of Hawaii is a non-profit organization that operates mosques in Hawaii. ER 75-76. The State of Hawaii is also a plaintiff. ER 70-74.

Plaintiffs moved for a temporary restraining order on October 10, 2017, six days before filing the operative complaint challenging the Proclamation. ER 379-80.

**2.** After highly expedited briefing (and without any argument), the district court granted a worldwide temporary restraining order barring enforcement of Section 2 of the Proclamation "in all places, including the United States, at all United States borders and ports of entry, and in the issuance of visas," except as to nationals of Venezuela and North Korea. ER 44-45.

The district court held that the principle of nonreviewability of the political branches' exclusion of aliens was limited to decisions concerning individual aliens

and thus did not prevent it from reviewing plaintiffs' statutory claims. ER 29-30. The court held that this Court's now-vacated prior decision in *Hawaii* regarding EO-2 empowered it "to review statutory and constitutional 'challenges to the substance and implementation of immigration policy.'" ER 29-30.

The district court held that the State of Hawaii has standing to challenge the Proclamation's entry restrictions based on asserted proprietary injuries to the State's University system in its recruitment and retention of faculty and students. ER 17-19. Individual plaintiffs have standing, the court held, because the Proclamation prolongs their separation from family members who are nationals of the designated countries who have pending or approved visas, and because the Proclamation results in various alleged stigmatizing injuries. ER 20-23. The court further held that the Muslim Association of Hawaii has standing because it will be harmed by a decrease in current and future members, and also because its members are U.S. citizens or LPRs who are threatened with delay in reuniting with alien relatives from the designated countries. ER 24. And the district court found that all plaintiffs are in the zone of interests protected by the INA. ER 27.

The district court also held that plaintiffs' claims are ripe, pointing to the alleged denial of a visa to a Syrian journalist in reasoning that plaintiffs allege "injuries that have already occurred and that will continue to occur" based on implementation of the Proclamation's entry restrictions. ER 28 & n.13.

**3.** The district court held that plaintiffs are likely to succeed on the merits as to their claims under the INA, and declined to reach plaintiffs' Establishment Clause and other claims. ER 31.

The district court held that the Proclamation exceeds the President's statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a). Those provisions, the district court reasoned, require the President to make a finding that the entry of aliens is detrimental to the interest of the United States. ER 32-33. Although the President made such a finding in the Proclamation itself, and also provided a factual explanation in the Proclamation of the underlying basis for the finding, the district court concluded that the specific entry restrictions imposed by the Proclamation were "a poor fit for the issues regarding the sharing of 'public-safety and terrorism-related information' that the President identifies." ER 34.

The court further held that the Proclamation violates the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas, 8 U.S.C. § 1152(a)(1), by "indefinitely and categorically suspending immigration from [] six countries." ER 40.

**4.** The court found that plaintiffs would suffer irreparable harm absent an injunction, reasoning that the entry restrictions would delay visits from relatives, constrain the State's efforts to recruit and retain foreign students and faculty, and reduce membership in the Muslim Association. ER 42. Although the district court

acknowledged that the Proclamation's concern with "[n]ational security and the protection of our borders" is "unquestionably * * * of significant public interest," the court nonetheless concluded that the balancing of harms "tip[s] in Plaintiff's favor." ER 43.

**5.** The district court subsequently converted its temporary restraining order into a preliminary injunction, after the federal defendants court notified the district court about the potential for vacatur of this Court's *Hawaii* opinion and suggested that the court convert the temporary restraining order into a preliminary injunction only if vacatur of *Hawaii* would not change the court's decision. ER 1-2.

## SUMMARY OF ARGUMENT

**I.** The district court erred in holding that plaintiffs' claims are justiciable. It is a fundamental separation-of-powers principle that the political branches' decisions to exclude aliens abroad generally are not judicially reviewable absent express authorization by law. That principle bars review of plaintiffs' claims under the INA, which in any event are not cognizable under the Administrative Procedure Act (APA) and Article III ripeness requirements. Although the Supreme Court has allowed limited judicial review when a U.S. citizen claims that the exclusion of an alien abroad infringes the plaintiff's own constitutional rights, the district court did not consider any constitutional claims and the fact that plaintiffs may plead

constitutional claims does not permit a court to consider statutory challenges to the exclusion of aliens abroad in violation of the principle of nonreviewability.

**II.** The district court also erred in holding that plaintiffs are likely to succeed on the merits of their INA claims.

The entry restrictions imposed by the Proclamation fall well within the President's broad, discretionary authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1). The Proclamation contains ample findings that the identified countries have inadequate information-sharing practices or other risk factors, and that the entry restrictions encourage those countries to improve and protect this country from those risks unless and until they do so. Past Presidents have similarly invoked this statutory authority to impose nationality-based suspensions on the entry of nationals from countries that pose national-security and foreign-policy concerns.

Imposing nationality-based entry suspensions does not contravene 8 U.S.C. § 1152(a)(1)'s prohibition on nationality-based discrimination in the issuance of an immigrant visa. Section 1152(a)(1) applies to immigrants who are otherwise eligible for a visa, but does not abrogate the President's authority under Sections 1182(f) and 1185(a) to limit eligibility in the first place. The statutory provisions can, and should, be harmonized.

**III.** Finally, the district court erred in concluding that the balancing of harms supports its injunction. The injunction causes irreparable harm by overriding

the President's national-security judgment. Plaintiffs have not identified any cognizable and irreparable injury that they personally would incur, and any effect on the receipt of visas by their relatives or other identified individuals is speculative. In any event, the injunction was vastly overbroad under Article III and equitable principles, because it extended beyond plaintiffs' own alleged injuries to reach any alien worldwide who is subject to the Proclamation's entry restrictions.

## STANDARD OF REVIEW

A plaintiff seeking a preliminary injunction must show that "he is likely to succeed on the merits," that "he is likely to suffer irreparable harm," and that "the balance of equities" and "public interest" favor an injunction. *Shell Offshore, Inc. v. Greenpeace, Inc.*, 709 F.3d 1281, 1289 (9th Cir. 2013). This Court generally reviews the grant of a preliminary injunction for "abuse of discretion," but it reviews the district court's "interpretation of the underlying legal principles" de novo. *Id.* at 1286, 1290. In addition, "because [i]njunctive relief * * * must be tailored to remedy the specific harm alleged, * * * [a]n overbroad injunction is an abuse of discretion." *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1119 (9th Cir. 2009) (internal quotation marks omitted).

## ARGUMENT

The injunction under review rests solely on statutory grounds. The district court held that the President exceeded his authority under the INA to restrict the

entry of aliens, and that the Proclamation violates the INA's prohibition on nationality-based discrimination in the issuance of immigrant visas. The district court should not have even reached the merits of these statutory claims, which are barred by the bedrock principle that the political branches' exclusion of aliens abroad is subject only to such judicial review under the INA as Congress has expressly provided. In any event, the district court fundamentally misapplied the INA. The Proclamation falls well within two statutory grants of power to the President: he may "suspend the entry of all aliens or of any class of aliens" when he finds doing so is in the national interest, 8 U.S.C. § 1182(f), and he may prescribe "reasonable rules, regulations, and orders," and "limitations and exceptions," regarding entry of aliens, *id.* § 1185(a)(1). Nor does the Proclamation, which renders the aliens affected ineligible to receive a visa in the first place, violate the prohibition on nationality discrimination in the issuance of immigrant visas in 8 U.S.C. § 1152(a)(1)(A) to aliens who are otherwise found to be eligible.

## I. Plaintiffs' INA Claims Are Not Justiciable

**A.** The Supreme Court "ha[s] long recognized the power to expel or exclude aliens as a fundamental sovereign attribute exercised by the Government's political departments largely immune from judicial control." *Fiallo v. Bell*, 430 U.S. 787, 792 (1977). "[I]t is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the

Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950).

Courts have distilled from this deeply rooted principle of nonreviewability the rule that the denial or revocation of a visa for an alien abroad "is not subject to judicial review * * * unless Congress says otherwise." *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999). Congress has not provided for judicial review of decisions to exclude aliens abroad, *e.g.*, 6 U.S.C. § 236(f), and has forbidden "judicial review" of visa revocations (subject to a narrow exception inapplicable to aliens abroad), 8 U.S.C. § 1201(i). Accordingly, the longstanding bar on judicial review of the political branches' exclusion of aliens abroad forecloses plaintiffs' statutory challenges to the Proclamation.

Moreover, history "unmistakabl[y] confirms that "the immigration laws 'preclude judicial review' of * * * consular visa decisions." *Saavedra Bruno*, 197 F.3d at 1160. The lone time the Supreme Court held that certain aliens (only those physically present in the United States) could seek review of exclusion orders under the APA, Congress abrogated that ruling and limited those aliens to the habeas remedy (which is not available to aliens abroad). *See id.* at 1157-62. Because even an alien present in the United States cannot invoke the APA to obtain review, *a fortiori* neither can aliens abroad nor U.S. citizens acting at their behest. *See* 5 U.S.C. §§ 701(a)(1), 702(1).

**B.** The district court, relying on this Court's decision in *Washington v. Trump*, 847 F.3d 1151 (9th Cir. 2017), and the now-vacated decision in *Hawaii v. Trump*, concluded that it had authority "to review statutory and constitutional challenges to the substance and implementation of immigration policy." ER 30. In *Hawaii*, the Court distinguished between a challenge to "an individual consular officer's decision to grant or to deny a visa pursuant to valid regulations," which the Court assumed was barred, and "constitutional and statutory challenges to the substance and implementation of immigration policy," which the Court held were not. *Hawaii*, 859 F.3d at 768; *see also Washington*, 847 F.3d at 1163 (holding reviewable a constitutional challenge to a presidential policy).

That distinction, however, is fundamentally flawed. Although the nonreviewability principle is applied most frequently to decisions by consular officers adjudicating visa applications, it would invert the constitutional structure to limit review in that context while permitting review of a statutory challenge to the President's decision to restrict entry of classes of aliens. A consular officer is a subordinate Executive-Branch official under the constitutional hierarchy. Consular nonreviewability is grounded in the "firmly-established principle" that the power to exclude aliens is "inherent in sovereignty, necessary for maintaining normal international relations and defending the country," and "to be exercised exclusively by the political branches of government." *Saavedra Bruno*, 197 F.3d at 1158-59.

Those considerations apply even more strongly to broader national-security judgments of the President than to individualized decisions by a consular official. *See Harisiades v. Shaughnessy*, 342 U.S. 580, 584-91 (1952) (relying on these considerations in rejecting broad challenges to immigration statute).

Moreover, the district court particularly erred in relying on *Washington* and its holding that the *constitutional* claims there were reviewable. Although Congress has not expressly authorized judicial review of Executive decisions to exclude aliens abroad, it has not "clear[ly]" "preclude[d] judicial review" for persons asserting violations of their own constitutional rights. *Webster v. Doe*, 486 U.S. 592, 603 (1988). The Supreme Court has twice engaged in limited judicial review when a U.S. citizen contended that the denial of a visa to an alien abroad violated the citizen's *own* constitutional rights. *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972) (reviewing but rejecting claim that the denial of a waiver of visa-ineligibility to a Belgian national violated U.S. citizens' own First Amendment right to receive information); *Kerry v. Din*, 135 S. Ct. 2128 (2015) (reviewing but rejecting claim by a U.S. citizen that the refusal of a visa to her husband violated her own alleged due-process right to reunite with her spouse).

In *Washington*, this Court ruled based solely on due-process claims that the State raised on behalf of certain aliens with connections to this country. 847 F.3d at 1160, 1164-67. Regardless of whether the constitutional claims in *Washington* were

properly subject to limited judicial review under *Mandel* and *Din*, all of those cases are inapposite here, because the district court did not reach the merits of plaintiffs' Establishment Clause or Equal Protection claims. Instead, the only claims the district court addressed on the merits were plaintiffs' INA claims, which were the only claims on which the district court held plaintiffs were likely to succeed.

In holding that even statutory challenges to the exclusion of aliens abroad are reviewable, this Court's since-vacated decision in *Hawaii* cited *Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 187-88 (1993). *Hawaii*, 859 F.3d at 768. But the Supreme Court in *Sale* did not question the President's national security judgment under 8 U.S.C. § 1182(f), and it did not address whether plaintiffs' claims that they had personal rights under a treaty and statute were reviewable because the Court rejected those claims on the merits regardless. *Sale*, 509 U.S. at 170-88; *cf. Steel Co. v. Citizens for a Better Env't*, 523 U.S. 83, 91 (1998) ("drive-by jurisdictional rulings * * * have no precedential effect"). The *Hawaii* decision also cited cases involving constitutional challenges to other aspects of immigration laws, such as *INS v. Chadha*, 462 U.S. 919, 940-41 (1983), and *Zivotofsky ex rel. Zivotofsky v. Clinton*, 566 U.S. 189, 196 (2012), but none involved a challenge to the exclusion of aliens abroad by the political branches. The government does not contend that every aspect of the immigration laws is outside the scope of permissible judicial review. But, as discussed, the rule for challenges under the INA to the

exclusion of aliens abroad is clear: such claims are not cognizable unless Congress chooses to expressly so provide.

Finally, the *Hawaii* decision also cited *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), *aff'd by an equally divided court*, 484 U.S. 1 (1987). *Hawaii*, 859 F.3d at 768. But as the D.C. Circuit recognized in *Saavedra Bruno*, *Abourezk* "rested in large measure" on an INA provision that was subsequently amended to "make[] clear that district courts do not have general jurisdiction over claims arising under the immigration laws." 197 F.3d at 1164. *Abourezk* thus does not support this Court's exercise of review.

**C.** Even if the general rule of nonreviewability did not foreclose judicial review of plaintiffs' statutory claims, review would still be unavailable for three additional reasons.

*First*, the APA provides for judicial review only of "final agency action." 5 U.S.C. § 704. The President's Proclamation is not "agency action" at all, *Franklin v. Massachusetts*, 505 U.S. 788, 800-01 (1992), and there also has been no "final" agency decision denying a visa based on the Proclamation to any of the aliens abroad identified by plaintiffs. Even in *Mandel* and *Din*, the Court did not consider constitutional claims of U.S. plaintiffs challenging the exclusion of aliens abroad until after the aliens had been denied visas, and, in *Mandel*, had been denied a waiver.

Indeed, for this reason, plaintiffs' statutory claims do not satisfy Article III and equitable ripeness requirements. If any alien in whose entry a U.S. plaintiff has a cognizable interest is found otherwise eligible for a visa and denied a waiver, then that plaintiff can bring suit at that time and the Court can consider the challenge in a concrete dispute (if the plaintiff's claim is otherwise justiciable). *See Texas v. United States*, 523 U.S. 296, 300 (1998) ("A claim is not ripe for adjudication if it rests upon 'contingent future events that may not occur as anticipated, or indeed may not occur at all.'").

The district court relied on this Court's prior ruling in *Hawaii* to conclude that plaintiffs' claims are currently ripe for review. ER 28 (citing *Hawaii*, 859 F.3d at 767-68). Respectfully, however, this Court's suggestion that plaintiffs' claims were ripe even though individual aliens had not sought and been denied a waiver of the suspension of entry was erroneous. It is not at all clear that the process of seeking a waiver would cause any meaningful delay of the definitive resolution of an application for a visa. Visa times vary widely, and it is not unusual for an alien to wait months or years from the time he applies for an immigrant visa before receiving one. Unless and until a given alien applies for a visa, is otherwise eligible, and is denied a waiver from the entry restrictions under the Proclamation, there is no final agency action that could even be subject to challenge, and plaintiffs have not been concretely and adversely affected by that alien's coverage under the Proclamation.

The district court also asserted that the "premise is not true" that no alien has yet sought and been denied a visa pursuant to the Proclamation's entry restrictions, citing a declaration that purportedly describes the "denial of [a] visa to [a] Syrian journalist and cancellation of [a] University lecture since [the] signing of" the Proclamation. ER 18, 28 n.13. That declaration, however, fails to support the district court's factual assumption. The Proclamation was not issued until September 24, 2017, and the declaration does not specify when in September the journalist's visa was denied. ER 242-44. Furthermore, the Proclamation's entry restrictions were not scheduled to become effective until October 18, 2017, for Syrians (among others) with a credible claim of a bona fide relationship with a U.S. entity. Procl. § 7(a)(ii), (b). It thus is entirely unclear whether the visa application was denied pursuant to the entry restrictions in the Proclamation.

*Second*, plaintiffs lack a statutory right to enforce. Nothing in the INA gives plaintiffs a direct right to judicial review, and the APA's "general cause of action" exists only for "persons 'adversely affected or aggrieved by agency action within the meaning of a relevant statute,'" *Block v. Community Nutrition Inst.*, 467 U.S. 340, 345 (1984). The statutory provisions empowering the President to restrict entry of aliens, 8 U.S.C. §§ 1182(f), 1185(a)(1), and prohibiting nationality-based discrimination in the issuance of immigrant visas, *id.* § 1152(a)(1)(A), do not confer

any legally cognizable rights on third parties like plaintiffs here—*i.e.*, U.S. persons or entities seeking entry of aliens abroad.

In reaching the contrary conclusion, the district court, like the *Hawaii* decision, cited *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469, 471-72 (D.C. Cir. 1995) (*LAVAS*), *vacated on other grounds*, 519 U.S. 1 (1996). ER 26. But as the D.C. Circuit has since held, even when the INA permits a U.S. person to file a petition for a foreign family member's classification as a relative for immigrant status, any arguably cognizable interest the U.S. person has "terminate[s]" "[w]hen [his] petition [i]s granted," *Saavedra Bruno*, 197 F.3d at 1164, and the alien abroad must establish his own eligibility for admission through his own visa application and adjudication by a consular officer abroad. Nothing in the INA or implementing regulations gives a relative in the United States a right to participate in that process or to seek judicial review of a denial of the visa—just like a relative of an alien who is in removal proceedings in the United States has no right to participate in those proceedings or to seek judicial review of a final order of removal entered against the alien. *A fortiori*, the INA does not protect any interest of membership organizations or state universities that merely seek to benefit from an alien's entry. *Lujan v. National Wildlife Fed'n*, 497 U.S. 871, 883 (1990).

*Third*, the APA does not apply to the extent "agency action is committed to agency discretion by law." 5 U.S.C. § 701(a)(2). Here, the relevant statutes give

the President unreviewable discretion to impose restrictions on entry. *See* pp.28-30, *infra*. For these reasons as well, the district court erred in holding that plaintiffs' claims under the INA are justiciable.

## II. Plaintiffs' INA Claims Are Not Likely To Succeed On The Merits

Even if plaintiffs' statutory challenges were justiciable, they would fail on the merits. The Proclamation is a valid exercise of the President's authority under the INA to suspend the entry of aliens, and it does not violate the INA's prohibition on nationality-based discrimination in issuing immigrant visas.

### A. The Proclamation Falls Squarely Within The President's Broad Authority Under Sections 1182(f) and 1185(a)

The Proclamation was issued pursuant to the President's inherent Article II authority to exclude aliens, *see Knauff*, 338 U.S. at 543, and his broad statutory authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1). The text of those statutes confirms the expansive discretion afforded to the President, and historical practice likewise confirms that the President need not offer detailed justifications for entry suspensions. Although the Government respectfully disagrees with this Court's now-vacated reasoning in *Hawaii* that a Presidential finding that entry of excluded classes of aliens would be detrimental to the interests of the United States is judicially reviewable under Section 1182(f) and required at all under Section 1185(a)(1), the detailed findings in the Proclamation readily satisfy the standard adopted by the Court. The district court reached a contrary conclusion only by

applying a form of heightened scrutiny that finds no support in either the text of the statutes or the *Hawaii* decision.

### 1. The President Has Extremely Broad Discretion To Suspend Entry Of Aliens Abroad

**a.** Section 1182(f) provides that "[w]henever the President finds that the entry of any aliens or of any class of aliens into the United States would be detrimental to the interests of the United States, he may by proclamation, and for such period as he shall deem necessary, suspend the entry of all aliens or any class of aliens as immigrants or nonimmigrants, or impose on the entry of aliens any restrictions he may deem to be appropriate." Section 1182(f) provides the President "sweeping" discretionary power to suspend the entry of aliens. *Abourezk*, 785 F.2d at 1049 n.2; *see, e.g., Mow Sun Wong v. Campbell*, 626 F.2d 739, 744 n.9 (9th Cir. 1980); *Allende v. Shultz*, 845 F.2d 1111, 1118-19 (1st Cir. 1988); *Haitian Refugee Ctr., Inc. v. Baker*, 953 F.2d 1498, 1507 (11th Cir. 1992). The Supreme Court has deemed it "perfectly clear that [Section] 1182(f) * * * grants the President ample power to establish a naval blockade that would simply deny illegal Haitian migrants the ability to disembark on our shores." *Sale*, 509 U.S. at 187.

By its terms, Section 1182(f) grants the President broad authority and confirms his discretion at every turn. It reserves to the President the decisions (1) whether, when, and on what basis to suspend entry ("[w]henever [he] finds that the entry" of aliens "would be detrimental" to the national interest); (2) whose entry

to suspend ("all aliens or any class of aliens," whether as "immigrants or nonimmigrants"); (3) for how long ("for such period as he shall deem necessary"); (4) and on what terms ("he may * * * impose on the entry of aliens any restrictions he may deem to be appropriate"). *Ibid.*

Section 1185(a) also broadly authorizes the President to prescribe "reasonable rules, regulations, and orders," as well as "limitations and exceptions," governing the entry of aliens. This statutory text likewise confirms the breadth of the President's authority, without requiring any predicate finding whatsoever. *See Allende*, 845 F.2d at 1118 & n.13; *see also Haig v. Agee*, 453 U.S. 280, 297 (1981) (construing similar language in § 1185(b) as "le[aving] the power to make exceptions exclusively in the hands of the Executive"). Section 1185(a) is the latest in a line of statutory grants of authority tracing back nearly a century. *See* Pub. L. No. 65-154, § 1(a), 40 Stat. 559 (1918). That authority was previously limited to times of war or declared national emergency, but Congress removed that limitation in 1978. Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992-93 (1978). Thus, beyond the President's power to suspend entry of particular classes of aliens when in the national interest, Congress accorded him additional authority to establish rules, limitations, and exceptions governing entry and departure of aliens more broadly.

The plain terms of Sections 1182(f) and 1185(a)(1) provide no basis for judicial second-guessing of the President's determination about what restrictions to

"prescribe" or what restrictions are necessary to avoid "detriment[] to the interests of the United States." In these circumstances, where Congress has traditionally and expressly committed these matters to the President's judgment and discretion, there are no meaningful standards for review. *See Doe*, 486 U.S. at 600-01; *Dalton v. Specter*, 511 U.S. 462, 474-76 (1994). As the Supreme Court recognized in *Reno v. American-Arab Anti-Discrimination Committee,* 525 U.S. 471, 491 (1999) (*AAADC*), courts are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's reasons for excluding particular foreign nationals. At a minimum, to the extent Section 1182(f) envisions any "find[ings]," the fact that it provides for the President to act by "proclamation" makes clear that they need not be extensive and should not be subject to searching review.

**b.** Historical practice confirms the breadth of, and deference owed to, the President's exercise of authority under Sections 1182(f) and 1185(a)(1). For decades, Presidents have invoked that authority to suspend or restrict entry of classes of aliens, including in some instances based on nationality.[3] Presidents have

---

[3] *E.g.*, Proclamation No. 8693, 76 Fed. Reg. 44,751 (2011) (Obama; aliens subject to U.N. Security Council travel bans); Proclamation No. 8342, 74 Fed. Reg. 4093 (2009) (George W. Bush; government officials who impeded antihuman-trafficking efforts); Proclamation No. 6958, 61 Fed. Reg. 60,007 (1996) (Clinton; Sudanese government officials and armed forces); Exec. Order No. 12,807, 57 Fed. Reg. 23,133 (1992) (George H.W. Bush; undocumented aliens traveling by sea, upheld in *Sale*, pp. 31, *supra*); Proclamation No. 5887, 53 Fed. Reg. 43,185 (1988) (Reagan;

restricted entry pursuant to those statutes without detailed public justifications or findings; some have discussed the President's rationale in one or two sentences that broadly declare the Nation's interests. For instance, the only justification provided for the Presidential action at issue in *Sale* was that "[t]here continues to be a serious problem of persons attempting to come to the United States by sea without necessary documentation and otherwise illegally." Executive Order No. 12,807, pmbl. pt. 4, 57 Fed. Reg. 23,133 (1992). Yet the Supreme Court expressed no concerns about the adequacy of that finding, ruling that "[w]hether the President's chosen method" made sense from a policy perspective was "irrelevant to the scope of his authority" under Section 1182(f). *Sale*, 509 U.S. at 187-88.

Similarly, in 1979, when President Carter invoked Section 1185(a)(1) in response to the Iranian hostage crisis, he made no express findings and delegated to lower Executive Branch officials the authority to deny and revoke visas for Iranian nationals. *See* Exec. Order No. 12,172, § 1-101, 44 Fed. Reg. 67,947 (1979). Courts, including this one, had no trouble upholding those restrictions. *E.g.*, *Yassini v. Crosland*, 618 F.2d 1356, 1362 (9th Cir. 1980); *Malek-Marzban v. INS*, 653 F.2d 113, 116 (4th Cir. 1981); *Nademi v. INS*, 679 F.2d 811, 813-14 (10th Cir. 1982).

---

Nicaraguan government officers and employees); Proclamation No. 5829, 53 Fed. Reg. 22,289 (1988) (Reagan; certain Panamanian nationals); Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986) (Reagan; Cuban nationals as immigrants).

And when President Reagan suspended the entry of Cuban nationals as immigrants in 1986 pursuant to 8 U.S.C. § 1182(f), he offered only a single sentence explaining the basis for his action. *See* Proclamation No. 5517, 51 Fed. Reg. 30,470 (1986).

### 2. The Proclamation Is Justified By The President's National-Security And Foreign-Affairs Judgments

Here, the Presidential findings and explanation set forth in the Proclamation amply support the exercise of his authority to impose entry restrictions under Sections 1182(f) and 1185(a). The President imposed the entry restrictions after reviewing the recommendations of the Acting Secretary of Homeland Security, following a worldwide review that evaluated every country according to prescribed criteria. The Acting Secretary recommended entry restrictions on eight countries, each of which was identified as "inadequate" in its information-sharing practices or as presenting other special circumstances. *See* Procl. § 1(c)-(g), (i). The entry restrictions for each country are tailored to the country's particular circumstances and conditions. *See id.* §§ 1(h)(i), 2(a)-(h).

The President found that the "entry into the United States of persons described in Section 2 of [the] proclamation would be detrimental to the interests of the United States, and that their entry should be subject to certain restrictions, limitations, and exceptions." *Id.* pmbl. As the President explained, the entry restrictions serve two purposes. First, they "prevent the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose

to the United States." Procl. § 1(h)(i); *id.* § 1(a), (b) (discussing the importance of foreign governments' information-sharing to vetting process). Plaintiffs have offered no basis to second-guess this national-security judgment. *Cf. Department of Navy v. Egan*, 484 U.S. 518, 530 (1988). Second, the entry restrictions are "needed to elicit improved identity-management and information-sharing protocols and practices from foreign governments" whose nationals are subject to the restrictions. Procl. § 1(h)(i). The diplomatic-engagement period described in the Proclamation yielded significant improvements in foreign governments' information sharing. *Id.* § 1(e)-(g). Encouraging further changes in the behavior of foreign governments through entry restrictions is an accepted foreign-policy measure, as illustrated by President Carter's Iranian order and President Reagan's Cuban order. *See* pp. 31-32, *supra*.

Furthermore, both of these purposes are furthered by nationality-based entry restrictions. Foreign governments "manage the identity and travel documents of their nationals" and "control the circumstances under which they provide information about their nationals to other governments." *Id.* § 1(b). Because the Proclamation's entry restrictions seek both to protect against deficient information-sharing practices by certain foreign countries and to encourage improvement in those practices, it is eminently sensible to impose those restrictions on nationals of those countries traveling on those countries' passports (and, conversely, not to impose

them on dual nationals of a covered country who are traveling on a non-covered country's passport, *id.* § 3(b)(iv)).

Even if some type of judicial review were available of the President's determination under 8 U.S.C. § 1182(f) that the entry of a class of aliens would be "detrimental to the interests of the United States," the President at most need only justify entry restrictions on aliens by articulating a rational connection between the entry restrictions imposed and the national interest. The Presidential findings in the Proclamation plainly satisfy that standard, as the district court in *IRAP* correctly held. *IRAP v. Trump*, 2017 WL 4674314, at *23 (D. Md. Oct. 17, 2017). In rejecting a challenge that the Proclamation was outside the scope of the President's authority under 8 U.S.C. § 1182(f), the *IRAP* court noted that "there is no requirement that a § 1182(f) entry restriction meet more stringent standards found elsewhere in the law," and that, under § 1182(f)'s "broad standard," prior President proclamations "have provided far less detail regarding their findings." 2017 WL 4674314, at *23 In contrast, the district court's approach here, which demanded detailed justifications and highly tailored terms, would deeply enmesh courts in second-guessing the President's conduct of foreign affairs, despite the well-established principle that such matters are "largely immune from judicial inquiry or interference." *Regan v. Wald*, 468 U.S. 222, 242 (1984).

### 3. The District Court Applied Improperly Heightened Scrutiny And Disregarded The President's Findings And Determinations

The government respectfully disagrees with this Court's ruling in *Hawaii* that the President must set forth detailed findings to support his determination under 8 U.S.C. §§ 1182(f) and 1185(a) that the entry of a class of aliens would be detrimental to the interests of the United States. But the careful and extensive findings in the Proclamation readily satisfy the requirements set out in the Court's *Hawaii* decision. The district court, in contrast, applied an improperly heightened degree of scrutiny akin to strict scrutiny. Although the district court identified several purported deficiencies in the Proclamation and its findings, none withstands scrutiny even under this Court's *Hawaii* decision.

First, the court found the Proclamation deficient because it makes "no finding that nationality *alone* renders entry of this broad class of individuals a heightened security risk to the United States." ER 33 (quoting *Hawaii*, 859 F.3d at 772). In fact, however, the Proclamation explains that it is intended to address heightened security risks stemming from the identified countries' "inadequate identity-management protocols, information-sharing practices, and risk factors." Procl. § 1(a)-(b), (g). The Proclamation explains that "[i]nformation-sharing and identity-management protocols and practices are important for the effectiveness of the screening and vetting protocols and procedures of the United States." *Id.* § 1(b).

And the Proclamation explains that, for countries with inadequate practices, the entry restrictions are necessary to protect the United States by "prevent[ing] the entry of those foreign nationals about whom the United States Government lacks sufficient information to assess the risks they pose to the United States." *Id.* § 1(i). Those findings supply precisely what this Court found lacking in *Hawaii*, where the Court reasoned that there was "no finding that present vetting standards are inadequate." *Hawaii*, 859 F.3d at 771. The President also found that the entry restrictions would "be the most likely to encourage cooperation" with "the United States' identity-management and information-sharing policies and policy, national security, and counterterrorism goals." That finding, which demonstrates the diplomatic focus of the entry restrictions and their intent to provide an incentive to foreign countries to modify their practices relating to the United States, provides ample support for the entry restrictions. *See id.* at 773 n.14.

The district court is similarly mistaken in objecting that the Proclamation applies to nationals of the designated countries even if they lack significant active ties to those countries at the moment. ER 34. Again, the Proclamation is concerned with the information-sharing and identity-management protocols of the foreign government issuing the alien's passport, a concern that exists regardless of how strong the individual's ties to that country may be at a particular time. Conversely, the same concerns are not raised where an alien travels on a passport issued by a

country that does have adequate information-sharing and identity-management protocols, regardless of whether that individual also has strong ties to a country lacking adequate protocols.

The district court also opined that the Proclamation does not explain why existing law is insufficient to address the defects the President found, because, in the court's view, the existing individualized screening process is sufficient to exclude individuals who pose a risk to safety and security. ER 34. As an initial matter, that reasoning ignores that the Proclamation was also intended to encourage the designated countries to improve their information-sharing practices. Furthermore, a President is plainly entitled to make his own determination about the sufficiency of protections under other provisions of the INA (which is evident from the very grant of additional authority in Section 1182(f)). And where insufficient information-sharing creates a risk in screening that applies to all of a foreign country's nationals, the President is entitled to conclude that individualized screening is insufficiently protective, and to adopt a prophylactic rule that nationals of the country will not receive visas unless they can demonstrate to the satisfaction of a consular officer or a U.S. Customs and Border Protection officer that, *inter alia*, allowing the alien to enter the United States "would not pose a threat to the national security or public safety of the United States" and "entry would be in the national interest." Procl. § 3(c)(i). Although this Court in *Hawaii* reasoned that the government could exclude

dangerous individuals on a case-by-case basis, it based that holding on the fact that EO-2 "specifically avoids making any finding that the screening processes are inadequate." 859 F.3d at 773. Here, the President's findings establish that predicate, which fully justifies country-wide restrictions.

The district court also incorrectly identified what it believed were "internal incoherencies" in the Proclamation, criticizing the President for tailoring entry restrictions to the particular circumstances of each identified country and, in some instances, to classes of visas within each country. ER 35-36. But contrary to the district court's apparent belief, the carefully tailored entry restrictions in the Proclamation are a virtue, not a failing: the specific restrictions applicable to each identified country, and in some instances to classes of visas within the country, were based on the President's country-specific evaluation of relevant factors, including information-sharing and identity-management protocols, as well as "foreign policy, national security, and counterterrorism goals." Procl. § 1(h)(i). The specific bases for that nuanced tailoring are explicitly addressed, and explained, in the Proclamation itself. *See* Procl. §§ 1(h)(1), 2. This is precisely the type of justification for entry restrictions that this Court found lacking in *Hawaii*.

Thus, the Proclamation acknowledges that Iraq "did not meet the baseline" that the Department of Homeland Security applied to evaluate countries, but describes the numerous countervailing interests counseling against entry restrictions,

including the "close cooperative relationship between the United States and the democratically elected government of Iraq, the strong United States diplomatic presence in Iraq, the significant presence of United States forces in Iraq, and Iraq's commitment to combating the Islamic State of Iraq and Syria (ISIS)." Procl. § 1(g).

Likewise, the differing treatment of Venezuela and Somalia reflects the different circumstances of each country. Although Somalia satisfied baseline information-sharing requirements, it "has significant identity-management deficiencies," "[a] persistent terrorist threat also emanates from Somalia's territory," and the country "stands apart from other countries in the degree to which its government lacks command and control of its territory, which greatly limits the effectiveness of its national capabilities in a variety of respects." Procl. § 2(h). While Venezuela "is uncooperative in verifying whether its citizens pose national security or public-safety threats," there are "alternative sources for obtaining information to verify the citizenship and identity of nationals from Venezuela," and "[a]s a result, the restrictions imposed by the proclamation focus on government officials of Venezuela who are responsible for the identified inadequacies." *Id.* § 2(f).

The differential treatment of different types of visas, and in different classes of visas between different countries, was also explained. The entry of immigrants from six designated countries was restricted because, in comparison to

nonimmigrants, immigrants "become lawful permanent residents of the United States," and thus pose different "national security or public-safety concerns" by virtue of their entrenched status and the difficulty in removing them if necessary. Procl. § 1(h)(ii). The President also explained why he was taking a tailored, country-by-country approach to nonimmigrants, distinguishing between countries based on the existence of "mitigating factors, such as a willingness to cooperate or play a substantial role in combatting terrorism." *Id.* § 1(h)(iii).

Finally, the district court wrongly criticized the Proclamation as "unsupported by verifiable evidence," ER 37, reasoning that the entry restrictions are aimed at preventing terrorist attacks and that there is no evidence that nationals of the designated countries have committed terrorist attacks in the last forty years. ER 37 n.18. But no such "evidence" was required even under this Court's *Hawaii* decision, and the district court's contrary conclusion is at odds with the Supreme Court's recognition that it is "a dangerous requirement" to require "hard proof" when the Government is assessing "national security and foreign policy concerns," because such predictive "conclusions must often be based on informed judgment rather than concrete evidence." *Holder v. Humanitarian Law Project*, 561 U.S. 1, 34-35 (2010) (*HLP*).

Furthermore, the district court's criticism overlooked how the Proclamation achieves its stated purpose and the evidence collected in support of that approach.

First, the President had ample evidence to conclude that the designated countries were deficient in information-sharing, identity-management, or other risk factors, and that restrictions on entry could protect against those risks as well as encourage these countries to change their practices. Countries were identified as being at risk of having deficient information-sharing as well as having other risk factors in a comprehensive global review by the Department of Homeland Security, in consultation with the Department of State. Notably, many countries improved their performances during the 50-day engagement period involving the Department of State. Procl. § 1(f). The entry restrictions were intended to encourage the designated countries to improve their practices.

Second, the Proclamation directly ties the sufficiency of information-sharing and identity-management to the goal of protecting U.S. citizens from terrorist attacks, explaining that "[s]creening and vetting protocols and procedures associated with visa adjudications and other immigration processes play a critical role" in enabling the United States "to detect foreign nationals who may commit, aid, or support acts of terrorism, or otherwise pose a safety threat, and * * * to prevent such individuals from entering the United States." Procl. § 1(a). The Proclamation also explains that the entry restrictions are intended to "encourage cooperation" with identity-management and information-sharing policies as well as other foreign policies. Procl. § 1(i).

The district court incorrectly dismissed these measures as not "satisfying," ER 37, and a mere "laudatory * * *foreign policy goal[]," ER 38. But those findings correctly and explicitly connect the tailored restrictions in the Proclamation to the need to address the potential terrorist and public-safety threats posed by aliens applying for visas—and how failing to address those concerns through entry restrictions would be "detrimental to the interests of the United States," 8 U.S.C. § 1182(f). The extensive explanation set out in the Proclamation readily satisfies any statutory requirement to make findings in support of entry restrictions.

### B. The Proclamation Does Not Violate 8 U.S.C. § 1152(a)(1)(A)

The district court also held that the Proclamation's targeted entry restrictions violate 8 U.S.C. § 1152(a)(1)(A), which prohibits "discriminat[ing]" on the basis of an alien's "nationality" in the "issuance of an immigrant visa." The court erred in reading Section 1152(a) to override the President's distinct authority under Sections 1182(f) and 1185(a).

#### 1. Section 1152(a)(1)(A) And Sections 1182(f) and 1185(a) Do Not Conflict And Operate In Different Spheres

The Government respectfully disagrees with this Court's now-vacated decision in *Hawaii* that Section 1152(a)(1)(A) must "cabin" the President's authority under Sections 1182(f) and 1185(a) because otherwise "the President could circumvent the limitations set by § 1152(a)(1)(A)." 859 F.3d at 777-78. That reasoning creates a conflict between the statutes where none exists, disregards settled

historical practice, and raises serious questions about Section 1152(a)(1)(A)'s constitutionality.

**a.** It is axiomatic that "when two statutes are capable of co-existence, it is the duty of the courts * * * to regard each as effective." *Radzanower v. Touche Ross & Co.*, 426 U.S. 148, 155 (1976). That principle applies here. Section 1182(f) authorizes the President to "suspend entry of any aliens or of any class of aliens," and Section 1185(a)(1) authorizes the President to impose "limitations and exceptions" on entry. Section 1152(a)(1), in contrast, prohibits nationality-based discrimination "in the issuance of an immigrant visa." At an absolute minimum, Section 1152(a)(1)(A) by its plain terms does not prohibit the President from restricting entry based on nationality under Sections 1182(f) and 1185(a), even if it were to require the State Department to issue immigrant visas to aliens whose entry the President has suspended based on nationality. Moreover, Section 1152(a) does not require issuing immigrant visas in the first place to aliens whose entry has been validly suspended under Sections 1182(f) and 1185(a). The two sets of statutory provisions simply operate in different spheres: Sections 1182(f) and 1185(a), like numerous other provisions of the INA, limit the universe of individuals eligible to receive visas; Section 1152(a)(1)(A), by contrast, prohibits discrimination on the basis of nationality within that universe of eligible individuals by consular officers and others included in the visa issuance process. Indeed, the INA expressly *requires*

the denial of visas to aliens who are ineligible "under section 1182." 8 U.S.C. § 1201(g).

A visa allows an alien to "obtain transportation to the United States" and seek admission at a port of entry. 1 Charles Gordon et al., *Immigration Law and Procedure* § 8.04[1] (2016). But Congress has directed that a visa may not be issued if the applicant "is ineligible to receive a visa * * * under [S]ection 1182." 8 U.S.C. § 1201(g). Section 1182 lists many such grounds for ineligibility, among them health, criminal history, and terrorist affiliation. Whatever the relevant underlying ground in any individual case, the alien is denied a visa because he is "ineligible" to enter "under [S]ection 1182." *Ibid.*

That is also true of aliens who are ineligible to enter because they are subject to a suspension of entry under Section 1182(f)—including aliens subject to the Proclamation's entry restrictions. The Department of State treats aliens covered by exercises of the President's Section 1182(f) authority as ineligible for visas. *See* U.S. Dep't of State, 9 *Foreign Affairs Manual* 302.14-3(B) (2016). Thus, if an alien is subject to the Proclamation and does not qualify for a waiver, he is denied an immigrant visa because he is ineligible to receive one as someone barred from entering the country under Section 1182(f)—not because he is suffering the type of nationality-based discrimination prohibited by Section 1152(a)(1)(A). Section 1152(a)(1)(A) is concerned only with the allocation of visas among aliens who are

eligible to receive them (*i.e.*, those aliens who have cleared the bar of ineligibility under Section 1182(f) and the INA's other provisions concerning ineligibility). Moreover, it would make little sense to issue a visa to an alien who the consular officer already knows is barred from entering the country, only for the alien to be denied entry upon arrival at this Nation's borders. A visa does not entitle the alien to be admitted if, upon arrival, "he is found to be inadmissible." 8 U.S.C. § 1201(h).

**b.** The legislative history shows that Congress understood the INA to operate in this manner. The 1965 amendment enacting the provision codified at 8 U.S.C. § 1152(a)(1)(A) was designed to eliminate the country-quota system previously in effect, but it was intended to operate only as to those aliens *otherwise eligible for visas*, not to modify the eligibility criteria for admission or to limit any of the pre-existing provisions like Sections 1182(f) or 1185(a)(1) addressing entry or protecting security. *See* H.R. Rep. No. 89-745, at 12 (1965) ("Under this [new] system, selection *from among those eligible to be immigrants* * * * will be based upon the existence of a close family relationship to U.S. citizens or permanent resident aliens and not on the existing basis of birthplace or ancestry." (emphasis added)); S. Rep. No. 89-748, at 11, 13 (1965) (similar), *reprinted in* 1965 U.S.C.C.A.N. 3328, 3329, 3331.

**c.** Historical practice also strongly supports the President's interpretation of his statutory authority. Section 1152(a) has never been viewed as a constraint on

the President's suspension authority, and Presidents have invoked Section 1182(f) to draw distinctions based in part on nationality. In 1986, President Reagan suspended the immigrant entry of "all Cuban nationals," subject to certain exceptions, until "the Secretary of State," after "consultation with the Attorney General, determines that normal migration procedures with Cuba have been restored." 51 Fed. Reg. at 30,470-71. President Carter issued an order in 1979 in response to the Iranian hostage crisis; although the order did not itself deny or revoke visas, the President explained upon its issuance that the State Department would "invalidate all visas issued to Iranian citizens" and would not reissue visas or issue new visas "except for compelling and proven humanitarian reasons or where the national interest of our own country requires." Jimmy Carter, *Sanctions Against Iran: Remarks Announcing U.S. Actions* (Apr. 7, 1980), http://www.presidency.ucsb.edu/ws/?pid=33233; *see also* 44 Fed. Reg. 67,947 (1979). Construing Section 1152(a)(1)(A) to forbid nationality-based restrictions on entry would mean that those measures were unlawful.

Indeed, this Court previously recognized that the President may permissibly distinguish among "classes of aliens on the basis of nationality," but held that that authority could only be exercised "as retaliatory diplomatic measures responsive to government conduct directed at the United States," not "because of a particular concern that entry of the individuals themselves would be detrimental." *Hawaii*,

859 F.3d at 772 n.13; *cf.* D. Ct. Dkt. 368-1, at 10 n.4 (plaintiffs concede that the Proclamation's restrictions on the entry of nationals of North Korea are lawful in light of "the current state of relations between the United States and North Korea"). That distinction, however, has no support in the statutory text of Section 1152(a)(1)(A), which contains no such exception. More fundamentally, the Proclamation is materially indistinguishable in this regard from the orders of President Carter and President Reagan. The Proclamation is equally a "retaliatory diplomatic measure[] responsive to government conduct directed at the United States," *id.*, because it seeks to incentivize foreign nations whose information-sharing practices are inadequate.

Similarly, although plaintiffs challenge the indefinite nature of the Proclamation's entry suspensions, there is no textual basis in Section 1152(a)(1)(A) to distinguish the orders of President Carter and President Reagan on this ground. Nor would such a distinction be supported by the underlying facts; if anything, the prior suspensions were more indefinite in scope than the Proclamation. President Reagan's suspension of entry of Cuban immigrants was to "remain in effect until such time as the Secretary of State, after consultation with the Attorney General, determines that normal migration procedures with Cuba have been restored." 51 Fed. Reg. at 30,471. And President Carter's instruction to the State Department was to "invalidate all visas issued to Iranian citizens" and not to reissue visas or issue

new visas "except for compelling and proven humanitarian reasons or where the national interest of our own country requires." *Sanctions Against Iran, supra.* The Proclamation, by contrast, requires periodic review of the continuing need for the restrictions and establishes a process for recommending that they be terminated or modified. Procl. § 4.

Construing Section 1152(a)(1)(A) to prevent the President from exercising his statutory power to suspend entry based in part on nationality would undermine the President's Article II authority as Commander-in-Chief and his power over foreign affairs. For example, such a construction would mean that, as a statutory matter, the President cannot temporarily suspend the entry of aliens from a specific country, even if he is aware of a grave threat from unidentified nationals of that country or the United States is on the brink of war with that country. Section 1152(a)(1)(A) can and should be construed to avoid that serious constitutional question.

### 2. In The Event Of A Conflict, Sections 1182(f) And 1185(a)(1) Prevail Over Section 1152(a)(1)(A)

Even if the Court believed Section 1152(a)(1)(A) is inconsistent with Sections 1182(f) and 1185(a)(1), background principles of construction would require finding that Section 1152(a)(1) gives way.

First, Section 1185(a)(1)(A) was amended to its current form in 1978, after enactment of Section 1152(a)(1)(A) in 1965. *See* Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. No. 95-426, § 707(a), 92 Stat. 963, 992 (1978). As

the later enacted statute, Section 1185(a)(1) would prevail in any conflict. *See National Ass'n of Home Builders v. Defenders of Wildlife*, 551 U.S. 644, 662 (2007).

Second, although Section 1152(a)(1)(A) was enacted later in time than Section 1182(f), Section 1152(a)(1)(A) would give way under the principle of construction that the specific governs the general. *See NLRB v. SW General, Inc.*, 137 S. Ct. 929, 941 (2017). While Section 1152(a)(1)(A) sets a general rule governing nondiscrimination in the issuance of immigrant visas by consular officers and others involved in that process, Sections 1182(f) and 1185(a)(1) constitute more specific, and thus controlling, grants of authority expressly and directly to the *President* to restrict entry of aliens to protect the national interest. *See Sale*, 509 U.S. at 170-73.

Finally, even if the district court were correct that Section 1152(a)(1)(A) would otherwise forbid withholding visas from aliens whose entry was suspended, Section 1152(a)(1)(B) confirms that Section 1152(a)(1)(A) does not "limit the authority of the Secretary of State to determine the procedures for the processing of immigrant visa applications." The means by which the Secretary of State implements the Proclamation's entry restrictions—*i.e.*, by withholding visas from aliens who are not eligible for entry—constitutes a "procedure[]" within the meaning of Section 1152(a)(1)(B).

## III. The Balance Of Equities Weighs Strongly Against An Injunction

### A. The District Court's Injunction Imposes Serious, Irreparable Harm On The Government And The Public

The district court's injunction barring enforcement of the Proclamation's entry restrictions undermines the President's constitutional and statutory authority to safeguard the Nation's security and intrudes on the political branches' constitutional prerogatives. "[N]o governmental interest is more compelling than the security of the Nation," *Agee*, 453 U.S. at 307, and "the Government's interest in combatting terrorism is an urgent objective of the highest order," *HLP*, 561 U.S. at 28. The President's protection of these interests warrants the utmost deference, particularly where, as here, he acts based on a "[p]redictive judgment" regarding specific national-security risks. *Egan*, 484 U.S. at 529; *see HLP*, 561 U.S. at 33-35.

The injunction also causes irreparable injury by invalidating an action taken at the height of the President's authority. "[T]he President has unique responsibility" over "foreign and military affairs." *Sale*, 509 U.S. at 188. Rules "concerning the admissibility of aliens" necessarily rely on not just legislative authority but also "inherent executive power." *Knauff*, 338 U.S. at 542. And because "the President act[ed] pursuant to an express * * * authorization of Congress, his authority is at its maximum, for it includes all that he possesses in his own right plus all that Congress can delegate." *Zivotofsky ex rel. Zivotofsky v. Kerry*, 135 S. Ct. 2076, 2083-84 (2015).

The district court's injunction overriding the President's judgment thus necessarily imposes irreparable harm. Even a single State "suffers a form of irreparable injury" "[a]ny time [it] is enjoined by a court from effectuating statutes enacted by representatives of its people." *Maryland v. King*, 567 U.S. 1301, 1303 (2012) (Roberts, C.J., in chambers); *see, e.g.*, *O Centro Espirita Beneficiente Uniao de Vegetal v. Ashcroft*, 314 F.3d 463, 467 (10th Cir. 2002). *A fortiori*, this injunction imposes irreparable injury on the President and the public given "the singular importance of the President's duties" to the entire Nation. *Nixon v. Fitzgerald*, 457 U.S. 731, 751 (1982).

The district court recognized that "national security interests are legitimate objectives of the highest order," but reasoned that those interests are outweighed by "the public's harms when the President has wielded his authority unlawfully" and the public interest in "curtailing unlawful executive action." ER 43. But that ignores the harm if, instead, the Proclamation is ultimately held to be lawful.

### B. Plaintiffs Suffer No Irreparable Harm

Plaintiffs, by contrast, would suffer no cognizable harm, much less irreparable injury, in the absence of an injunction. The only concrete, judicially cognizable harm that plaintiffs allege is that the Proclamation may delay their relatives, members, and students in entering the United States. But delay in entry alone does not amount to irreparable harm. As already noted, visa times vary widely, and it is

not unusual for an alien to wait months or years for an immigrant visa. Until aliens abroad meet otherwise-applicable visa requirements and seek and are denied a waiver, they have not received final agency action, and plaintiffs' claimed harms are unripe and too "remote" and "speculative" to merit injunctive relief. *Stormans, Inc. v. Selecky*, 586 F.3d 1109, 1139 (9th Cir. 2009).

## IV. The Global Injunction Is Improper

At a minimum, the scope of the district court's global injunction is vastly overbroad. Both constitutional and equitable principles require that injunctive relief be limited to redressing a plaintiff's own cognizable injuries. Article III requires that "a plaintiff must demonstrate standing * * * for each form of relief that is sought." *Town of Chester v. Laroe Estates, Inc.*, 137 S. Ct. 1645, 1650 (2017). "The remedy" sought therefore must "be limited to the inadequacy that produced the injury in fact that the plaintiff has established." *Lewis v. Casey*, 518 U.S. 343, 357 (1996). Equitable principles independently require that injunctions "be no more burdensome to the defendant than necessary to provide complete relief to the plaintiffs." *Madsen v. Women's Health Ctr., Inc.*, 512 U.S. 753, 765 (1994).

The alleged injuries identified by the district court would be fully redressed by enjoining the Proclamation's application as to any identified individual alien abroad whose exclusion causes the plaintiffs concrete, irreparable harm. The district court offered no rationale for its nationwide injunction other than its belief that the

Proclamation is invalid in all its applications. ER 44. But that view simply reflects the legal rationale for ruling in favor of the parties before the court; it does not justify relief to third parties.

When the district court previously issued a nationwide injunction barring enforcement of EO-2 and this Court affirmed in relevant part, the Supreme Court partially stayed the injunction to the extent it reached foreign nationals who lack any bona fide relationship with a person or entity in the United States. *Trump*, 137 S. Ct. at 2087. The Court determined at that time and with respect to EO-2 that, "when it comes to [aliens abroad] who lack any such connection to the United States * * * the balance tips in favor of the Government's compelling need to provide for the Nation's security." *Id.* at 2089. In contrast, the district court's global application applies to all aliens worldwide, and thus the district court plainly abused its discretion in going beyond the Supreme Court's stay decision. Moreover, even that scope of injunctive relief would have been unwarranted here. The Supreme Court did not conclude in its earlier stay decision that similar relief was required in all circumstances, and it tailored its stay to its assessment of the equities with respect to the now-expired EO-2. This case is very different for the reasons described, and the equitable balancing requires following the ordinary rule of plaintiff-specific relief.

## CONCLUSION

For these reasons, the district court's preliminary injunction should be vacated, either in whole or at least as to all aliens except those whose exclusion would impose a cognizable, irreparable injury on plaintiffs. At an absolute minimum, the injunction should be vacated as to aliens who lack a credible claim to a bona fide relationship with an individual or entity in the U.S.

Respectfully submitted,


NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Acting Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

/s/ Sharon Swingle
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*


NOVEMBER 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limitations of Rule 32(a)(7)(B). The brief contains 12,432 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

/s/ Sharon Swingle
Sharon Swingle

## CERTIFICATE OF SERVICE

I hereby certify that on November 2, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle

## STATEMENT OF RELATED CASES

Appellants are not aware of any related cases pending in this Court.

/s/ Sharon Swingle

Sharon Swingle