No. 17-17168

IN THE

# United States Court of Appeals for the Ninth Circuit

STATE OF HAWAII, *et al.*,

*Plaintiffs-Appellees*,

v.

DONALD J. TRUMP, *et al.*,

*Defendants-Appellants*.

On Appeal from the United States District Court
for the District of Hawaii, No. 1:17-cv-00050-DKW-KSC
District Judge Derrick K. Watson

## BRIEF FOR PLAINTIFFS-APPELLEES


DOUGLAS S. CHIN
Attorney General of the State of Hawaii
CLYDE J. WADSWORTH
Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA
DONNA H. KALAMA
KIMBERLY T. GUIDRY
Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813

*Counsel for the State of Hawaii*

NEAL KUMAR KATYAL
COLLEEN ROH SINZDAK
MITCHELL P. REICH
ELIZABETH HAGERTY
YURI S. FUCHS
SUNDEEP IYER*
REEDY C. SWANSON**
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004
Telephone: (202) 637-5600
Email: neal.katyal@hoganlovells.com

*Counsel for Plaintiffs-Appellees*


November 18, 2017

*(Additional Counsel Listed on Inside Cover)*

ROBERT T. NAKATSUJI
KALIKO‘ONALANI D. FERNANDES
KEVIN M. RICHARDSON
Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239

*Counsel for the State of Hawaii*

THOMAS P. SCHMIDT
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW
ALEXANDER B. BOWERMAN
HOGAN LOVELLS US LLP
1735 Market St., 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Counsel for Plaintiffs-Appellees*

**Admitted only in Maryland; supervised by firm members*
***Admitted only in Virginia; supervised by firm members*

## RULE 26.1 CORPORATE DISCLOSURE STATEMENT

Pursuant to Federal Rule of Appellate Procedure 26.1, Plaintiff-Appellee Muslim Association of Hawaii, Inc., certifies as follows: The Muslim Association of Hawaii, Inc., has no parent corporations. It has no stock, and hence, no publicly held company owns 10% or more of its stock.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ........ iii

INTRODUCTION ........ 1

BACKGROUND ........ 2

A. Earlier Executive Orders ........ 2

B. The Third Executive Order ........ 4

C. The Third Amended Complaint ........ 5

D. The District Court's Opinion ........ 7

SUMMARY OF ARGUMENT ........ 9

ARGUMENT ........ 13

I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS ........ 13

A. EO-3 Is Reviewable ........ 13

B. EO-3 Exceeds The President's Authority Under 8 U.S.C. §§ 1182(f) And 1185(a) ........ 20

1. *EO-3 does not contain an adequate finding of detrimentality* ........ 22

a. The President must issue a "find[ing]" that supports the conclusion that entry would be "detrimental" ........ 22

b. EO-3's findings are inadequate ........ 25

2. *EO-3 does not exclude aliens whose entry would be "detrimental to the interests of the United States" within the meaning of Section 1182(f)* ........ 29

**TABLE OF CONTENTS—Continued**

Page


a. The words "detrimental to the interests of the United States" derive meaningful content from their history, purpose, and context ....... 29

b. The President may find aliens' entry "detrimental to the interests of the United States" only if the aliens (1) themselves threaten national security or (2) threaten congressional policy in an exigency ....... 33

c. The Government's contrary reading would subvert the INA and raise grave constitutional concerns ....... 43

d. EO-3 exceeds the limits on the President's Section 1182(f) power ....... 45

C. EO-3 Violates Section 1152(a)(1)(A) ....... 47

D. EO-3 Violates The Establishment Clause ....... 54

II. The Remaining Preliminary Injunction Factors Are Met ....... 58

A. EO-3 Would Inflict Irreparable Harms On Plaintiffs ....... 58

B. The Balance Of The Equities And The Public Interest Favor Relief ....... 59

III. A Nationwide Injunction Is Appropriate ....... 60

CONCLUSION ....... 61

STATEMENT OF RELATED CASES

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

Page(s)

**CASES:**

*Abbott Labs.* v. *Gardner*,
387 U.S. 136 (1967) ... 18

*Abourezk* v. *Reagan*,
785 F.2d 1043 (D.C. Cir. 1986) ... 42

*Am. Trucking Ass'ns, Inc.* v. *City of L.A.*,
559 F.3d 1046 (9th Cir. 2009) ... 58

*Arbaugh* v. *Y&H Corp.*,
546 U.S. 500 (2006) ... 16

*Arizona* v. *United States*,
567 U.S. 387 (2012) ... 16, 20, 42, 43

*Armstrong* v. *Exceptional Child Ctr., Inc.*,
135 S. Ct. 1378 (2015) ... 14

*Bennett* v. *Spear*,
520 U.S. 154 (1997) ... 17

*Bryan* v. *United States*,
524 U.S. 184 (1998) ... 39

*Burlington Truck Lines, Inc.* v. *United States*,
371 U.S. 156 (1962) ... 22

*Califano* v. *Yamasaki*,
442 U.S. 682 (1979) ... 60

*Carlson* v. *Landon*,
342 U.S. 524 (1952) ... 31, 44

*Catholic League for Religious & Civil Rights* v. *City & Cty. of S.F.*,
624 F.3d 1043 (9th Cir. 2010) (en banc) ... 20

*Chamber of Commerce of U.S.* v. *Reich*,
74 F.3d 1322 (D.C. Cir. 1996) ... 14, 17

Page(s)

*Chisom* v. *Roemer*,
501 U.S. 380 (1991)....39

*Dada* v. *Mukasey*,
554 U.S. 1 (2008)....50

*Dalton* v. *Specter*,
511 U.S. 462 (1994)....19, 23

*Dames & Moore* v. *Regan*,
453 U.S. 654 (1981)....*passim*

*DHX, Inc*. v. *Allianz AGF MAT, Ltd.*,
425 F.3d 1169 (9th Cir. 2005)....13

*EC Term of Years Trust* v. *United States*,
550 U.S. 429 (2007)....41

*Franklin* v. *Massachusetts*,
505 U.S. 788 (1992)....17

*Galvan* v. *Press*,
347 U.S. 522 (1954)....16, 20, 45

*Gonzales* v. *Oregon*,
546 U.S. 243 (2006)....44

*Gratz* v. *Bollinger*,
539 U.S. 244 (2003)....14

*Gulf States Util. Co.* v. *Fed. Power Comm'n*,
411 U.S. 747 (1973)....32

*Haig* v. *Agee*,
453 U.S. 280 (1981)....31, 33, 34, 37

*Hall Street Assocs.* v. *Mattel, Inc.*,
552 U.S. 576 (2008)....41

*Hawaii* v. *Trump*,
241 F. Supp. 3d 1119 (D. Haw. 2017)....55

Page(s)

*Hawaii* v. *Trump*,
245 F. Supp. 3d 1227 (D. Haw. 2017) .......... 3, 54

*Hawaii* v. *Trump*,
859 F.3d 741 (9th Cir. 2017) .......... *passim*

*INS* v. *Nat'l Ctr. for Immigrants' Rights*,
502 U.S. 183 (1991) .......... 31

*IRAP* v. *Trump*,
2017 WL 4674314 (D. Md. Oct. 17, 2017) .......... 8, 51, 54

*IRAP* v. *Trump*,
857 F.3d 554 (4th Cir. 2017) (en banc) .......... 53, 54, 55

*Jama* v. *Immigration & Customs Enf't*,
543 U.S. 335 (2005) .......... 30

*Jean* v. *Nelson*,
472 U.S. 846 (1985) .......... 12, 52, 53

*Kent* v. *Dulles*,
357 U.S. 116 (1958) .......... *passim*

*Kerry* v. *Din*,
135 S. Ct. 2128 (2015) .......... 46

*Kim Ho Ma* v. *Ashcroft*,
257 F.3d 1095 (9th Cir. 2001) .......... 31

*Kleindienst* v. *Mandel*,
408 U.S. 753 (1972) .......... 54

*Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State*,
45 F.3d 469 (D.C. Cir. 1995) .......... 18, 47, 51

*Lichter* v. *United States*,
334 U.S. 742 (1948) .......... 21, 34

*Loving* v. *Virginia*,
388 U.S. 1 (1967) .......... 53

Page(s)

*Mahler* v. *Eby*,
264 U.S. 32 (1924) ............................................................ 31, 32, 34, 44

*Marbury* v. *Madison*,
5 U.S. (1 Cranch) 137 (1803) ............................................................ 2

*Matthews* v. *Diaz*,
426 U.S. 67 (1976) ............................................................ 30

*McCreary Cty.* v. *ACLU*,
545 U.S. 844 (2005) ............................................................ 54, 55, 57, 58

*N.Y. Cent. Sec. Corp.* v. *United States*,
287 U.S. 12 (1932) ............................................................ 32

*Nat'l Broad. Co.* v. *United States*,
319 U.S. 190 (1943) ............................................................ 32

*Olsen* v. *Albright*,
990 F. Supp. 31 (D.D.C. 1997) ............................................................ 53

*RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*,
132 S. Ct. 2065 (2012) ............................................................ 50

*Reno* v. *American-Arab Anti-Discrimination Committee*,
525 U.S. 471 (1999) ............................................................ 23

*Romero* v. *INS*,
39 F.3d 977 (9th Cir. 1994) ............................................................ 31

*Saavedra Bruno* v. *Albright*,
197 F.3d 1153 (D.C. Cir. 1999) ............................................................ 19

*Sale* v. *Haitian Ctrs. Council, Inc.*,
509 U.S. 155 (1993) ............................................................ 15, 23

*Sekhar* v. *United States*,
133 S. Ct. 2720 (2013) ............................................................ 33, 51

*Sierra Club* v. *Bosworth*,
510 F.3d 1016 (9th Cir. 2007) ............................................................ 60

Page(s)

*Texas* v. *United States*,
787 F.3d 733 (5th Cir. 2015) ....................................................................60

*Trump* v. *Hawaii*,
No. 16-1540, 2017 WL 4782860 (U.S. Oct. 24, 2017) ................................4, 13

*Trump* v. *Int'l Refugee Assistance Project*,
137 S. Ct. 2080 (2017) (per curiam)....................................................................4

*United Dominion Indus., Inc.* v. *United States*,
532 U.S. 822 (2001)...........................................................................................50

*United States* v. *Curtiss-Wright Export Corp.*,
299 U.S. 304 (1936)......................................................................................44, 45

*United States* v. *Juvenile Male*,
670 F.3d 999 (9th Cir. 2012) ..........................................................................50

*United States* v. *Lowden*,
308 U.S. 225 (1939)...........................................................................................32

*United States* v. *Witkovich*,
353 U.S. 194 (1957)...................................................................................*passim*

*United States* ex rel. *Knauff* v. *Shaughnessy*,
338 U.S. 537 (1950)...................................................................................*passim*

*U.S. Army Corps of Engineers* v. *Hawkes Co.*,
136 S. Ct. 1807 (2016).........................................................................................18

*Util. Air Regulatory Grp.* v. *EPA*,
134 S. Ct. 2427 (2014)...................................................................................43, 60

*Washington* v. *Trump*,
847 F.3d 1151 (9th Cir. 2017) (per curiam) ...............................................*passim*

*Webster* v. *Doe*,
486 U.S. 592 (1988)...........................................................................................23

*Whitman* v. *Am. Trucking Ass'ns*,
531 U.S. 457 (2001)...........................................................................................32

Page(s)

*Wong Wing Hang* v. *INS*,
360 F.2d 715 (2d Cir. 1966) ....................53

*Youngstown Sheet & Tube Co.* v. *Sawyer*,
343 U.S. 579 (1952)....................47

*Zadvydas* v. *Davis*,
533 U.S. 678 (2001)....................31

*Zemel* v. *Rusk*,
381 U.S. 1 (1965)....................*passim*

*Ziglar* v. *Abbasi*,
137 S. Ct. 1843 (2017)....................59

*Zivotofsky* ex rel. *Zivotofsky* v. *Kerry*,
135 S. Ct. 2076 (2015)....................45

**STATUTES:**

5 U.S.C. § 701(a)(2)....................19

5 U.S.C. § 702....................15

5 U.S.C. § 704....................16

5 U.S.C. § 706(2) ....................15

8 U.S.C. § 1101(15)(R)....................18

8 U.S.C. § 1101(27)(C)....................18

8 U.S.C. § 1101(a)(15)(F)....................18

8 U.S.C. § 1101(a)(15)(H) ....................18

8 U.S.C. § 1101(a)(15)(J) ....................18

8 U.S.C. § 1101(a)(15)(O) ....................18

8 U.S.C. § 1152(a)(1)(A) ....................*passim*

8 U.S.C. § 1152(a)(1)(B) ....................50, 52

Page(s)

8 U.S.C. § 1153(a) ....................18

8 U.S.C. § 1182(a) ....................41, 42, 46

8 U.S.C. § 1182(f) ....................*passim*

8 U.S.C. § 1185 ....................*passim*

8 U.S.C. § 1187(a)(12) ....................46

8 U.S.C. § 1201 ....................46

8 U.S.C. § 1202 ....................46

8 U.S.C. §§ 1221-1226a ....................46

8 U.S.C. § 1361 ....................25, 46

50 U.S.C. § 21 ....................35

Act of May 22, 1918, § 1(a), 40 Stat. 559 ....................34

Act of June 21, 1941, 55 Stat. 252 ....................34, 35

Foreign Relations Authorization Act, Fiscal Year 1978, Pub. L. 95-105, § 511 (1977) ....................41

Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. 95-426, § 707(a) (1978) ....................36

Immigration and Nationality Act of 1952, Pub. L. 82-414, §§ 212(f), 215(a) ....................36, 37

Pub. L. 107-173 (2002) ....................46

Pub. L. 110-53, §§ 701-731 (2007) ....................46

**CONSTITUTIONAL PROVISIONS:**

U.S. Const. amend. I ....................31

U.S. Const. art. I, § 8, cl. 4 ....................60

Page(s)

**EXECUTIVE MATERIALS:**

22 C.F.R. § 58.47 (1941) ....................35

22 C.F.R. § 58.53(i) (1945)....................35

6 Fed. Reg. 5929 (Nov. 22, 1941)....................35

10 Fed. Reg. 8997 (July 21, 1945)....................35

Exec. Order No. 12,172 (1979)....................25

Exec. Order No. 12,807 (1992)....................24, 40

Exec. Order No. 13,606 (2012)....................40

Exec. Order No. 13,712 (2015)....................40

Exec. Order No. 13,769 (Jan. 27, 2017) ....................*passim*

Exec. Order No. 13,780 (Mar. 6, 2017)....................*passim*

Exec. Order No. 13,810 (Sept. 25, 2017) ....................7

Proc. 1473 (1918)....................34

Proc. 2523 (1941)....................35

Proc. 2850 (1949)....................35

Proc. 5517 (1986)....................40

Proc. 5829 (1988)....................24

Proc. 5887 (1988)....................24

Proc. 6958 (1996)....................24

Proc. 8342 (2009)....................24

Proc. 8693 (2011)....................24

Proc. 9645 (Sept. 24, 2017) ....................*passim*

Page(s)

U.S. Dep't of State Bull. No. 2116, *Cuba: New Migration and Embargo Measures* 86-87 (Nov. 1986) ....................40

U.S. Dep't of Homeland Security, *Fact Sheet: The President's Proclamation* (Sept. 24, 2017) ....................17

U.S. Dep't of State, *Presidential Proclamation on Visas* (Oct. 17, 2017) ....................17

U.S. Dep't of State, *Directory of Visa Categories* ....................26

**LEGISLATIVE MATERIALS:**

58 Cong. Rec. 7303 (1919) ....................34

87 Cong. Rec. 5048 (1941) ....................38, 39

87 Cong. Rec. 5049 (1941) ....................38

87 Cong. Rec. 5050 (1941) ....................38, 44

87 Cong. Rec. 5051 (1941) ....................22

87 Cong. Rec. 5326 (1941) ....................38

87 Cong. Rec. 5386 (1941) ....................39

98 Cong. Rec. 4423 (1952) ....................39

111 Cong. Rec. 21,765 (1965) ....................48

111 Cong. Rec. 21,782 (1965) ....................51

111 Cong. Rec. 24,226 (1965) ....................48

H.R. Rep. No. 65-485 (1918) ....................34, 37, 38

H.R. Rep. No. 89-745 (1965) ....................48, 52

**OTHER AUTHORITIES:**

Antonin Scalia & Bryan A. Garner, Reading Law (2012) ....................33

Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* (2017) ....................40

Page(s)

Oxford English Dictionary (3d ed., rev. 2017) ........................................................28

## INTRODUCTION

It has been more than nine months since the President first attempted to ban the admission of aliens from seven overwhelmingly Muslim countries. Since then, he has changed the number of countries from seven to six, tweaked the order's scope, and converted the ban from a temporary 90-day measure to an indefinite ban. But he has done nothing to cure the intractable legal problems that have doomed this misguided project from the start.

Instead, those problems have grown only more pronounced. The President still has not issued any "find[ing]" that supports the implausible conclusion that the entry of millions of aliens, by virtue of their nationality alone, is "detrimental to the interests of the United States"; nor has he even attempted to make the order comport with the limits of that power as it has been understood for nearly a century. 8 U.S.C. § 1182(f). The President continues to "discriminat[e] * * * because of * * * nationality" in the face of a statute that expressly prohibits him from doing so. *Id.* § 1152(a)(1)(A). And after courts found that his previous order amounted to an obvious pretext for implementing a Muslim ban, he has responded by swapping out one Muslim country for another and imposing wholly symbolic restrictions on Venezuela and North Korea.

In the face of the President's persistent refusal to follow the dictates of Congress and the Constitution, it falls to this Court, once again, to "say what the

law is." *Hawaii* v. *Trump*, 859 F.3d 741, 769 (9th Cir. 2017) (quoting *Marbury* v. *Madison*, 5 U.S. (1 Cranch) 137, 177 (1803)). The President's power over immigration is not "unlimited." *Id.* at 770. And the State of Hawaii, its residents, and all Americans have a right to study, visit their loved ones, and practice their faith free of the burdens imposed by arbitrary and discriminatory executive action. The District Court properly prevented the newest iteration of this illegal order from going into effect. For the third time, its injunction should be upheld.

## BACKGROUND

### A. Earlier Executive Orders

The history of this case is now familiar territory. For over a year, then-candidate Donald Trump campaigned on a promise to enact a "total and complete shutdown on all Muslims entering the United States." ER 137. Seven days after taking office, the President issued an executive order entitled "Protecting the Nation From Foreign Terrorist Entry Into The United States," Exec. Order No. 13,769 (Jan. 27, 2017) ("EO-1"), which purported to temporarily ban entry by nationals of seven Muslim-majority countries and all refugees. ER 10. Before EO-1 could take effect, a district court enjoined it. *Id.* The Government sought an emergency stay, which this Court denied. *Washington* v. *Trump*, 847 F.3d 1151, 1156 (9th Cir. 2017) (per curiam).

Rather than continue defending EO-1—an order sufficiently indefensible that the Government declines even to mention it in its brief, *see* Br. 4-12—the President issued a new order, which bore the same title and imposed nearly the same entry bans. Exec. Order No. 13,780 (Mar. 6, 2017) ("EO-2"). EO-2 barred entry by nationals of six overwhelmingly Muslim countries for 90 days, excluded all refugees for 120 days, and capped annual refugee admissions at 50,000. *Id.* §§ 2(c), 6(a)-(b). It also established a process to identify "additional countries" for "inclusion in a Presidential proclamation that would prohibit the entry of appropriate categories of foreign nationals." *Id.* § 2(e).

Before EO-2 could take effect, the District Court enjoined the order's travel and refugee bans. *Hawaii* v. *Trump*, 245 F. Supp. 3d 1227 (D. Haw. 2017). This Court largely affirmed. *Hawaii*, 859 F.3d 741. It held that the President had not satisfied an "essential precondition" for invoking the statutes on which EO-2 rested—8 U.S.C. §§1182(f) and 1185(a)—because EO-2's "findings" did not "support the conclusion that entry of" the affected classes of aliens "would be harmful to the national interest." *Id.* at 755, 770. It further held that EO-2 "violat[ed] the non-discrimination mandate" of 8 U.S.C. § 1152(a)(1)(A) by "suspending the issuance of immigrant visas and denying entry based on nationality." *Id.* at 776, 779.

The Supreme Court granted certiorari in this case and a parallel Fourth Circuit suit and partially stayed the injunction. *Trump* v. *Int'l Refugee Assistance Project* ("*IRAP*"), 137 S. Ct. 2080 (2017) (per curiam). The Government did not seek expedited review, and two weeks before the scheduled oral argument, EO-2's travel ban expired. The Court removed the case from its oral argument calendar, and after the refugee ban expired on October 24, it dismissed the case as moot. *Trump* v. *Hawaii*, No. 16-1540, 2017 WL 4782860, at *1 (U.S. Oct. 24, 2017). "Following [its] established practice in such cases," the Supreme Court vacated this Court's judgment but "express[ed] no view on the merits." *Id.*

**B. The Third Executive Order**

The same day that EO-2's travel ban expired, the President issued a proclamation entitled "Enhancing Vetting Capabilities and Processes for Detecting Attempted Entry Into the United States by Terrorists or Other Public-Safety Threats," Proc. 9645 (Sept. 24, 2017) ("EO-3"). Despite the changed nomenclature, EO-3 is a direct descendant of EO-1 and EO-2. The very first line of the order identifies it as an outgrowth of EO-2. EO-3 pmbl. And the order continues, and makes indefinite, substantially the same travel ban that has been at the core of all three executive orders.

In particular, Section 2 of EO-3 continues to ban all immigration from five of the six overwhelmingly Muslim countries covered by EO-2: Iran, Libya, Syria,

Yemen, and Somalia. *Id.* § 2(b)-(c), (e), (g)-(h). It switches out the sixth Muslim-majority country, Sudan, for another Muslim-majority country, Chad. *Id.* § 2(a). Additionally, the order prohibits all non-immigrant visas for nationals of Syria, all non-immigrant visas except student and exchange visas for nationals of Iran, and all business and tourist visas for nationals of Libya, Yemen, and Chad. *Id.* § 2(a)-(c), (e), (g)-(h).

EO-3 also imposes token restrictions on two non-Muslim-majority countries. The order bars some forms of entry for a small set of Venezuelan government officials. *Id.* § 2(f). And it bans all entry from North Korea—a country that sent fewer than 100 nationals to the United States last year, and that was already subject to extensive entry bans. *See* ER 90.

EO-3 immediately went into effect for nationals already subject to EO-2 and not protected by the District Court's partially stayed injunction. EO-3 § 7(a). The order was slated to go into full effect on October 18, 2017. *Id.* § 7(b).

### C. The Third Amended Complaint

On October 10, 2017, the State of Hawaii and Dr. Ismail Elshikh moved to file a Third Amended Complaint challenging EO-3 and adding three new plaintiffs: two John Does and the Muslim Association of Hawaii (the "Association"). ER 70-76, 379.

The State explained that EO-3, like its predecessors, would impair the University of Hawaii's retention and recruitment of students and faculty, ER 91-94, 252-255, 257-268, harm the State's tourism industry, ER 94-95, 224-234, and impair its sovereign prerogatives in enforcing its nondiscrimination laws, ER 95-96. Indeed, EO-3 has already compelled the University to cancel visits from several speakers who are nationals of the affected countries. ER 92-93, 242-245, 248-249.

The individual Plaintiffs stated that EO-3 would impede them from being reunited with their close family members. Dr. Elshikh's brother-in-law is a Syrian national who has applied for a tourist visa. ER 238. Doe 1's mother-in-law is an Iranian national who has also applied for a tourist visa. ER 269. And Doe 2's Yemeni son-in-law has applied for an immigrant visa. ER 272-273. Each of these individuals would be impaired from seeing their relatives if EO-3 went into effect, ER 97-98.

The Association explained that EO-3 would inflict associational, financial, and dignitary harms on the Association and its members. ER 99-100. The order would prevent individuals from visiting the Association's mosque, deter current members from remaining in Hawaii, and diminish the Association's contribution-based revenues. ER 217-219. The order would also stigmatize the Association's members and impair their ability to worship together. ER 219.

### D. The District Court's Opinion

On the same day the Plaintiffs filed their amended complaint, they moved for a Temporary Restraining Order (TRO) against the provisions of EO-3 banning entry from every targeted country except Venezuela and North Korea. See ER 379.[1]

On October 17, 2017, the District Court granted a TRO. ER 8-9. It held, at the outset, that each Plaintiff had standing to challenge EO-3. It found the order would "hinder the University from recruiting and retaining a world-class faculty and student body," impair the individual Plaintiffs from reuniting with their relatives, and harm the Association's membership and finances. ER 17-26. The Court "ha[d] little trouble" rejecting the Government's various challenges regarding statutory standing, ripeness, and reviewability. ER 26-29.

On the merits, the District Court concluded that Plaintiffs were likely to succeed in showing that EO-3 violates the Immigration and Nationality Act ("INA"). ER 31. The court found that EO-3 likely exceeds the limits on the

[1] Plaintiffs do not challenge the order's ban on North Korean nationals because "North Korean person[s]" are already excluded pursuant to a separate sanctions order that is not part of this challenge, Exec. Order No. 13,810 § 1(a)(iv) (Sept. 25, 2017), and because the current state of relations with North Korea presents the sort of exigent circumstance previously found to justify a suspension on entry, *see infra* pp. 40-41, 50-52. The President's decision to apply the ban only to certain Venezuelan officials distinguishes that country from the other nations affected by the ban.

President's suspension authority under Sections 1182(f) and 1185(a) because its "findings are inconsistent with and do not fit the restrictions that the order actually imposes." ER 31-39. The court also found that "EO-3 attempts to do exactly what Section 1152 prohibits" by "singling out immigrant visa applicants seeking entry to the United States on the basis of nationality." ER 39-41. The Court found it unnecessary to address Plaintiffs' constitutional claims. ER 25.

The District Court found that the remaining TRO factors were satisfied. Plaintiffs had "identif[ied] a multitude of harms that are * * * irreparable," including "prolonged separation from family members" and "constraints to recruiting and retaining students and faculty members." ER 42. In contrast, Defendants "are not likely harmed by having to adhere to immigration procedures that have been in place for years." ER 43. "[C]arefully weighing the harms," the court concluded that "the equities tip in Plaintiffs' favor," and issued "[n]ationwide relief." ER 43-44.[2]

On October 20, 2017, the parties jointly stipulated that the TRO should be converted to a preliminary injunction. D. Ct. Dkt. 389. This appeal followed.

---

[2] The same day that the District Court issued its decision, the District Court for the District of Maryland concluded that EO-3 violated Section 1152(a)(1)(A) and the Establishment Clause and issued an order largely enjoining EO-3's implementation. *IRAP* v. *Trump*, 2017 WL 4674314 (D. Md. Oct. 17, 2017), *appeal docketed*, No. 17-2240 (4th Cir. Oct. 23, 2017).

## SUMMARY OF ARGUMENT

The President's newest order suffers from the same defects as its invalidated predecessors. It exceeds the scope of the President's immigration powers, contradicts the INA's ban on nationality discrimination, and violates the Constitution. The District Court's injunction should be upheld.

I. A. This Court has authority to review Plaintiffs' claims. Plaintiffs' Article III standing is beyond serious dispute: EO-3 impedes the State's recruitment and retention of students and faculty, separates the individual Plaintiffs from their loved ones, and diminishes the Association's membership and its resources. The remote prospect that individual aliens might be granted discretionary waivers does not alleviate these hardships. Nor is there any statutory bar to review: The doctrine of consular nonreviewability has no application to "the President's promulgation of sweeping immigration policy," *Hawaii*, 859 F.3d at 768, and Defendants have already begun to carry out EO-3 and impair interests protected by the INA.

B. Turning to the merits, EO-3 flouts both of the essential preconditions for invocation of the President's suspension power under 8 U.S.C. §§1182(f) and 1185(a).

*First*, the President has not issued a "find[ing]" that supports the conclusion that millions of aliens, by virtue of their nationality alone, would be "detrimental"

to the United States. 8 U.S.C. § 1182(f). EO-3 asserts that the targeted countries lack adequate "identity-management and information-sharing protocols." EO-3 § 1(h)(i). But existing law already permits immigration officers to exclude aliens for whom they lack adequate information. Furthermore, contrary to its stated rationale, EO-3 permits affected aliens to enter on a variety of non-immigrant visas, does not impose meaningful restrictions on two countries (Iraq and Venezuela) also found to lack adequate protocols, and applies to one country (Somalia) whose protocols *were* found to satisfy the Government's criteria. And the order excludes millions of nationals—such as children and aliens who have lived abroad for decades—for whom the targeted countries do not plausibly possess any relevant information. The President cannot compensate for these deficiencies by claiming that the order will "incentivize" foreign countries; that rationale identifies no "detriment[]" that the aliens' "entry" would cause.

*Second*, the generalized risks EO-3 identifies do not qualify as "detrimental to the interests of the United States" within the meaning of the statute. As the Supreme Court has repeatedly held, broad grants of immigration authority "derive * * * meaningful content" from their history, context, and purpose. *United States* ex rel. *Knauff* v. *Shaughnessy*, 338 U.S. 537, 543 (1950). Every source of meaning makes clear that Congress deemed aliens "detrimental to the interests of the United States" only where either (1) the aliens *themselves* pose a threat to national security

(like spies, saboteurs, and war criminals), or (2) the aliens more broadly threaten congressional policy when Congress cannot practicably act. That was the settled understanding of the words when Congress enacted Section 1182(f), and the express purpose of the statute's drafters. Every prior President has adhered to these limits. The limitless construction the Government proposes would overthrow the structure of the INA and raise grave constitutional concerns; it should be rejected.

EO-3 exceeds the established limits on the President's power. There is no contention that all 150 million individuals the President has excluded would *themselves* pose a national security threat. And Congress is fully capable of addressing—and has addressed—the sort of vetting concerns the order raises.

C. EO-3 also violates the nondiscrimination mandate contained in 8 U.S.C. § 1152(a)(1)(A). That statute unambiguously prohibits "discriminat[ion] * * * in the issuance of an immigrant visa * * * because of * * * nationality." Like EO-2, EO-3 openly engages in such discrimination. The Government cannot evade this clear statutory bar by calling EO-3 a constraint on visa "eligibility" or imposing nationality-based restrictions at a point of entry; either form of evasion would render Section 1152(a)(1)(A) a nullity. Nor can the President appeal to his more general powers under Sections 1182(f) and 1185(a) to override Section 1152(a)(1)(A)'s more specific and later-in-time restrictions.

Moreover, Section 1152(a)(1)(A) reflects a broader congressional policy barring executive officials from using "broad statutory discretion" to discriminate "based on * * * national origin." *Jean* v. *Nelson*, 472 U.S. 846, 857 (1985). Absent some clear evidence that Congress wished to depart from that policy, of which there is none, the order cannot be sustained.

D. Finally, EO-3 violates the Constitution. Multiple courts rightly found that EO-1 and EO-2 sought to effectuate the President's promise to exclude Muslims from the United States. EO-3 continues the same unlawful policies. The Government's claim that this order arose from a neutral process is belied by the significant mismatch between EO-3's rationale and its exclusions. And the token addition of two non-Muslim countries does not erase the animus underlying the order.

II. The balance of equities favors Plaintiffs. EO-3 irreparably harms Plaintiffs, while merely restoring the longstanding status quo in immigration. The Government's generalized appeals to national security are unsupported and undercut by the order itself.

III. A nationwide injunction is the proper remedy where the President flouts statutory constraints or the Constitution—particularly in the immigration realm. The District Court's injunction was appropriate and should be upheld in full.

# ARGUMENT

## I. PLAINTIFFS ARE LIKELY TO SUCCEED ON THE MERITS.

### A. EO-3 Is Reviewable.

The District Court properly held that Plaintiffs statutory and constitutional claims are reviewable. ER 17-30. The Government's contrary arguments merely reiterate contentions this Court has soundly rejected once—and in some circumstances twice—before. It should reject them again.[3]

1. Plaintiffs' Article III standing is beyond serious dispute. The State, "as the operator of the University of Hawai'i system, will suffer proprietary injuries" because of EO-3's impact on current and prospective students, faculty, and speakers. ER 17-19; *see Washington*, 847 F.3d at 1161. The individual Plaintiffs will be impeded from reuniting with close family members who have applied for visas. ER 19-23. The Association will lose members, visitors, and revenue. ER 23-26. Each harm is actual and imminent, directly traceable to EO-3, and redressable by the order's invalidation.

---

[3] Although this panel's prior opinion was vacated because of mootness, the Supreme Court "express[ed] no view on the merits," *Hawaii*, 2017 WL 4782860, at *1, and the opinion therefore retains "informational and perhaps even persuasive or precedential value," *DHX, Inc.* v. *Allianz AGF MAT, Ltd.*, 425 F.3d 1169, 1176 (9th Cir. 2005) (Beezer, J., concurring) (collecting cases). This Court's earlier decision in *Washington* remains binding precedent.

The Government asserts (at 24) that Plaintiffs' claims are not ripe because "individual aliens ha[ve] not sought and been denied a waiver of the suspension of entry." This Court rejected that argument in the context of the challenge to EO-2, *Hawaii*, 859 F.3d at 767, and it has not grown stronger with time. EO-3 imposes immediate "burden[s]" on Plaintiffs by subjecting them to a presumptive ban on entry, "den[ying]" them "equal treatment" through "the imposition of [a] barrier," *Gratz* v. *Bollinger*, 539 U.S. 244, 262 (2003), and deterring foreign nationals from joining or remaining part of the University or the Association, ER 218-219, 253-255; *see* ER 241-245 (explaining that several speaking engagements have already been cancelled). The order's wholly discretionary waiver provision does not cure these problems: It confers no "enforceable" rights, and may be invoked only where denying admission would cause "undue hardship" and disserve "the national interest." EO-3 §§3(c)(i), 9(c). The "substantial hardship" Plaintiffs will suffer from EO-3 is in no way "contingent." *Hawaii*, 859 F.3d at 768.

2. It is equally clear that this Court has the authority to consider Plaintiffs' statutory challenge. *Hawaii*, 859 F.3d at 768-769. Those claims are reviewable under two well-established routes. First, this Court has equitable authority to enjoin "violations of federal law by federal officials," including the President. *Armstrong* v. *Exceptional Child Ctr., Inc.*, 135 S. Ct. 1378, 1384 (2015); *see* *Chamber of Commerce of U.S.* v. *Reich*, 74 F.3d 1322, 1327-28 (D.C. Cir. 1996);

*Dames & Moore* v. *Regan*, 453 U.S. 654, 669 (1981). Second, the Administrative Procedure Act (APA) authorizes the Court to "set aside" agency action at the behest of an "aggrieved" individual. 5 U.S.C. §§702, 706(2). Plaintiffs' claims fall comfortably within both authorities: Plaintiffs allege that the President violated multiple provisions of the INA by promulgating EO-3, and they seek to enjoin agency officials from carrying out the President's unlawful command.

a. The Government "renews [its] argument"—for the third time in this litigation—that the doctrine of consular nonreviewability renders this Court powerless to review the President's compliance with the law. *Hawaii*, 859 F.3d at 768. The Court has rejected that argument twice before, and it remains meritless. *Id.*; *see Washington*, 847 F.3d at 1162-63. The doctrine of consular nonreviewability limits review of "an *individual* consular officer's decision to grant or to deny a visa pursuant to *valid regulations*." *Hawaii*, 859 F.3d at 768 (emphases added). It does not prevent courts from reviewing whether a "sweeping immigration policy" violates statutory limits. *Id.* (quoting *Washington*, 847 F.3d at 1162).

Indeed, the Supreme Court has repeatedly reviewed such claims. In *Sale* v. *Haitian Centers Council, Inc.*, 509 U.S. 155 (1993), the Court reviewed whether "[t]he President * * * violate[d]" various INA and treaty provisions by invoking his authority under 8 U.S.C. § 1182(f) to "suspend[] the entry of undocumented

aliens from the high seas." *Id.* at 160.[4] Likewise, in *Knauff*, the Court reviewed whether restrictions on entry imposed under the immediate predecessor of Section 1182(f) were "'reasonable' as they were required to be by the 1941 Act" and complied with the War Brides Act. 338 U.S. at 544-547.

The Government claims (at 20) that "permitting review of a statutory challenge to the President's decision" would "invert the constitutional structure." That gets things exactly backwards. The Constitution gives Congress "exclusive[]" authority to set immigration policy, *Arizona* v. *United States*, 567 U.S. 387, 409 (2012) (quoting *Galvan* v. *Press*, 347 U.S. 522, 531 (1954)), and requires the President to act within the confines of the authority delegated to him. The notion that the Judiciary cannot prevent the President from transgressing his lawful authority—no matter how brazen the statutory violation—"runs contrary to the fundamental structure of our constitutional democracy." *Washington*, 847 F.3d at 1161.

b. The Government contends (at 23) that judicial review is unavailable because Defendants have not taken "final agency action." 5 U.S.C. § 704. Not so.

---

[4] The Government (at 22) calls this a "drive-by jurisdictional ruling." That is plainly incorrect. The Solicitor General in *Sale* argued at length that the plaintiffs' claims were barred by the doctrine of consular nonreviewability. U.S. Br. 13-18 (No. 92-344); Oral Arg. Tr., 1993 WL 754941, at *16-22. Even though the parties extensively "cross[ed] swords" over the issue, *Arbaugh* v. *Y&H Corp.*, 546 U.S. 500, 512 (2006), not one Justice accepted the argument, and the Court reviewed the plaintiffs' claims on the merits.

The President has made the final decision to promulgate EO-3. Although the President is not an "agency," the Court retains equitable authority to enjoin actions taken by the President in excess of his statutory authority. *Chamber of Commerce*, 74 F.3d at 1327-28; *see, e.g.*, *Dames & Moore*, 453 U.S. at 667.

Furthermore, the Department of State and the Department of Homeland Security have made a final decision to "enforce the President's directive," and Plaintiffs may obtain "[r]eview of the legality of [the President's] action" that way. *Franklin* v. *Massachusetts*, 505 U.S. 788, 828 (1992) (Scalia, J., concurring); *see id.* at 803 (majority opinion). In particular, on September 24, both agencies began enforcing portions of EO-3 against aliens who lack a bona fide relationship with a U.S. person or entity, Br. 11 (citing EO-3 § 7); after those actions were temporarily halted by the District Court on October 17, the agencies resumed enforcement on November 13 pursuant to this Court's partial stay. Dkt. 39. Furthermore, each agency has issued detailed guidance directing officers how to implement EO-3 in full if the injunction is lifted.[5] Defendants have thus "consummate[ed]" their decision to implement the order, and are inflicting—and, if the injunction is lifted, will further inflict—real "legal consequences" by virtue of that unlawful action. *Bennett* v. *Spear*, 520 U.S. 154, 177-178 (1997).

[5] *See* U.S. Dep't of State, *Presidential Proclamation on Visas* (Oct. 17, 2017), https://goo.gl/HoNiNz; U.S. Dep't of Homeland Security, *Fact Sheet: The President's Proclamation* (Sept. 24, 2017), https://goo.gl/gaiEpi.

The Government protests (at 23) that the agencies have not yet "den[ied] a visa * * * to any of the aliens abroad identified by plaintiffs." That argument merely replicates the Government's mistaken contention that Plaintiffs' claims are unripe. As the Supreme Court has made clear, plaintiffs may challenge an agency action that "give[s] notice" of the agency's enforcement plans, even if no "particular action [has been] brought against a particular [entity]." *U.S. Army Corps of Eng'rs* v. *Hawkes Co.*, 136 S. Ct. 1807, 1815 (2016) (quoting *Abbott Labs.* v. *Gardner*, 387 U.S. 136, 150 (1967)). That is precisely what Plaintiffs seek to do.

c. The Government also claims (at 25) that Plaintiffs are not within the zone of interests protected by the INA. As this Court previously explained, the INA authorizes the admission of students and scholars, *see* 8 U.S.C. § 1101(a)(15)(F), (J), (H), (O), and promotes the unification of family members, *id.* § 1153(a). *See Hawaii*, 859 F.3d at 766 (citing *Legal Assistance for Vietnamese Asylum Seekers* v. *Dep't of State* ("*LAVAS*"), 45 F.3d 469, 471-472 (D.C. Cir. 1995)). The State and the individual Plaintiffs seek to vindicate those very interests, ER 91-94, as does the Association (on behalf of its individual members), ER 97-100; *see also* 8 U.S.C. § 1101(15)(R), (27)(C) (authorizing visas for "member[s] of a religious denomination" seeking to support the denomination's activities).

The Government is incorrect that *Saavedra Bruno* v. *Albright*, 197 F.3d 1153 (D.C. Cir. 1999), casts doubt on this conclusion. That case merely found that a corporation and a manager lacked statutory standing to challenge the denial of a visa to a single employee, largely because the doctrine of consular nonreviewability deprived them of any right "to judicial review." *Id.* at 1163-64. That holding has no relevance here, where the nonreviewability doctrine is inapplicable and the plaintiffs—a state university, family members, and a religious association—seek to protect wholly different statutory interests.

d. Last, the Government claims (at 27) that the challenged actions are "committed to agency discretion by law." 5 U.S.C. § 701(a)(2). The essence of Plaintiffs' argument, however, is that Congress did *not* vest the President with complete discretion to exclude aliens whenever he wishes. *See infra* pp. 20-53. Rather, Congress imposed limits on the President's power—ones critical to the separation of powers, and which the President has grossly exceeded. Courts can and do review whether "the President has violated a statutory mandate" in this manner. *Dalton* v. *Specter*, 511 U.S. 462, 474 (1994) (citing *Dames & Moore*, 453 U.S. at 667).

3. This Court also has authority to review Plaintiffs' constitutional claims. *See Washington*, 847 F.3d at 1163-64. As the Government concedes (at 21), courts may review whether the Government has "violated [a] citizen's *own* constitutional

rights." Plaintiffs allege that EO-3 contravenes their own rights under the Establishment Clause by excluding and denigrating Muslims. *See infra* pp. 54-58. Those violations have separated Plaintiffs from their relatives and associates abroad, subjected the State to an establishment of religion, stigmatized the individual Plaintiffs as Muslims, and impaired the Association's operations and free exercise. ER 91-100. Those injuries are more than sufficient to warrant review. *See Catholic League for Religious & Civil Rights* v. *City & Cty. of S.F.*, 624 F.3d 1043, 1048 (9th Cir. 2010) (en banc).

### B. EO-3 Exceeds The President's Authority Under 8 U.S.C. §§ 1182(f) And 1185(a).

The Constitution entrusts "[p]olicies pertaining to the entry of aliens * * * exclusively to Congress." *Arizona*, 567 U.S. at 409 (quoting *Galvan*, 347 U.S. at 531). For more than a century, Congress has implemented its immigration power principally through an "extensive and complex" statutory code—one that "specifie[s]" in considerable detail the "categories of aliens who may not be admitted to the United States." *Id.* at 395.

In Sections 1182(f) and 1185(a), Congress delegated a share of its immigration power to the President. Section 1182(f) states that the President may exclude "any aliens" or "any class of aliens" whose entry he "finds * * * would be detrimental to the interests of the United States." 8 U.S.C. § 1182(f). Section 1185(a) states that it is unlawful "for any alien to * * * enter the United States

except under such reasonable rules, regulations, and orders, and subject to such limitations and exceptions as the President may prescribe." *Id.* § 1185(a)(1).

Although these statutes are "broad," they are "not unlimited." *Hawaii*, 859 F.3d at 770. By their terms, they impose two essential preconditions that must be satisfied before the President may exclude a "class of aliens" or "all aliens" from the United States. 8 U.S.C. § 1182(f). First, the President must issue "find[ings]" that support the conclusion that admission of the excluded aliens would be "detrimental." *Id.* Second, the harm the President identifies must amount to a "detriment[] to the interests of the United States," *id.*—a phrase that the Supreme Court has made clear "derive[s] much meaningful content from the purpose of the Act, its factual background and the statutory context in which [it] appear[s]." *Knauff*, 338 U.S. at 543 (quoting *Lichter* v. *United States*, 334 U.S. 742, 785 (1948)).

EO-3 satisfies neither of these critical requirements. It does not contain any "find[ing]" supporting the conclusion that 150 million nationals of six countries would harm the United States. And the diffuse, generalized harm it identifies does not qualify as "detrimental to the interests of the United States" within the meaning provided by the law's text, purpose, and structure, the unbroken practice of Presidents for the past century, and the Constitution itself.

### 1. *EO-3 does not contain an adequate finding of detrimentality.*

a. The President must issue a "find[ing]" that supports the conclusion that entry would be "detrimental."

Section 1182(f) permits the President to exclude a "class of aliens" only if he "*finds* that [their] entry * * * would be detrimental to the interests of the United States." This text makes plain that the President cannot exclude aliens based only on an assertion. Rather, he must issue a "find[ing]" that "support[s] the conclusion that entry * * * would be harmful to the national interest." *Hawaii*, 859 F.3d at 770.

That interpretation accords with precedent, common sense, and congressional intent. When a statute requires that an officer make "findings," courts invariably have authority to inquire whether there is some "rational connection between the facts found and the choice made." *Burlington Truck Lines, Inc.* v. *United States*, 371 U.S. 156, 168 (1962). Otherwise, the President could justify an exclusion for an irrational reason or no reason at all—by "finding," for example, that Somali nationals must be excluded because their visas are printed in a color the President dislikes. Indeed, the use of the word "find" was deliberate; the legislative history makes clear that Congress used "find" rather than "deem" in the immediate predecessor of Section 1182(f) so that the President would be required to "base his [decision] on some fact," not on mere "opinion" or "guesses." 87 Cong. Rec. 5051 (1941) (statements of Rep. Jonkman and Rep. Jenkins).

Section 1182(f) is thus easily distinguished from statutes that commit decisions to the Executive's unreviewable discretion. *See* Br. 29-30. In *Webster* v. *Doe*, 486 U.S. 592 (1988), the statute at issue provided that the CIA Director could terminate employees whenever he "*deem*[*ed*] [it] necessary or advisable," employing the very term Congress rejected in Section 1182(f). *Id.* at 600; *see id.* at 600-601 (noting that the statute placed "extraordinary" emphasis on secrecy and trust). In *Reno* v. *American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999), the plaintiffs sought to bring "selective-enforcement claims" in the face of a statute that explicitly divested courts of jurisdiction to review any "decision * * * by the Attorney General to commence proceedings." *Id.* at 476-478. And in *Dalton*, the statute "d[id] not *at all* limit the President's discretion"; it provided in unqualified terms that the President could "approv[e] or disapprov[e]" a recommended base closure. 511 U.S. at 476 (emphasis added).

The Government observes (at 31) that prior Section 1182(f) orders have not included "detailed" findings. But the question is not the elaborateness of an order's findings, but whether they actually support the exclusions ordered. Every past order the Government cites excluded aliens because they were found to have engaged in self-evidently harmful conduct, such as supporting "subversive

activities" against the United States or its allies,[6] committing severe violations of international law,[7] or attempting to enter the country "illegally."[8] Those findings, while brief, plainly supported the exclusion of the culpable aliens. *Sale* is no exception: The order there barred aliens whose entry was already "illegal," and the only question the Court found "irrelevant" to the Section 1182(f) analysis concerned whether the order "pose[d] *** harm" to *the aliens excluded*. 509 U.S. at 187-188.

The Government is also incorrect in suggesting (at 29) that the President can dispense with Section 1182(f)'s "finding" requirement simply by invoking his authority under Section 1185(a). Section 1185(a)(1) grants the President general authority to "prescribe" "reasonable rules, regulations, and orders" regarding entry and departure. Section 1182(f), in turn, sets the parameters for the President's power to suspend entry. Under established principles of statutory interpretation, the more general authority in Section 1185(a) cannot be used to evade the preconditions in Section 1182(f). *See Hawaii*, 859 F.3d at 770 n.10. Nor has any prior President attempted to circumvent Section 1182(f)'s requirements through

[6] Proc. 5887 (1988); *see* Proc. 5829 (1988).

[7] Proc. 8342 (2009) (human trafficking); Proc. 6958 (1996) (sheltering international terrorists).

[8] Exec. Order No. 12,807 (1992); *see also* Proc. 8693 (2011) (excluding aliens falling into all three groups).

Section 1185(a); every previous order suspending a class of aliens has both invoked Section 1182(f) and offered some finding in support of the exclusion.[9]

b. EO-3's findings are inadequate.

EO-3's findings fail to support the sweeping restrictions the President has imposed. The principal reason the order gives for banning every national of six countries is that those nations lack adequate "identity-management and information-sharing protocols and practices" to provide the United States "sufficient information to assess the risks" that their nationals pose. EO-3 § 1(h)(i). As the District Court explained, that finding is wholly inadequate for at least three reasons.

*First*, the law already addresses the problem the President identifies. ER 35. "As the law stands, a visa applicant bears the burden of showing that the applicant is eligible to receive a visa," and "[t]he Government already can exclude individuals who do not meet that burden." *Hawaii*, 859 F.3d at 773; *see* 8 U.S.C. § 1361. Contrary to the Government's suggestion (at 37), EO-3 fails to identify any respect in which this individualized adjudication process is "insufficiently protective." It states only that the targeted countries "have 'inadequate' * * *

[9] The Government points (at 31) to President Carter's 1979 order, but that order did not suspend entry at all; it simply delegated the President's powers under Section 1185(a)(1) with respect to Iranian visa-holders. Exec. Order No. 12,172, § 1-101 (1979).

information-sharing practices." EO-3 § 1(g). But if a foreign government does not provide information necessary to determine whether a national of that country is a terrorist, immigration officers have full authority to deny entry to that individual. There is no logical basis for imposing additional sweeping restrictions.

*Second*, EO-3 contradicts its stated rationale. ER 36-37. The Government claims that it "lack[s] sufficient information to assess the risks" that nationals of the banned countries purportedly pose, EO-3 § 1(h)(i), but the order permits nationals from nearly every banned country to enter on a wide range of nonimmigrant visas, *id.* § 2(a)-(c), (g)-(h). Just as the Government was unable to explain "why the 50,001st to the 100,000th refugee would be harmful to the national interest" but the 50,000th would not, *Hawaii*, 859 F.3d at 776, EO-3 fails to explain why it would be detrimental to the national interest to admit aliens as business travelers or tourists but not (for example) as crewmembers, exchange visitors, or agricultural workers. *See* U.S. Dep't of State, *Directory of Visa Categories*, https://goo.gl/c1t3P3. The order claims that "mitigating factors" justify these distinctions. EO-3 § 1(h)(iii). Yet none of the factors to which the order points—such as the possibility of "future cooperation," *id.*—even arguably mitigates the information-sharing deficiencies that supposedly motivate the order, let alone explains the order's distinctions among visa categories.

Moreover, although EO-3 purports to be the product of a neutral review of each country's information-sharing capabilities and identity-management practices, it conspicuously fails to adhere to its own criteria. ER 35-36. Both Iraq and Venezuela failed to meet the Administration's baseline standards, yet the President declined to impose any entry ban on Iraq and imposed *de minimis* restrictions on Venezuela. *See* EO-3, §§ 1(g), 2(f). Conversely, Somalia satisfied all of the baseline standards, but the President imposed significant restrictions on the country nonetheless. *Id.* § 2(h). The Government's *ad hoc* and highly subjective explanations for these deviations, *see* Br. 38-39, make clear that its neutral-sounding criteria were not actually determinative in setting the scope of the ban.

*Third*, EO-3's nationality-based restrictions are substantially overbroad relative to the concerns the President asserts. ER 34. The United States does not need information from a foreign government in order to confirm that a child under the age of five is not a terrorist. Nor is it plausible that the banned countries have meaningful information about aliens "who left as children" or "whose nationality is based on parentage alone." *Hawaii*, 859 F.3d at 773. The Government's only response is to assert (at 36) that a foreign government's identity-management practices apply to all of their nationals. But in the absence of some reason to believe a foreign government has probative information revealing that a toddler or

a person who has never set foot in the country is a threat, that rationale cannot justify the nationality-based bans the President imposed.

Perhaps recognizing these problems, the President offers an alternative justification for the travel bans: That they serve as a bargaining chip to help "elicit" greater cooperation from the affected governments. EO-3 § 1(h)(i), (iii). That justification does not suffice under the plain text of the statute. Section 1182(f) requires the President to "find" that aliens' "entry * * * would be *detrimental* to the interests of the United States"—that is, that "entry" would be "'harmful' or 'injurious'" in some way. *Hawaii*, 859 F.3d at 770 n.11 (quoting Oxford English Dictionary (3d ed., rev. 2017)). The assertion that EO-3 "provide[s] an *incentive* to foreign countries to modify their practices," Br. 36 (emphasis added), is not a finding that the aliens' entry would be "harmful." *See Hawaii*, 859 F.3d at 771 (rejecting, on similar grounds, EO-2's finding that a ban would help "preserve[] * * * government resources").

Indeed, affirming EO-3 on this ground would effectively nullify the "finding" requirement. Every restriction on entry imposes diplomatic pressure on the target government, and the President can always claim that such pressure furnishes a basis for whatever ban he wishes to impose. Congress set a higher bar—one that every President has easily met in the past. EO-3 fails to meet that threshold.

### 2. *EO-3 does not exclude aliens whose entry would be "detrimental to the interests of the United States" within the meaning of Section 1182(f).*

Even if the President had adequately found that entry of the prohibited aliens would pose some risk, the highly generalized risk he identifies would not constitute a "detriment[] to the interests of the United States" within the meaning of the statute. As the Supreme Court has repeatedly made clear, broadly worded grants of authority in the immigration laws should not be construed as limitless delegations; instead, they draw vital limits from their history, purpose, and context. Every relevant source makes clear that Congress considered aliens "detrimental to the interests of the United States" only if (1) the aliens *themselves* pose a threat to national security (such as spies, saboteurs, or war criminals), or (2) admitting the aliens more broadly threatens congressional policy when Congress cannot practicably act. EO-3 satisfies neither limit on the President's authority.

#### a. The words "detrimental to the interests of the United States" derive meaningful content from their history, purpose, and context.

It is well-settled that broadly worded immigration statutes should not be read, "in isolation and literally," to confer "unbounded authority." *United States* v. *Witkovich*, 353 U.S. 194, 199 (1957). In drafting the immigration laws, Congress "must of necessity paint with a brush broader than it customarily wields in domestic areas." *Zemel* v. *Rusk*, 381 U.S. 1, 17 (1965). Immigration policy

encompasses "infinitely variable conditions," *Knauff*, 338 U.S. at 543, and "require[s] consideration of 'changing political and economic circumstances,'" *Jama* v. *Immigration & Customs Enf't*, 543 U.S. 335, 348 (2005). Congress cannot easily reduce these conditions to a "specific formula." *Knauff*, 338 U.S. at 543. But that does not mean that Congress wishes to "grant [the Executive] totally unrestricted freedom of choice." *Zemel*, 381 U.S. at 17. Rather, the Supreme Court has instructed that broad provisions of the immigration laws derive "rational content" from "all relevant considerations," including their history, purpose, context, executive practice, and the Constitution itself. *Witkovich*, 353 U.S. at 199.

In *Kent* v. *Dulles*, 357 U.S. 116 (1958), for instance, the Supreme Court considered a statute granting the President authority to "designate and prescribe [passport rules] for and on behalf of the United States." *Id.* at 123. Although this power was "expressed in broad terms," the Court refused to read it as a grant of "unbridled discretion." *Id.* at 127-128. Instead, the Court noted that Presidents had consistently applied prior statutes to refuse passports only on "two" specific grounds: lack of citizenship and illegal conduct. *Id.* at 127. "[T]hose two [grounds]" were "the only ones which it could fairly be argued were adopted by Congress in light of prior administrative practice," and so marked the limits of the

President's power. *Id.* at 127-128; *see Zemel*, 381 U.S. at 17-18 ("reaffirm[ing]" this holding); *Haig* v. *Agee*, 453 U.S. 280, 297-298 (1981) (same).[10]

The Supreme Court and this Court have "read significant limitations into other immigration statutes." *Zadvydas* v. *Davis*, 533 U.S. 678, 689 (2001); *see Kim Ho Ma* v. *Ashcroft*, 257 F.3d 1095, 1106 (9th Cir. 2001). In *Witkovich*, the Court held that the Attorney General's "seemingly limitless" authority to "require whatever information he deems desirable of aliens" authorized only those questions relevant to the statute's "purpose" of assessing "deporta[bility]." 353 U.S. at 199-200. In *Mahler* v. *Eby*, 264 U.S. 32 (1924), the Court held that a statute granting officers authority to deport any aliens they "find[] * * * [to be] undesirable residents of the United States" needed to be read in light of the "declared policy of Congress" and "previous legislation of a similar character," which gave the words "the quality of a recognized standard." *Id.* at 40. Other examples abound.[11]

This interpretive approach applies with particular force to statutes granting authority to act in "the public interest" or "the interests of the United States." The

---

[10] Although *Kent* noted that a contrary reading might raise First Amendment concerns, *Zemel* and *Haig* explicitly rejected such arguments and relied on the statute's text and history alone. *See Zemel*, 381 U.S. at 16-17; *Haig*, 453 U.S. 308.

[11] *See, e.g.*, *Zadvydas*, 533 U.S. at 689; *INS* v. *Nat'l Ctr. for Immigrants' Rights*, 502 U.S. 183, 191-194 (1991); *Carlson* v. *Landon*, 342 U.S. 524, 543-544 (1952); *Kim Ho Ma*, 257 F.3d at 1111; *Romero* v. *INS*, 39 F.3d 977, 980-981 (9th Cir. 1994).

Court has long made clear that "[i]t is a mistaken assumption" that broad formulations like these make "a mere general reference to public welfare without any standard to guide determinations." *N.Y. Cent. Sec. Corp.* v. *United States*, 287 U.S. 12, 24 (1932). Rather, such words are invariably limited by "ascertainable criteria" derived from "[t]he purpose of the Act, the requirements it imposes, and the context of the provision in question." *Id.* at 24-25; *see Whitman* v. *Am. Trucking Ass'ns*, 531 U.S. 457, 474 (2001) ("[W]e have found an 'intelligible principle' in various statutes authorizing regulation in the 'public interest.'").[12]

These same principles govern the interpretation of Section 1182(f). That statute confers authority in "broad terms": It authorizes the President to exclude aliens found "detrimental to the interests of the United States." But this language is no broader—indeed, in some cases narrower—than provisions conveying power to make passport rules "on behalf of the United States," *Kent*, 357 U.S. at 123, demand information "deem[ed] fit and proper," *Witkovich*, 353 U.S. at 195, exclude "undesirable residents of the United States," *Mahler*, 264 U.S. at 40, or act in "the public interest," *N.Y. Cent. Sec. Corp.*, 287 U.S. at 24. Congress has made clear that those statutes "derive * * * meaningful content" from their history, purpose, and context. *Knauff*, 338 U.S. at 543. Section 1182(f) must, as well.

[12] *See, e.g.*, *United States* v. *Lowden*, 308 U.S. 225, 230 (1939); *Nat'l Broad. Co.* v. *United States*, 319 U.S. 190, 216 (1943); *Gulf States Util. Co.* v. *Fed. Power Comm'n*, 411 U.S. 747, 757-762 (1973).

b. The President may find aliens' entry "detrimental to the interests of the United States" only if the aliens (1) themselves threaten national security or (2) threaten congressional policy in an exigency.

And every source of Section 1182(f)'s meaning speaks with a single voice. Congress intended to permit the President to find aliens' entry "detrimental to the interests of the United States" in only two broad circumstances: where (1) the aliens *themselves* pose a threat to national security (such as spies, saboteurs, and war criminals); or (2) the aliens more broadly threaten congressional policy when Congress cannot practicably act (such as during a fast-moving diplomatic crisis, war, or national emergency). These limits are reflected in the settled meaning of the statute's words at the time of Section 1182(f)'s enactment, the drafters' express and repeated statements of purpose, nearly a century of practice, and the context provided by both the statutory structure and the constitutional separation of powers.

i. Text. Start with the words of the statute. It is a basic principle of statutory construction that when Congress enacts a phrase that "has been given a uniform interpretation by inferior courts or the responsible agency," a later statute "perpetuating the wording is presumed to carry forward that interpretation." Antonin Scalia & Bryan A. Garner, Reading Law 322 (2012); *see Sekhar* v. *United States*, 133 S. Ct. 2720, 2724 (2013). Applying this principle in *Kent*, *Zemel*, and *Haig*, for instance, the Supreme Court held that a passport statute enacted in 1918,

extended in 1941, and made permanent in 1952 implicitly incorporated two longstanding limits evident in the "administrative practice" followed under the predecessor statutes. *Kent*, 357 U.S. at 128; *see Zemel*, 381 U.S. at 17-18l; *Haig*, 453 U.S. at 297-298; *see also, e.g.*, *Mahler*, 264 U.S. at 40; *Lichter*, 334 U.S. at 783-784.

The same interpretive rule applies here. Congress first gave the President explicit authority to regulate entry in 1918, at the height of World War I. That statute provided that "when the United States is at war," the President could suspend the entry of aliens (and set passport rules and departure controls) "if the President shall find that the public safety requires [it] * * * and shall make public proclamation thereof." Act of May 22, 1918, § 1(a), 40 Stat. 559, 559. In 1918, President Wilson exercised this authority to bar a narrow set of aliens who directly sought to harm national security, including spies, saboteurs, and other subversives. Proc. 1473, § 2 (1918); *see* 58 Cong. Rec. 7303 (1919); H.R. Rep. No. 65-485, at 3 (1918). He described these aliens as "*prejudicial to the interests of the United States*." Proc. 1473, § 2 (emphasis added).

In 1941, on the eve of World War II, Congress incorporated President Wilson's words into law. It amended the 1918 statute to provide that the President could exclude aliens during "war or * * * national emergency" if he found that "*the interests of the United States* require" it. Act of June 21, 1941, 55 Stat. 252

(emphasis added). President Roosevelt and his administration then issued regulations excluding several "[*c*]*lasses of aliens* whose entry [wa]s deemed to be *prejudicial to the interests of the United States*." 6 Fed. Reg. 5929, 5931 (Nov. 22, 1941) (emphases added); *see* Proc. 2523, § 3 (1941). Just as in President Wilson's order, those "classes" consisted exclusively of aliens who themselves threatened national security, such as spies and saboteurs. 22 C.F.R. § 58.47(b)-(h) (1941); *see also id.* § 58.47(a) (excluding aliens who were already statutorily inadmissible). Importantly, the regulations also added a catchall category, authorizing the exclusion of "[*a*]*ny alien* * * * in whose case circumstances of a similar character may be found to exist, which render the alien's admission prejudicial to the interests of the United States, which it was the purpose of the act of June 21, 1941 * * * to safeguard." *Id.* § 58.47(i) (emphasis added).

President Truman continued the same practice. In 1945, his administration marginally broadened the "[c]lasses of aliens" deemed "prejudicial to the interests of the United States" to include "war criminal[s]." 10 Fed. Reg. 8997, 9000-01 (July 21, 1945).[13] And in 1949, the President "ratified and confirmed" the wartime regulations by proclamation. Proc. 2850 (1949).

[13] Pursuant to the Alien Enemies Act, the regulations were also expanded to include "enemy aliens" aged fourteen or older. 22 C.F.R. § 58.53(i) (1945); *see* 50 U.S.C. § 21.

Accordingly, when Congress enacted the INA in 1952, it acted against an unbroken practice—spanning two World Wars, six Presidents, and the outbreak of the Korean War and the Cold War—under which only two broad "class[es] of aliens" were designated as "prejudicial to the interests of the United States." Presidents had excluded aliens akin to subversives, spies, and war criminals who themselves posed a threat to national security. And at least since 1941, Presidents had reserved residual authority, in times of war and emergency, to bar the entry of other aliens when "circumstances of a similar character" applied and when the exclusion was necessary to vindicate "the purpose of the act." No President claimed or exercised broader powers.

Congress drafted Section 1182(f) and 1185(a) in a manner that incorporated those historical limits. In Section 1185, it reenacted without relevant change the wartime statute under which Presidents Wilson, Roosevelt, and Truman had issued their regulations and proclamations. Immigration and Nationality Act of 1952, Pub. L. 82-414, § 215(a).[14] And in Section 1182(f), it borrowed the operative

[14] Section 1185 also gave the President a broader suite of powers in time of war or national emergency, including the authority to regulate the entry and departure of citizens and set passport rules. In 1978, as part of a revision of the President's authority over "[t]ravel [d]ocumentation," Congress made Section 1185 applicable outside of war and national emergency. Foreign Relations Authorization Act, Fiscal Year 1979, Pub. L. 95-426, § 707(a) (1978). As noted above, Section 1185(a) has never been invoked as a standalone authority to suspend entry, and the fact that it shares its origins with Section 1182(f) further demonstrates that

language of the implementing regulations and proclamations almost verbatim and permitted the President to exclude "class[es] of aliens * * * detrimental to the United States" during times of peace, as well. *Id.* §212(f). Absent "evidence of any intent to repudiate the longstanding administrative construction"—of which there is none—it is reasonable to infer that Congress intended these words to convey the same limited meaning they had carried for decades. *Haig*, 453 U.S. at 297-298.

ii. Purpose. The statute's purpose unambiguously supports this reading. Every enactment from 1918 to 1952 was accompanied by unusually clear statements of purpose, which make plain that Congress sought to empower the President to exclude "subversives" or to act in times of exigency—not to wield a broader power that could be used to overthrow the immigration laws.

The drafters of the 1918 statute expressly stated that their "intent" was to "stop an important gap in the war legislation of the United States." H.R. Rep. No. 65-485, at 2. As the House report explained, Congress principally sought to authorize the President to exclude "renegade Americans or neutrals" who were employed as German "agents." *Id.* But it explained that the provision was drafted more "broad[ly]" because "[n]o one can foresee the different means which may be

---

Congress did not intend it to confer a broader suspension power than that provision. *See supra* pp. 24-25.

adopted by hostile nations to secure military information or spread propaganda and discontent," and because it was "obviously impracticable [for the President] to appeal to Congress for new legislation in each new emergency." *Id.* at 3.

The drafters of the 1941 statute shared the same limited objectives. President Roosevelt initially requested authority to exclude aliens harmful to "the interests of the United States" so that he could exclude foreign agents "engaged in espionage and subversive activities" prior to the outbreak of war. 87 Cong. Rec. 5048 (1941) (statement of Ruth Shipley, Director, Passport Division, U.S. Dep't of State). Several members of Congress balked at this language, however, because it appeared to "give the President of the United States unlimited power, under any circumstances, to make the law of the United States," *id.* at 5326 (statement of Sen. Taft), or to "override the immigration laws," *id.* at 5050 (statement of Rep. Jonkman). The bill's sponsors reassured them that the statute "would *only* operate against those persons who were committing acts of sabotage or doing something inimical to the best interests of the United States, *under the Act as it was in operation during* [*World War I*]." *Id.* at 5049 (statement of Rep. Eberharter) (emphases added); *see id.* at 5052 (statement of Rep. Johnson). The State Department offered a similar "assurance" that "the powers granted in the bill would not be used except for the objective" of "suppress[ing] subversive

activities." *Id.* at 5386 (statement of Rep. Van Nuys); *see id.* at 5048 (statement of Director Shipley).

As noted above, Presidents Roosevelt and Truman fulfilled that promise. *See supra* pp. 34-35. And in 1952, when Congress borrowed the express terms of the wartime regulations to create Section 1182(f), the provision attracted almost no debate—itself a telling indication that Congress did not intend to confer a vast power it had previously been assured the President did not possess. *See Chisom* v. *Roemer*, 501 U.S. 380, 396 & n.23 (1991) ("Congress' silence in this regard can be likened to the dog that did not bark.").[15] The sole explanation by the bill's supporters reaffirmed the statute's longstanding objective: Representative Walter, the House sponsor, stated that Section 1182(f) was "essential" because it would permit the President to suspend entry during an exigency, like an "epidemic" or economic crisis, in which "it is impossible for Congress to act." 98 Cong. Rec. 4423 (1952).

iii. Executive practice. Presidential practice since 1952 provides further support for this reading. Of the dozens of exclusion orders issued under Section

[15] Some opponents of the INA made statements expressing concern that Section 1182(f) would vest the President with unbounded authority. None of the Act's supporters affirmed these descriptions, and they are not probative. *See Bryan* v. *United States*, 524 U.S. 184, 196 (1998) ("The fears and doubts of the opposition are no authoritative guide to the construction of legislation. In their zeal to defeat a bill, they understandably tend to overstate its reach." (citations omitted)).

1182(f), every one, without exception, has excluded aliens who fall into one of the two categories reflected in the statute's text and purpose. *See Dames & Moore*, 453 U.S. at 686 (explaining that "systematic, unbroken, executive practice * * * may be treated as a gloss" on presidential power).

Forty-two of the 43 orders issued prior to EO-1 excluded aliens who themselves engaged in conduct harmful to the national security. *See* Cong. Research Serv., *Executive Authority to Exclude Aliens: In Brief* 6-10 (2017), https://goo.gl/2KwIfV (listing orders). Indeed, all of them hewed closely to the categories listed in the wartime regulations: They excluded aliens who sought to subvert the United States or its partners abroad, *see, e.g.*, Exec. Order No. 13,712 (2015), who were war criminals or other serious violators of international law, *see, e.g.*, Exec. Order No. 13,606 (2012), or who were statutorily inadmissible, *see* Exec. Order No. 12,807 (1992).

The sole remaining order excluded aliens whose entry threatened congressional policy when Congress could not practicably act. In 1986, President Reagan restricted entry of Cuban nationals after finding that Cuba had breached an immigration agreement, and then, after lesser sanctions had failed, had begun "facilitating illicit migration to the United States" and "trafficking in human beings." Proc. 5517 (1986); 86 U.S. Dep't of State Bull. No. 2116, *Cuba: New Migration and Embargo Measures* 86-87 (Nov. 1986). This order responded to a

dynamic and fast-moving diplomatic crisis that, by its nature, was difficult for Congress to "swiftly" address. *Zemel*, 381 U.S. at 17. And it sought to further a longstanding congressional policy in favor of normalizing relations with Cuba "on a reciprocal basis." Foreign Relations Authorization Act, Fiscal Year 1978, Pub. L. 95-105, § 511 (1977).[16]

iv. Statutory context. The surrounding provisions of the INA further reinforce this reading. Section 1182(f) appears after a long and exceptionally detailed list of "[c]lasses of aliens" whom Congress wished to exclude from the United States, within a yet more comprehensive and finely reticulated immigration code. 8 U.S.C. § 1182(a). Under the *noscitur a sociis* canon, it is presumed that Section 1182(f) authorizes the President to exclude "classes of aliens" similar in kind to the categories that precede it. *Hall Street Assocs.* v. *Mattel, Inc.*, 552 U.S. 576, 586 (2008). Moreover, Congress presumably intended for the President to be able to supplement, but not "effortlessly evade," the statute's "specifically tailored" criteria for inadmissibility. *EC Term of Years Trust* v. *United States*, 550 U.S. 429, 434 (2007).

[16] President Carter's 1979 Iran order did not suspend entry and was not issued pursuant to Section 1182(f). *See supra* p. 25 n.9. But it too involved an "international cris[i]s"—the imprisonment of over 50 Americans as hostages—that the Supreme Court has recognized required swift presidential action. *Dames & Moore*, 453 U.S. at 669.

The longstanding limits on the President's power achieve both ends. Each of the exclusions specified in Section 1182(a) targets aliens who *themselves* have engaged in some activity or have some quality that renders their admission harmful to U.S. interests. *See, e.g.*, 8 U.S.C. § 1182(a)(1)(A) (communicable disease); *id.* § 1182(a)(3)(B) (terrorist); *id.* § 1182(a)(4) (public charge). The core of the President's section 1182(f) power permits him to designate additional categories of the same kind—that is, aliens who *themselves* pose a threat to the "interests of the United States." At the same time, his residual power to act in exigencies "provides a safeguard against the danger posed by any particular case or class of cases that is *not* covered by one of the categories in section 1182(a)." *Abourezk* v. *Reagan*, 785 F.2d 1043, 1049 n.2 (D.C. Cir. 1986) (emphasis added), *aff'd by equally divided Court*, 484 U.S. 1 (1987). No part of this power would enable the President to dispense with the limits Congress imposed.

v. The Constitution. Finally, the longstanding limits on the President's Section 1182(f) power are consistent with the President's established and proper role in the constitutional scheme. Section 1182(f) gives the President flexibility to respond to "changeable and explosive" circumstances in which Congress cannot "swiftly" act. *Zemel*, 381 U.S. at 17. But it leaves "exclusively to Congress" the authority to set immigration policy in the ordinary course. *Arizona*, 567 U.S. at

409. Under this reading, the President would not possess the "unrestricted freedom of choice" the constitutional separation of powers prohibits. *Zemel*, 381 U.S. at 17.

c. The Government's contrary reading would subvert the INA and raise grave constitutional concerns.

The Government nonetheless interprets Section 1182(f) in a manner that would grant the President limitless power over immigration. Section 1182(f), in the Government's view, vests the President with absolute discretion to determine "whether," "when," "on what basis," "for how long," "on what terms," and "who[m]" to exclude from the United States. Br. 28-29.

That cannot be. Time and again the Supreme Court has instructed that broad immigration statutes should not be read in this "literalis[tic]" and "limitless" fashion. *Witkovich*, 353 U.S. at 199. There is no evidence that Congress wished to depart from that longstanding interpretive approach here—indeed, just the contrary. And Presidents have adhered to a narrower interpretation for over six decades. Courts typically react with "a measure of skepticism" when the Executive "claims to discover in a long-extant statute an unheralded power" of such breadth. *Util. Air Regulatory Grp.* v. *EPA* ("*UARG*"), 134 S. Ct. 2427, 2444 (2014).

Furthermore, the Government's interpretation would upend the statutory scheme. Under the Government's reading, the President could erase the INA's "extensive and complex" restrictions at will. *Arizona*, 567 U.S. at 395. He could

end all family-based immigration, restore the national-origins system, or halt immigration entirely by excluding "all aliens." 8 U.S.C. § 1182(f). Congress surely did not intend to authorize the President to "transform [the INA's] carefully described limits * * * into mere suggestions" in this way, *Gonzales* v. *Oregon*, 546 U.S. 243, 260-261 (2006)—and the law's sponsors gave assurances that it would not do so, *see* 87 Cong. Rec. 5050-52 (1941).

More fundamentally, the authority the Government claims is irreconcilable with Constitution's separation of powers. Section 1182(f) would vest in the President a power of staggering breadth, with no intelligible principle to guide its exercise. The Supreme Court has adopted narrow constructions of far less consequential immigration provisions to avoid rendering them boundless delegations. *See, e.g.*, *Zemel*, 381 U.S. at 17-18; *Carlson*, 342 U.S. at 543-544; *Mahler*, 264 U.S. at 40.

The Government suggests that the President can be given this "expansive discretion" because it involves his "inherent Article II authority." Br. 27. That is incorrect. The Government relies exclusively on dicta in *Knauff* stating that the power to exclude aliens "is inherent in the executive power to control the foreign affairs of the nation." 338 U.S. at 542 (citing *United States* v. *Curtiss-Wright Export Corp.*, 299 U.S. 304 (1936)). The Court has since made clear, however, that "[p]olicies pertaining to the entry of aliens" are "entrusted

exclusively to Congress." *Galvan*, 347 U.S. at 531. And it has specifically repudiated *Curtiss-Wright*'s suggestion that "the President has broad, undefined powers over foreign affairs." *Zivotofsky* ex rel. *Zivotofsky* v. *Kerry*, 135 S. Ct. 2076, 2089 (2015). In any event, *Knauff* held that Section 1182(f)'s statutory predecessor derived "meaningful content," from its purpose, background, and context. 338 U.S. at 543. Plaintiffs' interpretation is faithful to that instruction, whereas the Government's reading would ignore it entirely.

d. <u>EO-3 exceeds the limits on the President's Section 1182(f) power.</u>

EO-3 exceeds the longstanding limits on the President's Section 1182(f) authority. There is no contention that EO-3 excludes aliens who *themselves* threaten national security, such as subversives, spies and war criminals—the heartland of the President's exclusion power for the last 99 years. Indeed, the Government has long disclaimed any belief that all 150 million aliens the President is excluding are "potential terrorists" or that they otherwise intend harm to the United States. U.S. Br. 24, *Hawaii* v. *Trump*, No. 17-15589 (9th Cir. Apr. 28, 2017).

Nor does EO-3 fall within the President's residual authority to protect congressional policy where Congress cannot practicably act. *First*, the order does not respond to an exigency of any kind. Rather, it raises concerns about screening and vetting that have existed for years if not decades—ones that Congress has

repeatedly enacted legislation specifically to address. *See infra* n.17. Unlike President Reagan's Cuba order or the wartime proclamations issued in 1918 and 1941, EO-3 does not respond to a fast-breaking diplomatic crisis, a war, a national emergency, or any other "changeable and explosive" circumstance to which Congress cannot "swiftly" respond. *Zemel*, 381 U.S. at 17. It seeks instead to address chronic administrative problems in a manner that will endure indefinitely. Section 1182(f) does not confer that authority.

*Second*, EO-3 does not follow but instead subverts congressional policy. Congress has established an intricate scheme for identifying and vetting terrorists. That system includes "specific criteria for determining terrorism-related inadmissibility," *Kerry* v. *Din*, 135 S. Ct. 2128, 2140 (2015) (citing 8 U.S.C. § 1182(a)(3)(B)), finely reticulated vetting procedures,[17] and exclusions from the Visa Waiver Program for aliens from countries deemed to present a heightened terrorist threat, 8 U.S.C. § 1187(a)(12). As this Court made clear, "executive action" under Section 1182(f) "should not render superfluous" these "specific grounds for terrorism-related admissibility." *Hawaii*, 859 F.3d at 781-782

The President, however, has effectively overridden Congress's scheme and replaced it with his own. EO-3 excludes aliens who do not satisfy any of the

[17] *See, e.g.*, Pub. L. 110-53, §§ 701-731 (2007); Pub. L. 107-173 (2002); 8 U.S.C. §§ 1201-1202, 1221-1226a, 1361.

criteria set in the statutory terrorism bar. It sidesteps entirely the vetting scheme Congress established. And whereas Congress determined—in the face of "similar security concerns"—that aliens from five of the targeted countries could be admitted if they underwent "vetting through visa procedures," the Order deems such vetting categorically inadequate and imposes a "blanket ban." *Id.* at 774.

Just as in EO-2, then, the President has taken "measures that [a]re incompatible with the expressed will of Congress." *Id.* at 782 (quoting *Youngstown Sheet & Tube Co.* v. *Sawyer*, 343 U.S. 579, 637 (1952) (Jackson, J., concurring)). Although broad, the authority under Section 1182(f) "is not unlimited." *Hawaii*, 859 F.3d at 770. EO-3 transgresses the statute's limits.

**C. EO-3 Violates Section 1152(a)(1)(A).**

1. EO-3 is also unlawful for a separate reason: It flatly violates the INA's antidiscrimination provision. Section 1152(a)(1)(A) provides that "no person shall receive any preference or priority or be discriminated against in the issuance of an immigrant visa because of * * * nationality." As Judge Sentelle has explained, "Congress could hardly have chosen more explicit language" in "unambiguously direct[ing] that no nationality-based discrimination shall occur." *LAVAS*, 45 F.3d at 473. Indeed, it specifically enacted this landmark civil rights statute to abolish the pernicious "national origins system" that had dominated immigration earlier in the twentieth century. H.R. Rep. No. 89-745, at 8 (1965). Congress intended to

ensure that "favoritism based on nationality w[ould] disappear[,]" and that "favoritism based on individual worth and qualifications w[ould] take its place." 111 Cong. Rec. 24,226 (1965) (statement of Sen. Kennedy); *see* 111 Cong. Rec. 21,765 (1965) (statement of Rep. Sweeney) (the law's "central purpose" was to "undo discrimination and to revise the standards by which we choose potential Americans").

EO-3 flouts the law's text and purpose. It imposes indefinite bans on immigration from six countries "because of [the aliens'] nationality." 8 U.S.C. § 1152(a)(1)(A). And in so doing, it effectively reestablishes the national-origins system and the invidious discrimination that Congress enacted Section 1152(a)(1)(A) to eliminate. Just like EO-2, EO-3 "suspend[s] the issuance of immigrant visas and den[ies] entry based on nationality," and so "exceeds the restriction of § 1152(a)(1)(A) and the overall statutory scheme intended by Congress." *Hawaii*, 859 F.3d at 779.

2. The Government offers several reasons why it believes Section 1182(f) permits the President to flagrantly violate Section 1152(a)(1)(A) in this manner. Each one is meritless.

The Government first asserts (at 44) that a person deemed ineligible for the issuance of an immigrant visa under Section 1182(f) based exclusively on her nationality has *not* been "discriminated against in the issuance of an immigrant

visa based on" * * * nationality." To articulate that premise is to defeat it. The Government cannot pretend nationality discrimination has not occurred simply because the President has labeled that discrimination a ground for determining visa "eligibility."

Apparently recognizing as much, the Government quickly falls back on its second argument: Even if Section 1152(a)(1)(A) bars nationality discrimination in the "issuance" of immigrant visas, the Government contends, at the very least the statute leaves the President free to discriminate based on nationality at the point of "entry." Br. 43. But EO-3 itself acknowledges that its supposed "entry" restrictions would be enforced by denying visas. *See* EO-3 § 3(c)(iii) (explaining that nationals must obtain a waiver to secure the "issuance of an immigrant visa"). Moreover, the only purpose of a visa is to enable entry; the Government discriminates in visa issuance by limiting disfavored nationalities to visas that have no effect, just as an employer discriminates in hiring if it only hires African-Americans for jobs that receive no pay.

Equally unavailing is the Government's claim (at 48-49) that Sections 1182(f) and 1185(a) authorize the President to override Section 1152(a)(1)(A). That contention is squarely foreclosed by every available canon of statutory interpretation. *See Hawaii*, 859 F.3d at 778. Section 1152(a)(1)(A)'s "specific" bar on nationality-based discrimination in visa issuance narrows Sections 1182(f)

and 1185(a), which set out "general" parameters for the President's authority to regulate admission. *RadLAX Gateway Hotel, LLC* v. *Amalgamated Bank*, 132 S. Ct. 2065, 2071 (2012). Section 1152(a)(1)(A) was enacted more than a decade later than either of the other provisions.[18] *See United States* v. *Juvenile Male*, 670 F.3d 999, 1008 (9th Cir. 2012). And Section 1152(a)(1)(A) contains several express exceptions—some of surpassing obscurity—that do not include Sections 1182(f) and 1185(a). *See* 8 U.S.C. § 1152(a)(1)(A)-(B); *see also United Dominion Indus., Inc.* v. *United States*, 532 U.S. 822, 836 (2001) ("[T]he mention of some implies the exclusion of others not mentioned.").

Ultimately, all of the Government's theories would impermissibly turn Section 1152 into a "nullity." *Dada* v. *Mukasey*, 554 U.S. 1, 16 (2008). Under any of these readings, the President could evade Section 1152(a)(1)(A) and engage in nationality discrimination at will. As this Court observed, Congress plainly did not intend to "enable the President to restore [the] discrimination on the basis of nationality that Congress sought to eliminate." *Hawaii*, 859 F.3d at 777.

The Government insists (at 48) that Section 1152(a)(1)(A) may not limit the President's Section 1182(f) powers because that would mean "the President cannot temporarily suspend the entry of aliens * * * even if he is aware of a grave threat

[18] The Government gestures (at 49) towards the 1978 revisions to Section 1185(a), but nothing in those amendments remotely suggests an intent to repeal or limit Section 1152(a)(1)(A).

from unidentified nationals of that country or the United States is on the brink of war." That is plainly false. Section 1152(a)(1)(A) bars "discrimination," a well-established term in the law that typically does not extend to restrictions narrowly tailored to a compelling interest. *See Sekhar*, 133 S. Ct. at 2724 (explaining that a word with a settled legal meaning "brings the old soil with it"); 111 Cong. Rec. 21,782 (1965) (statement of Rep. Matsunaga) ("There is certainly a marked difference between provisions which are discriminatory as they relate to the racial origin of prospective immigrants and those which are designed to keep subversive elements from our shores."); *see also IRAP*, 2017 WL 4674314, at *21 (stating that nationality-based exclusions "during a specific urgent national crisis or public health emergency * * * arguably would not result in discrimination" within the meaning of Section 1152(a)(1)(A)). Thus, Section 1152(a)(1)(A) would not impede the President's actions in the face of a genuine exigency. But the fact that this provision may permit the Government to draw nationality-based distinctions for the "most compelling" need does not mean that the President may make such distinctions in the ordinary course. *LAVAS*, 45 F.3d at 473.

Nor does the Government get any assistance from historical practice. It points to only two prior presidential orders allegedly involving nationality-based distinctions, and both of those orders involved the sort of exigent circumstances that are lacking here. President Carter's Iran order came in the midst of the Iranian

hostage crisis, and even then it did not itself impose any restrictions on entry. *See supra* p. 41 n.16. Similarly, President Reagan's Cuba order was issued during a dynamic diplomatic dispute, after lesser sanctions had failed and it became obvious that the Cuban government was grossly abusing the visa process. *See supra* pp. 40-41. Neither order offers support for using nationality-based discrimination to "incentivize foreign nations" in the absence of an exigency.[19]

3. In short, Section 1152(a)(1)(A) plainly prohibits national-origin discrimination as to aliens seeking immigrant visas. But the statute also reflects robust congressional opposition to *any* nationality-based discrimination in the issuance of visas. Congress enacted this provision to abolish the "national origins system" for selecting entrants to this country. *Hawaii*, 859 F.3d at 776 (quoting H.R. Rep. No. 89-745, at 8). Accordingly, since the statute's enactment, courts have held that the Executive is barred, except in exceptional circumstances or where expressly authorized by Congress, from drawing nationality-based distinctions for immigrants and nonimmigrants alike. In *Jean*, for example, the Supreme Court held that immigration officers generally must implement grants of "broad statutory discretion * * * without regard to race *or national origin*." 472

[19] The Government briefly suggests (at 49) that EO-3 merely sets "procedures for the processing of immigrant visa applications," 8 U.S.C. § 1152(a)(1)(B), but it does not even attempt to explain how a *ban* on issuing visas to nationals of certain countries may be viewed as a "procedure[] * * * for processing" those visas. *See Hawaii*, 859 F.3d at 779.

U.S. at 857 (emphasis added). And as Judge Friendly explained in 1966, one year after Section 1152(a)'s enactment, "discrimination against a particular race or group" is an "impermissible basis" for exclusion. *Wong Wing Hang* v. *INS*, 360 F.2d 715, 719 (2d Cir. 1966); *see also Olsen* v. *Albright*, 990 F. Supp. 31, 38-39 (D.D.C. 1997) (holding that the Government may not discriminate against aliens on the basis of nationality in issuing "nonimmigrant visa[s]").

This conclusion is reinforced by background norms of our constitutional system. For decades, the Supreme Court has held that discrimination on the basis of an inherent characteristic such as nationality is highly "suspect," and subject to the most serious scrutiny. *IRAP* v. *Trump*, 857 F.3d 554, 614 (4th Cir. 2017) (en banc) (Wynn, J., concurring); *see Loving* v. *Virginia*, 388 U.S. 1, 11 (1967). Absent a clear statement from Congress, the immigration laws should not be construed to authorize such disfavored and "invidious discrimination." *IRAP*, 857 F.3d at 617-618 (Wynn, J., concurring).

No law relied on by the President in issuing EO-3 contains a clear statement authorizing him to depart from this fundamental norm. And, indeed, Section 1152(a)(1)(A) expressly bars such discrimination as to immigrant visas. The injunction against EO-3 may be affirmed in its entirety on this basis as well.

### D. EO-3 Violates The Establishment Clause.

If this Court did somehow find that EO-3 is consistent with the immigration laws, the injunction should nonetheless be affirmed on constitutional grounds. *See Hawaii*, 859 F.3d at 761 (explaining that the Court "need not * * * reach the [constitutional] claim[s]" if the injunction "can be affirmed * * * on statutory grounds"). As the Ninth Circuit held in evaluating EO-1, "[a] law that has a religious, not secular, purpose violates" the Establishment Clause. *Washington*, 847 F.3d at 1167 (internal quotation marks, alterations, and citations omitted). Multiple courts, including the *en banc* Fourth Circuit, concluded that plaintiffs were likely to succeed on the claim that EO-2 was intended to serve the unconstitutional purpose of preventing Muslim immigration. *IRAP*, 857 F.3d at 601; *Hawaii*, 245 F. Supp. 3d at 1230. EO-3, which on its face and in substance continues the unlawful policies of EO-2, suffers from the same defect. *IRAP*, 2017 WL 4674314, at *27-37.

The constitutional analysis in this instance is particularly straightforward.[20] The Establishment Clause inquiry focuses on purpose as it would be understood by a "reasonable observer." *McCreary Cty.* v. *ACLU*, 545 U.S. 844, 864 (2005). It

---

[20] In the past, the Government's primary defense has been to ask the Court to look away, relying on *Kleindienst* v. *Mandel*, 408 U.S. 753 (1972). But this Court has already rejected *Mandel*'s application to "sweeping proclamations" like EO-3. *Washington*, 847 F.3d at 1166. And, as another court recently held, EO-3 cannot pass muster even if *Mandel* applies. *IRAP*, 2017 WL 4674314, at *27-37.

frequently requires courts to examine "evidence of purpose beyond the face of the challenged law," including "the historical background of the decision and statements by decisionmakers." *Washington*, 847 F.3d at 1167-68. After analyzing that evidence with respect to EO-2, both the *en banc* Fourth Circuit and the District Court recognized that "the reasonable observer would likely conclude that EO-2's primary purpose [wa]s to exclude persons from the United States on the basis of their religious belief." *IRAP*, 857 F.3d at 601; *Hawaii* v. *Trump*, 241 F. Supp. 3d 1119, 1137 (D. Haw. 2017). EO-3 expressly acknowledges in its opening paragraph that it emerged as a result of EO-2, and it indefinitely continues the bulk of EO-2's entry suspensions. Thus, it inevitably perpetuates that order's unconstitutional purpose. *See McCreary*, 545 U.S. at 866 ("reasonable observers have reasonable memories").

Moreover, since multiple courts concluded that EO-2 likely violated the Establishment Clause, the record has only gotten worse. *See* ER 87-88. For example, on June 5, 2017, days after the Government asked the Supreme Court to stay the injunction of EO-2, President Trump issued a series of Twitter posts championing the "original Travel Ban," decrying the fact that the "Justice Dep[artment]" submitted a "watered down, politically correct version * * * to S.C," and calling for "[a] much tougher version." ER 87. Nine days before EO-3 was released, he again used Twitter to demand a "larger, tougher and more

specific" ban, reminding the public that he remains committed to a "travel ban" even if it is not "politically correct." *Id.* And on the day EO-3 was made public, the President made clear that it *was* the harsher version of the travel ban, telling reporters, "The travel ban: the tougher, the better." ER 90; *see* U.S. Supp. Submission & Further Resp. 2, 4, *James Madison Proj.* v. *Dep't of Justice*, No. 1:17-cv-00144 (D.D.C. Nov. 13, 2017), ECF No. 29 (treating the President's tweets as "official statements of the President of the United States").

Even more to the point is what the President has not said and what he has not done. In the more than nine months since he took office, the President has *never* renounced his campaign promise to ban Muslim immigration, which remained on his frequently updated campaign website until minutes before the Fourth Circuit arguments on EO-2. And the President has *never* retreated from his attempt to impose a ban that will overwhelmingly exclude Muslims. Indeed, while EO-3 purports to be the result of a neutral process involving a study of vetting procedures, it reimposes virtually the same travel restrictions as its predecessors and makes them indefinite. Nor is that result surprising given that the "neutral" process was itself dictated by EO-2, and given that the President has made clear that the primary purpose of EO-3 is to impose a "tougher" version of his travel ban.

To be sure, the new order adds to and embellishes the ostensibly neutral rationales for the nationality bans. But the fit between EO-3's stated secular purposes and its operation remains exceedingly poor, and the order deviates from its own "neutral" criteria. *See supra* pp. 26-28. Nor does the inclusion of two non-Muslim countries ameliorate the Establishment Clause concerns. Both additions have little practical significance: North Korea's nationals almost never apply for admission to the United States and their entry is restricted by a prior sanctions order. ER 90. And, as noted, EO-3 leaves Venezuela largely untouched, restricting travel only for a small handful of government officials. The upshot is that, just as with EO-1 and EO-2, Muslims constitute the overwhelming majority of those banned by EO-3. *Id.*

Given this result, one might be forgiven for assuming that Venezuela and North Korea were added primarily to improve the Government's "litigating position." *McCreary*, 545 U.S. at 871. Indeed, their addition resembles nothing so much as the self-consciously secular trappings that the government defendants in *McCreary* attempted to add to their display of the Ten Commandments to improve their chances of surviving an Establishment Clause challenge. The *McCreary* Court had no trouble looking past those maneuvers and finding a constitutional violation, particularly given that the plainly religiously-motivated resolution underlying the prior display remained in place. *Id.* at 871-872. Because the

Government's efforts here are similarly transparent, and because the travel bans in EO-2 similarly remain in place and have now been made indefinite, this Court may also follow the course set by *McCreary* by affirming the injunction on Establishment Clause grounds.

## II. The Remaining Preliminary Injunction Factors Are Met.

### A. EO-3 Would Inflict Irreparable Harms On Plaintiffs.

Plaintiffs will suffer grave and irreparable harms as a result of EO-3. The order would result in "prolonged separation from family members, constraints to recruiting and retaining students and faculty members to foster diversity and quality within the University community, and the diminished membership of the Association." ER 42. As this Court has previously concluded, those harms are more than sufficient to sustain an injunction. *See Washington*, 847 F.3d at 1169. Indeed, they are textbook examples of irreparable harms because they "cannot be adequately remedied through damages." *Am. Trucking Ass'ns, Inc.* v. *City of L.A.*, 559 F.3d 1046, 1059 (9th Cir. 2009); *see Hawaii*, 859 F.3d at 782-783. The Government yet again asserts (at 52) that these harms are too "speculative" because no alien has been denied a waiver, but that ignores (once again) the substantial hardships the Government's order imposes right now. *See supra* p. 14; *see also Washington*, 847 F.3d at 1169; *Hawaii*, 859 F.3d at 782-783.

### B. The Balance Of The Equities And The Public Interest Favor Relief.

The balance of the equities and the public interest also support the District Court's preliminary injunction. Plaintiffs and the public have a vested "interest in the free flow of travel, in avoiding the separation of families, and in freedom from discrimination." *Washington*, 847 F.3d at 1169-70. EO-3 tramples on those interests, and contravenes congressional and constitutional commands as well.

The Government appeals to an amorphous national security interest and pleads for "the utmost deference." Br. 50. But the Government's mere invocation of national security concerns should not "become a talisman used to ward off inconvenient claims." *Ziglar* v. *Abbasi*, 137 S. Ct. 1843, 1862 (2017). Here, the Government has not identified any exigency that compels EO-3's indefinite travel bans. *See supra* pp. 50-52; Jt. Decl. of Former National Security Officials ¶¶ 5-12 (D. Ct. Dkt. 383-1). And the national security rationales it has offered are uniformly insufficient. *See supra* pp. 25-28. Moreover, the District Court's injunction simply maintains the status quo that has existed for decades. *See Washington*, 847 F.3d at 1168.

The Government asserts (at 50-51) that it suffers irreparable harm stemming from an injunction "overriding the President's judgment" at the "height of the President's authority." This Court has rejected that argument before. *See Washington*, 847 F.3d at 1168; *Hawaii*, 859 F.3d at 783 n.22. With good reason.

There is no basis for the President's claim of unreviewable power. *See supra* pp. 15-16. And any "institutional injury" imposed by the alleged "erosion of the separation of powers" would be a question for the merits, not for the irreparable harm analysis. *Washington*, 847 F.3d at 1168.

**III. A Nationwide Injunction Is Appropriate.**

The scope of the District Court's injunction is proper. Time and again, courts have held that nationwide relief is an appropriate remedy for the President's violation of the immigration laws. *See Washington*, 847 F.3d at 1166-67; *Hawaii*, 859 F.3d at 787-788; *Texas* v. *United States*, 787 F.3d 733, 767-768 (5th Cir. 2015). As the Supreme Court has made clear, "the scope of injunctive relief" must be "dictated by the extent of the violation established." *Califano* v. *Yamasaki*, 442 U.S. 682, 702 (1979). When an Executive Branch policy contravenes a statute or the Constitution, it is thus invalid in all its applications and must be struck down on its face. *See, e.g., UARG*, 134 S. Ct. at 2449; *Sierra Club* v. *Bosworth*, 510 F.3d 1016, 1023-24 (9th Cir. 2007). That remedy is particularly appropriate in the immigration realm, given that piecemeal relief would "fragment[] immigration policy" and contravene "the constitutional and statutory requirement for uniform immigration law and policy." *Washington*, 847 F.3d at 1166-67; *see* U.S. Const. art. I, § 8, cl. 4.

The Government's demand (at 52) that the injunction be narrowed to "identified individual alien[s] abroad" is irreconcilable with these authorities. It is also wholly impracticable. *See Washington*, 847 F.3d at 1166. Plaintiffs cannot identify in advance precisely which individuals may wish to enroll in the State's University or join the Association, or would be chilled by EO-3 from doing so.[21] The President's lawless and discriminatory bans harm countless Americans and their relations abroad. They should not be permitted to go into effect anywhere.

## CONCLUSION

For the foregoing reasons, the District Court's injunction should be affirmed in full.

Respectfully submitted,

/s/ Neal Kumar Katyal


DOUGLAS S. CHIN
Attorney General of the State of Hawaii
CLYDE J. WADSWORTH
Solicitor General of the State of Hawaii
DEIRDRE MARIE-IHA
DONNA H. KALAMA
KIMBERLY T. GUIDRY
ROBERT T. NAKATSUJI
KALIKO'ONALANI D. FERNANDES
KEVIN M. RICHARDSON

NEAL KUMAR KATYAL
COLLEEN ROH SINZDAK
MITCHELL P. REICH
ELIZABETH HAGERTY
YURI S. FUCHS
SUNDEEP IYER*
REEDY C. SWANSON**
HOGAN LOVELLS US LLP
555 Thirteenth Street NW
Washington, DC 20004


[21] The Government's alternative suggestion (at 53) that the injunction be limited to aliens with "bona fide relationship with a person or entity in the United States" was not raised below, and so is forfeited. And as the Government acknowledges, that standard arose in "very different" circumstances that do not apply here.

Deputy Attorneys General
DEPARTMENT OF THE ATTORNEY GENERAL, STATE OF HAWAII
425 Queen Street
Honolulu, HI 96813
Telephone: (808) 586-1500
Fax: (808) 586-1239

*Counsel for the State of Hawaii*

Telephone: (202) 637-5600
Fax: (202) 637-5910

THOMAS P. SCHMIDT
HOGAN LOVELLS US LLP
875 Third Avenue
New York, NY 10022
Telephone: (212) 918-3000
Fax: (212) 918-3100

SARA SOLOW
ALEXANDER B. BOWERMAN
HOGAN LOVELLS US LLP
1735 Market St., 23rd Floor
Philadelphia, PA 19103
Telephone: (267) 675-4600
Fax: (267) 675-4601

*Counsel for Plaintiffs-Appellees*

**Admitted only in Maryland; supervised by firm members*
***Admitted only in Virginia; supervised by firm members*

## STATEMENT OF RELATED CASES

Appellees are not aware of any related cases within the meaning of Ninth Circuit Rule 28-2.6 currently pending in this Court. Four appeals involving prior Executive Orders that would have been related to this case were previously pending before this Court: *Hawaii* v. *Trump*, No. 17-15589; *Hawaii* v. *Trump*, No. 17-16366; *Hawaii* v. *Trump*, No. 17-16426; and *Washington* v. *Trump*, No. 17-35105.

## CERTIFICATE OF COMPLIANCE

1. This motion complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(B) because it contains 13,972 words, excluding the parts of the brief exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii).

2. This brief complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and the typestyle requirements of Federal Rule of Appellate Procedure 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Office Word 2010 in Times New Roman 14-point font.

/s/ Neal Kumar Katyal
Neal Kumar Katyal

## CERTIFICATE OF SERVICE

I certify that I electronically filed the foregoing with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system on November 18, 2017. I certify that all participants in the case are registered CM/ECF users and that service will be accomplished by the appellate CM/ECF system.

/s/ Neal Kumar Katyal
Neal Kumar Katyal