**No. 17-17168**

---

**IN THE UNITED STATES COURT OF APPEALS**
**FOR THE NINTH CIRCUIT**

---

STATE OF HAWAII; ISMAIL ELSHIKH, JOHN DOES 1 & 2, and MUSLIM ASSOCIATION OF HAWAII, INC.,

*Plaintiffs – Appellees*,

v.

DONALD J. TRUMP, in his official capacity as President of the United States; U.S. DEPARTMENT OF HOMELAND SECURITY; ELAINE DUKE, in her official capacity as Acting Secretary of Homeland Security; U.S. DEPARTMENT OF STATE; REX TILLERSON, in his official capacity as Secretary of State; and the UNITED STATES OF AMERICA,

*Defendants – Appellants*.

---

On Appeal from the United States District Court
for the District of Hawaii
(1:17-cv-00050-DKW-KSC)

---

# REPLY BRIEF FOR APPELLANTS

---


NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Principal Deputy Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

# TABLE OF CONTENTS

**Page**

INTRODUCTION ........................................................................................ 1

ARGUMENT ........................................................................................ 4

I. Plaintiffs' INA Claims Are Not Justiciable ........................................ 4

II. Plaintiffs' INA Claims Are Not Likely To Succeed On The Merits ............. 9

A. The Proclamation Falls Squarely Within The President's Broad Authority Under Sections 1182(f) And 1185(a)(1) .................. 10

B. The Proclamation Does Not Violate 1152(a)(1)(A) ........................... 21

III. Plaintiffs' Establishment Clause Claim Does Not Alternatively Support The Injunction ........................................ 24

IV. The Balance Of Equities Weighs Strongly Against An Injunction ............... 27

CONCLUSION ........................................................................................ 29

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

## TABLE OF AUTHORITIES

**Cases:** **Page(s)**

*Abourezk v. Reagan*,
785 F.2d 1043 (D.C. Cir. 1986),
*aff'd by an equally divided Court*, 484 U.S. 1 (1987) .......................................18

*Allende v. Shultz*,
845 F.2d 1111 (1st Cir. 1988).....................................................................18

*Arizona v. United States*,
567 U.S. 387 (2012).......................................................................................5

*Armstrong v. Exceptional Child Center, Inc.*,
135 S. Ct. 1378 (2015)...................................................................................9

*Catholic League v. City & Cty. of S.F.*,
624 F.3d 1043 (9th Cir. 2010) (en banc) ....................................................24

*Crosby v. National Foreign Trade Council*,
530 U.S. 363 (2000).....................................................................................16

*Harisiades v. Shaughnessy*,
342 U.S. 580 (1952).......................................................................................5

*Hawaii v. Trump*,
859 F.3d 741 (9th Cir. 2017) ...............................................................13, 21

*In re Navy Chaplaincy*,
534 F.3d 756 (D.C. Cir. 2008)....................................................................24

*IRAP v. Trump*,
No. TDC-17-0361, 2017 WL 4674314 (D. Md. Oct. 17, 2017) ..................11, 20

*Kleindienst v. Mandel*,
408 U.S. 753 (1972).....................................................................................25

*Legal Assistance for Vietnamese Asylum Seekers v. Department of Justice*, 45 F.3d 469 (D.C. Cir. 1995), *vacated on other grounds*, 519 U.S. 1 (1996) .......... 7

*McCreary County v. ACLU of Kentucky*, 545 U.S. 844 (2005) .......... 25, 26

*McGowan v. Maryland*, 366 U.S. 420 (1961) .......... 25, 27

*Merritt v. Countrywide Financial Corp.*, 759 F.3d 1023 (9th Cir. 2014) .......... 24

*Olsen v. Albright*, 990 F. Supp. 31 (D.D.C. 1997) .......... 24

*Reno v. American-Arab Anti-Discrimination Committee*, 525 U.S. 471 (1999) .......... 15

*Rajah v. Mukasey*, 544 F.3d 427 (2d Cir. 2008) .......... 24

*Saavedra Bruno v. Albright*, 197 F.3d 1153 (D.C. Cir. 1999) .......... 5, 8

*Sale v. Haitian Ctrs. Council, Inc.*, 509 U.S. 155 (1993) .......... 6, 18

*Trump v. IRAP*, 137 S. Ct. 2080 (2017) .......... 29

*United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537 (1950) .......... 4, 5, 6, 7, 18

*U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016) .......... 8

*Washington v. Trump*,
847 F.3d 1151 (9th Cir. 2017) ....................................................................7

*Webster v. Doe*,
486 U.S. 592 (1988)....................................................................................11, 16

*Wong Wing Hang v. INS*,
360 F.2d 715 (2d Cir. 1966) ......................................................................24

**Constitution and Statutes:**

U.S. Const. amend. 1......................................................................................3

U.S. Const. art. III ........................................................................................28

Administrative Procedure Act:
5 U.S.C. § 701(a)(1).......................................................................................7
5 U.S.C. § 702(1) ..........................................................................................7
5 U.S.C. § 703 ...............................................................................................9

Immigration and Nationality Act:
8 U.S.C. § 1101(a)(15)(E)(iii) .......................................................................23
8 U.S.C. § 1101(a)(15)(H)(i)(b)(1)................................................................23
8 U.S.C. § 1152(a)(1).....................................................................................22
8 U.S.C. § 1152(a)(1)(A) ..................................................3, 10, 20, 21, 22, 23
8 U.S.C. § 1182(a) .........................................................................................18
8 U.S.C. § 1182(a)(7)(B)(iv) .........................................................................23
8 U.S.C. § 1182(f)......................................................................................*passim*
8 U.S.C. § 1184(g)(8) ....................................................................................23
8 U.S.C. § 1185(a)(1)................................................................................*passim*
8 U.S.C. § 1187(a)(3).....................................................................................26
8 U.S.C. § 1187(a)(12)...................................................................................26
8 U.S.C. § 1187(c) .........................................................................................20
8 U.S.C. § 1187(c)(2).....................................................................................26
8 U.S.C. § 1253(d) .........................................................................................22

42 U.S.C. § 2000e-2(a)(1)..............................................................................22
42 U.S.C. § 2000e-2(e)(1)..............................................................................22

Act of May 22, 1918, ch. 81, 40 Stat. 559 ....... 16

Act of June 21, 1941, ch. 210, 55 Stat. 252 ....... 16

Pub. L. No. 82-414, § 212(e), 66 Stat. 188 (1952) ....... 17

Pub. L. No. 95-426, § 707(a), 92 Stat. 992-93 (1978) ....... 17

Pub. L. No. 96-123, § 101(a)(1), 93 Stat. 923 (1979) ....... 17

Pub. L. No. 105-100, § 202, 111 Stat. 2193, 2193-94 (1997) ....... 23

**Other Authorities:**

8 C.F.R. § 214.2(h)(5)(i)(F) ....... 23

8 C.F.R. § 214.5 ....... 23

51 Fed. Reg. 30,470 (1986) ....... 19

http://www.presidency.ucsb.edu/ws/?pid=33233 ....... 19

Proclamation No. 9645, 82 Fed. Reg. 45,161 (2017) ....... *passim*

## INTRODUCTION

The President issued Proclamation No. 9645 pursuant to his broad constitutional and statutory authority to exclude aliens whose entry he determines would be detrimental to the interests of the United States. The Proclamation was the product of a worldwide review and evaluation of foreign governments' information-sharing practices and other risk factors, involving multiple Cabinet heads and other agency officials whose motives have never been questioned. That process culminated in a recommendation by the Acting Secretary of Homeland Security to restrict entry of certain nationals of eight countries, and, acting in accordance with that recommendation, the President imposed tailored substantive restrictions to encourage improvement in those countries' inadequate practices and to protect the Nation in the interim.

Plaintiffs disregard these critical features of the Proclamation, simply labeling it as "substantially the same" as the Executive Order (EO-2) previously before this Court. Br. 4. Plaintiffs suggest that the Proclamation's entry restrictions are unwarranted to protect national security and inappropriate to encourage foreign governments to improve their practices. This Court should reject plaintiffs' invitation to second-guess the national-security and foreign-policy judgments of the President and his top advisors, which could disable this and future Presidents from

addressing critical security risks and would impugn the validity of past Presidents' entry restrictions.

As an initial matter, the district court should not have reached those questions, because the court exceeded the limits on its jurisdiction. The district court held that the Proclamation violates the Immigration and Nationality Act (INA), but statutory challenges to the political branches' exclusion of aliens abroad are nonreviewable absent express congressional authorization. Plaintiffs neither identify such authorization nor provide a principled justification why that rule applies to individual decisions by subordinate officials but not to policy decisions by the head of the Executive Branch.

Plaintiffs' statutory claims also fail on the merits. Contrary to plaintiffs' fundamental premise, the President's broad authority to exclude aliens under 8 U.S.C. §§ 1182(f) and 1185(a)(1) is not limited to narrow circumstances where the particular "aliens *themselves* pose a threat to national security" or their entry "more broadly threaten[s] congressional policy when Congress cannot practicably act." Br. 10-11. That gerrymandered interpretation has no basis in statutory text or historical practice.

Section 1182(f)'s authorization for the President to exclude any class of aliens whose entry he finds "would be detrimental to the interests of the United States," and Section 1185(a)(1)'s authorization for the President to impose "reasonable

rules" as well as "limitations and exceptions" on alien entry, plainly permit the President to prohibit the entry of aliens from countries with which the United States has national-security and foreign-policy concerns—especially where the concerns relate to risks posed by those aliens due to the countries' inadequate information-sharing practices or other risk factors. Under that correct understanding of Sections 1182(f) and 1185(a)(1), plaintiffs' objections to the Proclamation's findings evaporate. So too does their separate objection under 8 U.S.C. § 1152(a)(1)(A); that provision, which bans nationality discrimination in the issuance of immigrant visas to eligible applicants, does not impliedly repeal the President's authority under § 1182(f) and § 1185(a) to suspend the entry eligibility of certain nations' citizens. Importantly, plaintiffs' statutory arguments would necessarily imply that the actions of past Presidents were invalid, including President Carter's Iran order and President Reagan's Cuba order.

As to plaintiffs' Establishment Clause claim, the district court did not reach it, and this Court should decline to address it in the first instance. In any event, the claim is not justiciable. Plaintiffs lack standing absent *personal* contact with the alleged violation, and the indirect injuries they allege flow from alleged discrimination against aliens abroad (who lack constitutional rights) rather than any violation of plaintiffs' *own* Establishment Clause rights. The claim also fails on the merits. Plaintiffs would have this Court infer a bad-faith religious purpose from the

supposed "significant mismatch" between the Proclamation's rationale and its scope, Br. 12, but that fundamentally misunderstands the good-faith secular purpose that is effectuated by the Proclamation's tailored substantive restrictions and the multi-agency review and recommendation process. Plaintiffs also allege religious animus based on various statements by the President regarding the Proclamation and its predecessor Executive Orders, but it is both illogical and dangerous to use such statements to disable the President from acting on the national-security and foreign-policy recommendations of his Cabinet.

Finally, even if some injunctive relief were appropriate, the district court erred in refusing to limit its injunction to identified aliens whose exclusion would impose concrete, irreparable harm on plaintiffs. *A fortiori*, the court erred in extending the injunction to reach aliens who lack a credible claim of a bona fide relationship with *any* person or entity in the United States.

## ARGUMENT

### I. Plaintiffs' INA Claims Are Not Justiciable

**A.** Plaintiffs' statutory claims are barred by the longstanding principle that "it is not within the province of any court, unless expressly authorized by law, to review the determination of the political branch of the Government to exclude a given alien." *United States ex rel. Knauff v. Shaughnessy*, 338 U.S. 537, 543 (1950). Plaintiffs seek to cabin this principle to "review of an *individual* consular officer's

decision." Br. 15. But that distinction would upend the separation-of-powers rationale of the nonreviewability principle.

Rather than relying on anything specific to the individualized nature of consular officers' visa adjudications, the principle of nonreviewability of the exclusion of aliens rests more broadly on the "recognition that 'any policy toward aliens is vitally and intricately interwoven with * * * the conduct of foreign relations, the war power, and the maintenance of a republican form of government'"—matters "'so exclusively entrusted to the political branches of government as to be largely immune from judicial inquiry or interference.'" *Saavedra Bruno v. Albright*, 197 F.3d 1153, 1159 (D.C. Cir. 1999) (quoting *Harisiades v. Shaughnessy*, 342 U.S. 580, 588-89 (1952)). That rationale applies *a fortiori* to the President's policy decision to exclude certain classes of aliens whose entry he finds would be detrimental to the interests of the United States, as compared to a visa adjudication under the INA by a subordinate official.

Plaintiffs' rejoinder that "[t]he Constitution gives Congress 'exclusive[]' authority to set immigration policy," Br. 16, is both incorrect and immaterial. To begin, the President has "inherent" constitutional authority to exclude aliens in addition to his statutory authority. *Knauff*, 338 U.S. at 542; *Saavedra Bruno*, 197 F.3d at 1158-59. Plaintiffs suggest that *Arizona v. United States*, 567 U.S. 387 (2012), holds otherwise, but that case ruled only that States lack power to regulate

immigration because that power is exclusively "entrusted to * * * the Federal Government," *id.* at 409, *not* that the President lacks power to exclude aliens absent congressional authorization. More fundamentally, the question here is not whether the Executive Branch must comply with congressional legislation concerning the exclusion of aliens, but whether any alleged statutory violation should be redressed through the courts rather than the political process. Plaintiffs' answer—that the judiciary must safeguard congressional primacy—fails to explain why courts may review the President's broad policy decisions *but not* the decisions of thousands of consular officers even if they were to allegedly engage in "brazen * * * statutory violation[s]." Br. 16. The government's answer, by contrast, is both coherent and consistent with precedent: neither statutory challenge is reviewable because disputes over the exclusion of aliens abroad are for the political branches to resolve *unless* Congress expressly provides for judicial review.

**B.** Plaintiffs fail to cite a single case prior to this litigation and the related *IRAP* litigation where a court has held that judicial review is available without express congressional authorization of a statutory claim seeking to order the Executive to allow the entry of an alien abroad. Each case on which plaintiffs rely (Br. 15-16) is readily distinguishable.

*Sale v. Haitian Centers Council, Inc.*, 509 U.S. 155, 170-88 (1993), denied relief on the merits and did not address reviewability. Plaintiffs emphasize that the

parties briefed the issue, Br. 16 n.4, but the Court did not reach it and could have decided it was unnecessary to do so given that the Court agreed with the government on the merits. Gov't Br. 22. *Knauff* also ruled on the merits of a statutory challenge, but the alien was detained at Ellis Island and thus Congress had expressly authorized habeas corpus review. 338 U.S. at 539-40. As for *Washington v. Trump*, 847 F.3d 1151, 1161 (9th Cir. 2017), it involved review of constitutional claims, not statutory claims. Gov't Br. 21-22.

**C.** Plaintiffs also erroneously argue (Br. 16-19) that Congress has authorized judicial review under the Administrative Procedure Act (APA).

First, the APA does not apply where a statute "preclude[s] judicial review" or the agency's action is otherwise nonreviewable. *See* 5 U.S.C. §§ 701(a)(1), 702(1). As the government showed in its opening brief (at 18-23), those exemptions apply here, given the principle of nonreviewability of the exclusion of aliens abroad. Plaintiffs offer no response to that showing, nor to the government's related demonstration (at 19) that Congress expressly abrogated APA review even for aliens physically present in the United States at the border.

Second, plaintiffs have no statutory right concerning the entry of third-party aliens abroad that can be enforced under the APA. Although Plaintiffs invoke *Legal Assistance for Vietnamese Asylum Seekers v. Department of State*, 45 F.3d 469, 471-72 (D.C. Cir. 1995), that vacated decision cannot be reconciled with the D.C.

Circuit's subsequent decision in *Saavedra Bruno*. Gov't Br. 25-26. Plaintiffs assert (Br. 18-19) that *Saavedra Bruno* is distinguishable because the U.S. plaintiff there was an employer, but this is an immaterial distinction: *Saavedra Bruno* did not suggest, and the INA and its implementing regulations do not provide, that a U.S. relative, university, or membership organization has any right to seek judicial review of a visa denial, let alone a greater right than an employer that sponsored an alien's work visa petition. Gov't Br. 25-26.

Third, there is neither final agency action nor a ripe claim to review under the APA. Although plaintiffs emphasize (Br. 17) that Presidential decisions can be challenged through actions of subordinate officials, they have not overcome the government's showing that there is no final action to challenge because no alien with whom they have a bona fide connection has been excluded by virtue of the Proclamation. Gov't Br. 23-25. Plaintiffs rely (Br. 18) on *U.S. Army Corps of Engineers v. Hawkes Co.*, 136 S. Ct. 1807 (2016), but there, the agency's final determination that property contained "waters of the United States" required the property owner to obtain a costly permit or risk "significant criminal and civil penalties." *Id.* at 1813-15. The Proclamation does not adversely affect any alien unless and until the alien is found otherwise eligible for entry and is denied a waiver.

Plaintiffs cannot overcome this obstacle by objecting to the waiver process itself. Regardless of the alleged stringency of the waiver standard (Br. 14), no alien

with whom a plaintiff has a relationship has yet been denied a waiver. Nor can plaintiffs contend that the mere need for a waiver denies plaintiffs "equal treatment" through the "imposition of [a] barrier" that is allegedly discriminatory (Br. 14): plaintiffs themselves are not subject to the Proclamation, and the aliens who are have no constitutional or statutory rights.

**D.** Finally, plaintiffs cannot evade these justiciability problems by invoking (Br. 14, 17) the Court's inherent equitable authority. The APA governs suits challenging government action, 5 U.S.C. § 703, and in any event *Armstrong v. Exceptional Child Center, Inc.*, 135 S. Ct. 1378, 1385 (2015), makes clear that equitable authority is constrained by "express and implied statutory limitations" on review.

## II. Plaintiffs' INA Claims Are Not Likely To Succeed On The Merits

As the government's opening brief described (at 7-10), the Proclamation is the result of a months-long worldwide review and process of diplomatic engagement, which culminated in a recommendation from the Acting Secretary of Homeland Security. The President acted in accordance with that recommendation in adopting tailored substantive restrictions designed to encourage improvement by eight countries with inadequate information-sharing practices or other risk factors, and to protect this Nation unless and until they do so. In light of these critical features, plaintiffs err in arguing both that the Proclamation exceeds the President's

authority under 8 U.S.C. §§ 1182(f) and 1185(a)(1), and that it violates the prohibition in 8 U.S.C. § 1152(a)(1)(A) on nationality-based discrimination in the issuance of immigrant visas.

### A. The Proclamation Falls Squarely Within The President's Broad Authority Under Sections 1182(f) And 1185(a)(1)

**1.** As a threshold matter, plaintiffs err in arguing (Br. 22-25) that Section 1182(f)'s requirement that the President must "find[]" that the aliens' entry "would be detrimental to the interests of the United States" empowers a court to review whether the President's findings are *adequately supported*. Even apart from the principle of nonreviewability, and the absence of any "finding" requirement in Section 1185(a)(1), judicial review of the basis of the President's Section 1182(f) finding would be contrary to statutory text and judicial precedent.

If plaintiffs were correct that Congress had intended for courts to second-guess the sufficiency of the President's determination, Congress would have authorized the President to exclude aliens *only* when their entry in fact "would be detrimental," not whenever he "*finds*" that their entry "would be detrimental." 8 U.S.C. § 1182(f) (emphasis added). Plaintiffs identify no reason (Br. 22) for Congress to include *any additional verb* like "finds" in Section 1182(f) other than to commit the determination of whether the aliens' entry "would be detrimental to the interests of the United States" to the President's judgment and discretion—so long as he makes the requisite finding, as he plainly did here. *See infra* pp. 16-20.

Plaintiffs also fail to distinguish *Webster v. Doe*, 486 U.S. 592 (1988), where the Supreme Court held that judicial review was foreclosed because the statute authorized termination of a CIA employee "whenever the Director 'shall *deem* such termination necessary or advisable in the interests of the United States.'" *Id.* at 600. Plaintiffs contend (Br. 23) that the key to *Doe* was that the statute used the verb "deem" rather than "find," but what the Court emphasized was that the statute included an additional verb and did "not simply [say] when the dismissal *is* necessary." *Doe*, 486 U.S. at 600. Similarly, plaintiffs assert (Br. 22) that the legislative history of Section 1182(f)'s predecessor statute suggests that the use of "find" rather than "deem" was intended to require a factual determination by the President, but that does not further imply an intent to make the President's factual determination judicially reviewable: again, if that were the goal, Congress would not have said either "deem" *or* "find."

In any event, where the President has made the requisite finding that aliens' entry would be detrimental within the meaning of Section 1182(f), even plaintiffs acknowledge (Br. 22) that judicial review should be limited to determining whether there is a "rational connection" between the harm to the national interest and the entry restrictions imposed. Plaintiffs lose under that standard, because the Proclamation is plainly rational. *See IRAP v. Trump*, No. TDC-17-0361, 2017 WL 4674314, at *23 (D. Md. Oct. 17, 2017). As we demonstrate below, plaintiffs'

contrary conclusion rests on an improperly heightened level of scrutiny and an unduly narrow interpretation of the harms to the national interest that the President may address.

**2.** Although plaintiffs initially argue (Br. 25-28) that the President's findings are inadequate to rationally support the Proclamation's entry restrictions, they ultimately admit (Br. 28) that their conclusion depends on the critical premise that Section 1182(f) does not authorize the President to find that allowing the continued entry of a particular country's nationals "would be detrimental to the interests of the United States" due to *that country's detrimental practices* towards the United States (rather than the individual nationals' own conduct). That premise finds no support in the statutory text or its historical application, and thus plaintiffs' conclusion that the President's findings are inadequate does not follow.

**a.** Starting with the text, plaintiffs simply ignore that, where a foreign country is engaged in harmful practices concerning this Nation, continuing to allow that country's nationals to enter can rationally be found to be "detrimental to the interests of the United States" due to the insufficient response to and deterrence of that country's harmful practices. This is especially true where the country's harmful conduct itself concerns the risk to the United States posed by entry of its nationals—here, the covered countries' inadequate information-sharing practices and other risk factors concerning the threat posed by their nationals to the security of our Nation.

Turning to historical practice, plaintiffs' position is irreconcilable with President Carter's Iran order and President Reagan's Cuba order. As this Court has recognized, those orders were directed at deterring certain harmful practices of the foreign nations (Iran's inadequate response to the hostage crisis at the American embassy, and Cuba's breach of an agreement to accept the return of certain nationals), and the practices had *nothing to do* with the harm posed by the particular nationals whose entry was suspended. *Hawaii v. Trump*, 859 F.3d 741, 772 n.13 (9th Cir. 2017); *see* Gov't Br. 46. Plaintiffs do not deny this for President Reagan's Cuban entry restrictions, Br. 40-41, and they dispute it for President Carter's Iran order only in the trivial sense that President Carter did not himself suspend entry but instead delegated authority to suspend entry to lower Executive Branch officials, Br. 25 n.9, 41 n.16; *see* Gov't Br. 46.

Plaintiffs primarily respond to these historical examples by proposing an ad hoc and atextual exception to their position, limited to aliens whose entry "threaten[s] congressional policy when Congress could not practicably act." Br. 29, 40. But that is a baseless limitation on the circumstances where the President can exclude aliens based on harms posed by their country and its practices. *See also infra* pp. 16-20.

**b.** Once plaintiffs' artificial limitation on Sections 1182(f) and 1185(a)(1) is set aside, it is clear that their challenges to the adequacy of the Proclamation's findings are flawed.

First, plaintiffs erroneously argue (Br. 25-26) that, because Congress already generally requires individualized screening of visa applicants, the President could not impose additional restrictions on nationals of countries with information-sharing inadequacies, and other risk factors, that undermine the reliability of that screening process. There is no reason that Congress would have wanted to foreclose Presidential action and depend solely on the ability of individual consular officers to repeatedly recognize the problem of inadequate information-sharing by those foreign governments, because a systemic problem warrants a systemic solution. That is especially true since such solutions are more likely to induce improvements by the foreign country.

Second, plaintiffs incorrectly assert (Br. 26) that the Proclamation's distinctions between immigrant and nonimmigrant visas "contradict[] [its] stated rationale," when those distinctions in fact reflect the Proclamation's careful tailoring. On the one hand, immigrant visas have been suspended for all but one of the countries with inadequate information-sharing practices or other risk factors because the greater difficulty of removing immigrants compared to nonimmigrants "heightens the costs and dangers of errors associated with admitting such

individuals." Procl. § 1(h)(ii). On the other hand, nonimmigrant visas have been suspended entirely only for the most recalcitrant countries because more cooperative countries warrant a less-restrictive sanction of only certain categories of nonimmigrant visas. *Id.* § 1(h)(iii).

Third, plaintiffs do not even contest that the Proclamation provides rational explanations for its differential treatment of nationals of Venezuela, Iraq, and Somalia, instead impugning those explanations as "*ad hoc* and highly subjective." Br. 27. But this merely underscores that courts are "ill equipped to determine the[] authenticity and utterly unable to assess the[] adequacy" of the Executive's reasons for excluding particular foreign nationals. *Reno v. American-Arab Anti-Discrimination Comm.*, 525 U.S. 471, 491 (1999).

Finally, plaintiffs are wrong (Br. 27-28) that the Proclamation is "substantially overbroad" simply because it extends to some aliens who may be unlikely to pose national-security threats that implicate their countries' inadequate information-sharing practices. In addition to ignoring the Proclamation's waiver process, this objection cannot be reconciled with the President's undisputed ability to suspend the entry of aliens based on harms posed by their countries rather than individual aliens themselves, as in President Carter's Iran order and President Reagan's Cuba order.

**3.** As noted, plaintiffs argue that Section 1182(f)'s "detrimental to the interests of the United States" standard is satisfied "only if (1) the aliens *themselves*

pose a threat to national security (such as spies, saboteurs, or war criminals), or (2) admitting the aliens more broadly threatens congressional policy when Congress cannot practicably act." Br. 29; *see also id.* at 30-47. Doubtless recognizing that this peculiar standard cannot be derived from the statute's text, *see supra* pp. 12-14, plaintiffs instead argue that statutory context and constitutional concerns require adoption of their narrowing construction. That is incorrect, and in any event the Proclamation is materially indistinguishable from the Cuban and Iranian entry suspensions that plaintiffs say satisfy their standard.

**a.** Plaintiffs argue (Br. 33-39) that, when Section 1182(f) was enacted in 1952, the phrase "interests of the United States" had a restrictive meaning in light of pre-existing related statutes and administrative practice. But that statutory language generally confers broad discretion rather than constrains it, *see, e.g.*, *Doe*, 486 U.S. at 600; *Crosby v. National Foreign Trade Council*, 530 U.S. 363, 369-70 (2000), and nothing about Section 1182(f)'s history suggests otherwise.

Plaintiffs rely on a 1918 statute, Br. 34, but it authorized restrictions only "when * * * the President shall find that the public safety requires." Act of May 22, 1918, ch. 81, 40 Stat. 559. In amending that statute in 1941 to add the phrase "interests of the United States," Congress broadened this statutory authority. Act of June 21, 1941, ch. 210, 55 Stat. 252. Plaintiffs note (Br. 35) that Presidents Roosevelt and Truman exercised that authority during World War II to target spies,

saboteurs, and other aliens whose entry undermined the war effort, but they cite no evidence that those Presidents understood those applications to be the only permissible uses. Nor does the selective and cherry-picked legislative history that plaintiffs invoke, Br. 39 & n.15, support their construction.

In any event, as plaintiffs acknowledge (Br. 36-37), the 1941 law was not the predecessor of Section 1182(f), but of Section 1185(a)(1). Both the fact that Congress enacted Section 1182(f) *in addition* to what became Section 1185(a)(1), Pub. L. No. 82-414, § 212(e), 66 Stat. 188 (1952), and that Congress employed different language, confirm that Section 1182(f) was meant to confer a different power. Moreover, Congress in 1978 eliminated restrictions confining Section 1185(a)(1) to times of war and national emergency, Pub. L. No. 95-426, § 707(a), 92 Stat. 992-993—thus rejecting the limitations on Section 1185(a)(1) that plaintiffs wrongly try to impose on the unqualified text of Sections 1182(f) and 1185(a)(1).

**b.** Plaintiffs also argue that their narrowing construction is necessary in light of nondelegation concerns and separation-of-powers concerns. Br. 29-32, 41-45. Plaintiffs' concerns are misplaced.

First, the Proclamation's entry restrictions are based on the President's determination that they are needed to encourage countries with inadequate information-sharing practices or other risk factors to improve their practices, while protecting the Nation from those risks in the interim. In exercising his statutory

authority under Sections 1182(f) and 1185(a)(1), the President was also implementing his "unique responsibility" over "foreign * * * affairs," *Sale*, 509 U.S. at 188, and his "inherent executive power" concerning the "admissibility of aliens," *Knauff*, 338 U.S. at 542 (rejecting similar non-delegation argument). Whatever the outer bounds of the President's authority to exclude aliens abroad, such national-security and foreign-policy concerns are within the core of the President's power.

Second, far from "evad[ing]" or "eras[ing]" the INA's restrictions (Br. 41, 43), the President is exercising authority under Sections 1182(f) and 1185(a)(1) that Congress itself expressly granted him to impose additional limitations beyond the inadmissibility grounds in Section 1182(a). For example, in *Abourezk v. Reagan*, 785 F.2d 1043 (D.C. Cir. 1986), and *Allende v. Shultz*, 845 F.2d 1111 (1st Cir. 1988), the courts held that a certain ground for visa ineligibility under Section 1182(a) required particular harm from aliens' *activities* in the United States rather than from their *mere entry* alone, but also held that the President nevertheless could rely on the entry-based harms to deny entry under Section 1182(f). *Abourezk*, 785 F.2d at 1049 n.2, 1053-60; *Allende*, 845 F.2d at 1116-18, 1118-19 & n.13. So too here: although Congress has not mandated the inadmissibility of aliens whose countries have inadequate information-sharing practices or the other risk factors invoked in the Proclamation, it has authorized the President to find, as he has, that it would be

detrimental to the interests of the United States to continue to allow the entry of certain aliens from such countries.

**c.** In all events, President Reagan's Cuba order and President Carter's Iran order—which are the historical bases for plaintiffs' acknowledgment that the President may exclude "aliens whose entry threaten[s] congressional policy when Congress could not practicably act," *see* Br. 40-41, 41 n.16—cannot be meaningfully distinguished from the Proclamation.

Plaintiffs contend that those orders concerned "exigenc[ies]" to which Congress could not "swiftly" respond, Br. 45-46, but that distinction is illusory. President Reagan's order was issued roughly 15 months after Cuba breached the diplomatic agreement at issue, 51 Fed. Reg. 30,470, 30,471 (1986), and the implementation of President Carter's order was issued more than five months after the hostages were seized and legislation cutting off certain foreign aid to Iran was enacted, http://www.presidency.ucsb.edu/ws/?pid=33233; Pub. L. No. 96-123, § 101(a)(1), 93 Stat. 923 (1979). Plaintiffs provide no principled and judicially administrable basis for why the President here nevertheless must wait for Congress to act against the countries identified as problematic in the multi-agency review and recommendation process.

Nor are plaintiffs correct that the Proclamation "subverts congressional policy." Br. 46. Plaintiffs' emphasis on the terrorism-related inadmissibility

grounds and the individualized screening process for visa applicants again ignores that Congress has authorized the President to adopt *supplemental* entry restrictions when he finds that the national interest so warrants. *See supra* pp. 12-14, 16-17. Plaintiffs' reliance on the Visa Waiver Program (VWP) is likewise mistaken: for the specific purpose of the VWP's facilitation of travel, Congress has excluded a country if it fails any one of several criteria, *see* 8 U.S.C. § 1187(c), but Congress has not foreclosed the President from addressing the separate issue of what to do about a country that fails so many criteria that its information-sharing practices and other risk factors are collectively inadequate; similarly, although the 2015 amendments to the VWP addressed the particular problem of aliens who are either dual nationals of, or had traveled to, certain countries that posed heightened terrorism concerns yet could travel without a visa on their VWP-country passport, Congress did not foreclose the President from addressing the distinct problem of nationals traveling on passports from countries that have inadequate information-sharing practices or present other risk factors. *See IRAP*, 2017 WL 4674314, at *26.

### B. The Proclamation Does Not Violate Section 1152(a)(1)(A)

Plaintiffs do not meaningfully dispute that Section 1152(a)(1)(A)'s nationality-discrimination ban is addressed to *the issuance of visas* to otherwise-eligible aliens *by consular officers and other government officials*, whereas Sections 1182(f) and 1185(a)(1) address the *President's authority* to deem aliens *ineligible to*

*enter* based on the national interest. That is fatal to plaintiffs' statutory challenge given the judicial obligation to read the statutes in harmony rather than in conflict.

To be sure, plaintiffs assert that the ban on nationality-discrimination in the issuance of immigrant visas would be rendered a "nullity" if nationality could be used as a basis to suspend entry, Br. 50, because "the only purpose of a visa is to enable entry," Br. 49. But this overlooks the obvious difference between Congress's constraining the ability of inferior Executive Branch officers to allocate immigrant visas among the set of aliens that Congress and the President allow to enter the country, and Congress's constraining the President's ability to exclude aliens from entering based on national-security and foreign-policy concerns about their countries. *See* Gov't Br. 43-45. The latter would raise serious separation-of-powers questions, and would necessarily imply the unlawfulness of President Reagan's order barring Cuban immigrants (with some exceptions) and President Carter's order authorizing a ban on Iranian immigrants. *See* Gov't Br. 45-48; *see also Hawaii*, 859 F.3d at 772 n.13, 778-79 (distinguishing EO-2 from "retaliatory diplomatic measures responsive to government conduct directed at the United States").

Plaintiffs try to solve this problem by arguing that Section 1152(a)(1)(A)'s ban on "discrimination" "does not extend to restrictions narrowly tailored to a compelling interest." Br. 51. But they cite no precedent for inferring a strict-scrutiny exception to *statutory* discriminatory prohibitions where Congress has not created

one. Title VII of the Civil Rights Act of 1965, for example, prohibits "discriminat[ion]" in employment based on various protected traits, but Congress expressly created a bona-fide occupational qualification exception that applies only to some traits and not others. 42 U.S.C. § 2000e-2(a)(1), (e)(1).

Furthermore, even if Sections 1182(f) and 1185(a)(1) were thought to conflict with Section 1152(a)(1)(A), the former would control. Contrary to plaintiffs' suggestion (Br. 49-50), if Section 1152(a)(1)(A) were a general ban on nationality discrimination concerning immigrant visas, it still would not supplant the more specific grants of authority in Sections 1182(f) and 1185(a)(1) for the President to restrict aliens' entry to protect the national interest, particularly in light of the serious constitutional concerns that such a construction would raise. Gov't Br. 36. Plaintiffs counter (Br. 50) that, because Section 1152(a)(1) includes several exceptions, it implicitly precludes exceptions not expressly mentioned, including Sections 1182(f) and 1185(a). But Section 1152(a)(1)'s express exceptions are demonstrably not exhaustive. For example, 8 U.S.C § 1253(d)—which requires the Secretary of State to "order consular officers" to "discontinue granting immigrant visas or nonimmigrant visas" to nationals of a country that refuses to accept return of its own nationals—is not included, yet plainly contemplates nationality-based prohibitions on granting immigrant visas.

Finally, plaintiffs' argument (Br. 52-53) that Section 1152(a)(1)(A) bars nationality discrimination in the issuance of *non*immigrant visas is flatly at odds with the statutory text. Plaintiffs' asserted reliance on "background norms" against nationality-based distinctions (Br. 53) is contradicted by the numerous nationality-based distinctions in existing immigration law, most notably the Visa Waiver program. 8 U.S.C. §§ 1182(a)(7)(B)(iv); *see, e.g.*, 8 U.S.C. §§ 1101(a)(15)(E)(iii) (E3 visas for Australian investors), 1101(a)(15)(H)(i)(b)(1) & 1184(g)(8) (H-1B1 visas for Chileans and Singaporeans); Pub. L. No. 105-100, § 202, 111 Stat. 2193, 2193-94 (1997) (adjustment of status and stay of removal for certain Nicaraguans and Cubans); 8 C.F.R. §§ 214.2(h)(5)(i)(F) (H-2A visas generally limited to nationals of countries designated by Secretary of Homeland Security); 8 C.F.R. § 214.5 (restrictions on certain Libyan nationals). Plaintiffs also erroneously conflate "nationality" with "national origin." Br. 52-53. Unlike national origin, which is an immutable characteristic, nationality is a alterable status identifying the country to which one currently "ow[es] permanent allegiance." 8 U.S.C. § 1101(a)(21). "[C]lassifications on the basis of nationality are frequently

unavoidable in immigration matters." *Rajah v. Mukasey*, 544 F.3d 427, 435 (2d Cir. 2008).[1]

## III. Plaintiffs' Establishment Clause Claim Does Not Alternatively Support The Injunction

At the outset, because the district court did not address plaintiffs' Establishment Clause challenge, this Court should decline plaintiffs' invitation to do so "*ab initio*," *Merritt v. Countrywide Financial Corp.*, 759 F.3d 1023, 1033-34 (9th Cir. 2014), especially with only minimal briefing. If the Court does consider the claim, however, it should reject it.

Plaintiffs lack standing because they are not alleging a cognizable violation of their own Establishment Clause rights. Plaintiffs assert that the Proclamation imposes "stigmati[c]" injuries by "denigrating Muslims," Br. 20, but that is insufficient absent personal contact with the alleged Establishment Clause violation. *See Catholic League v. City & Cty. of S.F.*, 624 F.3d 1043, 1051 (9th Cir. 2010) (en banc); *In re Navy Chaplaincy*, 534 F.3d 756, 764 (D.C. Cir. 2008). That requirement is lacking here, because the Proclamation applies only to third-party aliens abroad (who lack constitutional rights). Plaintiffs cannot satisfy the requirement by

---

[1] Neither *Wong Wing Hang v. INS*, 360 F.2d 715, 718-19 (2d Cir. 1966), nor *Olsen v. Albright*, 990 F. Supp. 31, 38-39 (D.D.C. 1997), held that 1152(a)(1)(A) bans nationality discrimination for nonimmigrant visas, and any suggestion that nationality discrimination was otherwise banned reflects an erroneous conflation with national-origin discrimination.

asserting that the Proclamation "separate[s] [them] from their relatives and associates abroad," Br. 20, because indirect injury-in-fact resulting from discrimination against third parties is not sufficient. For example, in *McGowan v. Maryland*, 366 U.S. 420 (1961), plaintiffs, employees of a store subject to a Sunday-closing law, lacked standing to challenge the law on free-exercise grounds because they "d[id] not allege any infringement of their own religious freedoms," *id.* at 429, and had standing to bring an Establishment Clause challenge *only* because they suffered "direct * * * injury, allegedly due to the [law's] imposition on them of the tenets of the Christian religion," *id.* at 430-31.

Plaintiffs' Establishment Clause challenge fares no better on the merits. The Proclamation is constitutional regardless of whether the Court applies the limited standard of review under *Kleindienst v. Mandel*, 408 U.S. 753, 770 (1972), which requires only a "facially legitimate and bona fide reason" for excluding aliens abroad where a U.S. citizen alleges his own constitutional interest in the alien's entry, or instead the primary "secular purpose" standard applied in *McCreary County v. ACLU of Kentucky*, 545 U.S. 844, 862 (2005). Any suggestion that the Proclamation was the product of bad faith or religious animus is foreclosed by both the multi-agency review and recommendation process (which involved numerous Cabinet heads and other officials whose integrity has never been questioned) and the tailored substantive restrictions (which are consistent with the expressed concern about

information-sharing practices and other risk factors and inconsistent with a purported implementation of a "Muslim ban").

Plaintiffs assert that the Proclamation "reimposes virtually the same travel restrictions as its predecessors." Br. 56. But plaintiffs fail to explain (Br. 57) why the Proclamation, if it were intended to reinstate an alleged Muslim ban, would have omitted two Muslim-majority countries (Sudan and Iraq) from the seven countries from which EO-2 or its predecessor suspended entry; exempted all or some nonimmigrant visa applicants from five of the six Muslim-majority countries covered (Somalia, Chad, Libya, Yemen, and Iran); and added two non-Muslim-majority countries and only one (barely) Muslim-majority country (Venezuela, North Korea, and Chad). Nor is it surprising or pernicious that the Proclamation covered many of the countries included in EO-2 and its predecessor: five of those countries (Iran, Libya, Somalia, Syria, and Yemen) were previously identified by Congress or the Executive Branch as posing heightened terrorism-related concerns based on criteria that the agencies likewise deemed relevant to their review and recommendation. *Compare* 8 U.S.C. § 1187(a)(3), (a)(12), (c)(2), *with* Procl. § 1(c).

Contrary to plaintiffs' suggestion (Br. 57), the changes in entry restrictions from EO-2 to the Proclamation are nothing like the succession of facially religious displays in *McCreary*, all of which lacked a secular purpose and the last of which was even more explicitly religious than its predecessors. 545 U.S. at 871. Even if

the Court were to conclude that EO-2 had an improper religious purpose, the changes in the Proclamation are analogous to the changes to the Sunday closing law in *McGowan*, where the Supreme Court held that more recent secular exemptions were sufficient to establish that the law no longer was motivated by its original purpose of observing the Sabbath. 366 U.S. at 445.

Finally, plaintiffs invoke various statements the President has made about the Proclamation and its predecessors, as well as his failure to renounce the anti-Muslim interpretation of those statements that plaintiffs impute to them. Br. 55-56. Those statements, however, primarily reflect an intent to protect the United States from the threat of terrorism by nationals from countries that pose heightened risks, and in any event cannot disable the President from enacting the Proclamation's religion-neutral restrictions in accordance with the national-security and foreign-policy recommendations of Cabinet members whose motives have never been questioned.

## IV. The Balance Of Equities Weighs Strongly Against An Injunction

Faced with the government's compelling national-security and foreign-policy interests (Gov't Br. 50-51), plaintiffs object that those interests are "amorphous" and "insufficient," Br. 59, but that simply repeats their failure to acknowledge why the President could rationally find that it is detrimental to the national interest to continue to allow the entry of aliens whose countries have been determined to have inadequate information-sharing practices or other risk factors. *See supra* pp. 12-14.

Likewise, plaintiffs emphasize that former national-security officials do not perceive "any exigency" that requires the Proclamation's change from "the status quo," Br. 59, but those officials were not part of the review and recommendation process that led to the Proclamation. Conversely, even apart from plaintiffs' failure to identify any cognizable injury, they fail to show why their speculative concern about a temporary delay in entry for aliens with whom they have a cognizable relationship imposes ripe harm on plaintiffs that is both irreparable and sufficiently substantial to outweigh the government's national-security and foreign-policy interests. Br. 58; Gov't Br. 51-52.

At a minimum, plaintiffs fail to defend the worldwide injunction. Notwithstanding the government's showing (at 52-53) that both Article III and equitable principles require that injunctive relief be limited to redressing plaintiffs' own injuries, plaintiffs insist (Br. 60) that a facially invalid law must be facially enjoined, continuing to conflate the scope of their merits theory with the scope of appropriate relief. Nor do plaintiffs identify any valid "constitutional [or] statutory" basis (Br. 60) for exempting immigration injunctions from the bedrock requirements of Article III and equity, especially where, as here, the immigration enactment at issue contains a severability clause (Procl. § 8).

Plaintiffs also complain that it is "wholly impracticable" to "identif[y] [the] individual alien[s] abroad" from whom they have been separated due to the

Proclamation, Br. 61, but that simply underscores why plaintiffs' injuries are not ripe unless and until identified aliens with whom they have cognizable relationships are found otherwise eligible for visas but denied waivers. *A fortiori*, the injunction should be vacated to the extent it reaches aliens with no credible claim to a bona fide relationship with a U.S. person or entity. *See Trump v. IRAP*, 137 S. Ct. 2080, 2087 (2017) (per curiam). Indeed, plaintiffs do not meaningfully argue otherwise, Br. 61 n.21, and this Court has already stayed the injunction in this respect.

## CONCLUSION

For these reasons, and those stated in the government's opening brief, the district court's preliminary injunction should be vacated, either in whole or at least as to all aliens except those whose exclusion would impose a cognizable, irreparable injury on plaintiffs. At an absolute minimum, the injunction should be vacated as to aliens who lack a credible claim to a bona fide relationship with an individual or entity in the United States.

Respectfully submitted,

NOEL J. FRANCISCO
*Solicitor General*

JEFFREY B. WALL
EDWIN S. KNEEDLER
*Deputy Solicitors General*

CHAD A. READLER
*Principal Deputy Assistant Attorney General*

HASHIM M. MOOPPAN
*Deputy Assistant Attorney General*

/s/ Sharon Swingle
SHARON SWINGLE
H. THOMAS BYRON III
LOWELL V. STURGILL JR.
*Attorneys, Appellate Staff*
*Civil Division, Room 7241*
*U.S. Department of Justice*
*950 Pennsylvania Avenue NW*
*Washington, DC 20530*
*(202) 353-2689*

NOVEMBER 2017

## CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-face requirements of Federal Rule of Appellate Procedure 32(a)(5) and the type-volume limitations of Rule 32(a)(7)(B). The brief contains 6,485 words, excluding the parts of the brief excluded by Fed. R. App. P. 32(f).

/s/ Sharon Swingle
Sharon Swingle

**CERTIFICATE OF SERVICE**

I hereby certify that on November 29, 2017, I electronically filed the foregoing brief with the Clerk of the Court for the United States Court of Appeals for the Ninth Circuit by using the appellate CM/ECF system. Participants in the case are registered CM/ECF users, and service will be accomplished by the appellate CM/ECF system.

/s/ Sharon Swingle
Sharon Swingle